## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

FLORIDA RIGHTS RESTORATION COALITION,
RHOSHANDA JONES, ANGEL SANCHEZ, AUTUMN
WAITE, and BRANDON WALTHOUR,

*Plaintiffs,*

v.

RONALD DESANTIS, in his official capacity as
Governor of Florida; CORD BYRD, in his official
capacity as Florida Secretary of State; RICKY D.
DIXON, in his official capacity as Secretary of the
Florida Department of Corrections; MELINDA N.
COONROD, in her official capacity as Commissioner of
the Florida Commission on Offender Review; RICHARD
D. DAVISON, in his official capacity as Commissioner
of the Florida Commission on Offender Review; DAVID
A. WYANT, in his official capacity as Commissioner of
the Florida Commission on Offender Review; MARK
GLASS, in his official capacity as the Commissioner of
the Florida Department of Law Enforcement;

Each of the following Supervisors of Elections in his or
her official capacity: KIM BARTON, as Supervisor of
Elections for Alachua County; CHRIS MILTON, as
Supervisor of Elections for Baker County; MARK
ANDERSEN, as Supervisor of Elections for Bay County;
AMANDA SEYFANG, as Supervisor of Elections for
Bradford County; TIM BOBANIC, as Supervisor of
Elections for Brevard County; JOE SCOTT, as
Supervisor of Elections for Broward County; SHARON
CHASON, as Supervisor of Elections for Calhoun
County; LEAH VALENTI, as Supervisor of Elections for
Charlotte County; MAUREEN BAIRD, as Supervisor of
Elections for Citrus County; CHRIS H. CHAMBLESS, as
Supervisor of Elections for Clay County; MELISSA
BLAZIER, as Supervisor of Elections for Collier County;
TOMI S. BROWN, as Supervisor of Elections for
Columbia County; MARK NEGLEY, as Supervisor of
Elections for DeSoto County; STARLET CANNON, as
Supervisor of Elections for Dixie County; MIKE
HOGAN, as Supervisor of Elections for Duval County;
DAVID H. STAFFORD, as Supervisor of Elections for
Escambia County; KAITLYN LENHART, as Supervisor
of Elections for Flagler County; HEATHER RILEY, as

Case No. _____

Supervisor of Elections for Franklin County; SHIRLEY
KNIGHT, as Supervisor of Elections for Gadsden
County; CONNIE SANCHEZ, as Supervisor of Elections
for Gilchrist County; ALETRIS FARNAM, as Supervisor
of Elections for Glades County; JOHN HANLON, as
Supervisor of Elections for Gulf County; LAURA
HUTTO, as Supervisor of Elections for Hamilton County;
DIANE SMITH, as Supervisor of Elections for Hardee
County; Brenda Hoots, as Supervisor of Elections for
Hendry County; SHIRLEY ANDERSON, as Supervisor
of Elections for Hernando County; KAREN HEALY, as
Supervisor of Elections for Highlands County; CRAIG
LATIMER, as Supervisor of Elections for Hillsborough
County; THERISA MEADOWS, as Supervisor of
Elections for Holmes County; LESLIE R. SWAN, as
Supervisor of Elections for Indian River County; CAROL
A. DUNAWAY, as Supervisor of Elections for Jackson
County; MICHELLE MILLIGAN, as Supervisor of
Elections for Jefferson County; TRAVIS HART, as
Supervisor of Elections for Lafayette County; ALAN
HAYS, as Supervisor of Elections for Lake County;
Tommy Doyle, as Supervisor of Elections for Lee
County; MARK EARLEY, as Supervisor of Elections for
Leon County; TAMMY JONES, as Supervisor of
Elections for Levy County; GRANT CONYERS, as
Supervisor of Elections for Liberty County; HEATH
DRIGGERS, as Supervisor of Elections for Madison
County; MICHAEL BENNETT, as Supervisor of
Elections for Manatee County; WESLEY WILCOX, as
Supervisor of Elections for Marion County; VICKI
DAVIS, as Supervisor of Elections for Martin County;
CHRISTINA WHITE, as Supervisor of Elections for
Miami-Dade County; JOYCE GRIFFIN, as Supervisor of
Elections for Monroe County; JANET H. ADKINS, as
Supervisor of Elections for Nassau County; PAUL A.
LUX, as Supervisor of Elections for Okaloosa County;
MELISSA ARNOLD, as Supervisor of Elections for
Okeechobee County; BILL COWLES, as Supervisor of
Elections for Orange County; MARY JANE
ARRINGTON, as Supervisor of Elections for Osceola
County; WENDY LINK, as Supervisor of Elections for
Palm Beach County; BRIAN CORLEY, as Supervisor of
Elections for Pasco County; JULIE MARCUS, as
Supervisor of Elections for Pinellas County; LORI
EDWARDS, as Supervisor of Elections for Polk County;
CHARLES OVERTURF, as Supervisor of Elections for

Putnam County; TAPPIE VILLANE, as Supervisor of
Elections for Santa Rosa County; RON TURNER, as
Supervisor of Elections for Sarasota County;
CHRISTOPHER ANDERSON, as Supervisor of
Elections for Seminole County; VICKY OAKES, as
Supervisor of Elections for St. Johns County;
GERTRUDE WALKER, as Supervisor of Elections for
St. Lucie County; WILLIAM KEEN, as Supervisor of
Elections for Sumter County; JENNIFER KINSEY, as
Supervisor of Elections for Suwannee County; DANA
SOUTHERLAND, as Supervisor of Elections for Taylor
County; DEBORAH OSBORNE, as Supervisor of
Elections for Union County; LISA LEWIS, as Supervisor
of Elections for Volusia County; JOSEPH R. MORGAN,
as Supervisor of Elections for Wakulla County; RYAN
MESSER, as Supervisor of Elections for Walton County;
CAROL FINCH RUDD, as Supervisor of Elections for
Washington County;

Each of the following Clerks of Court and Comptrollers
in his or her official capacity: J.K. IRBY, as Clerk of the
Court and Comptroller of Alachua County; STACIE D.
HARVEY, as Clerk of the Court and Comptroller of
Baker County; BILL KINSAUL, as Clerk of the Court
and Comptroller of Bay County; DENNY THOMPSON,
as Clerk of the Court and Comptroller of Bradford
County; RACHEL SADOFF, as Clerk of the Court and
Comptroller of Brevard County; BRENDA D. FORMAN,
as Clerk of the Court of Broward County; CARLA
HAND, as Clerk of the Court and Comptroller of Calhoun
County; ROGER D. EATON, as Clerk of the Court and
Comptroller of Charlotte County; ANGELA VICK, as
Clerk of the Court and Comptroller of Citrus County;
TARA S. GREEN, as Clerk of the Court and Comptroller
of Clay County; CRYSTAL K. KINZEL, as Clerk of the
Court and Comptroller of Collier County; JAMES M.
SWISHER, JR., as Clerk of the Court and Comptroller of
Columbia County; NADIA K. DAUGHTREY, as Clerk
of the Court of DeSoto County; BARBIE
HIGGINBOTHAM, as Clerk of the Court and
Comptroller of Dixie County; JODY PHILLIPS, as Clerk
of the Court of Duval County; PAMELA CHILDERS, as
Clerk of the Court and Comptroller of Escambia County;
TOM W. BEXLEY, as Clerk of the Court and
Comptroller of Flagler County; MICHELE MAXWELL,
as Clerk of the Court and Comptroller of Franklin

County; NICHOLAS D. THOMAS, as Clerk of the Court
and Comptroller of Gadsden County; TODD NEWTON,
as Clerk of the Court and Comptroller of Gilchrist
County; TAMI PEARCE SIMMONS, as Clerk of the
Court and Comptroller of Glades County; REBECCA
NORRIS, as Clerk of the Court and Comptroller of Gulf
County; W. GREG GODWIN, as Clerk of the Court and
Comptroller of Hamilton County; VICTORIA L.
ROGERS, as Clerk of the Court and Comptroller of
Hardee County; KIMBERLEY R. BARRINEAU, as
Clerk of the Court and Comptroller of Hendry County;
DOUG CHORVAT JR., as Clerk of the Court and
Comptroller of Hernando County; JEROME
KASZUBOWSKI, as Clerk of the Court and Comptroller
of Highlands County; CINDY STUART, as Clerk of the
Court and Comptroller of Hillsborough County; SAM
BAILEY, as Clerk of the Court and Comptroller of
Holmes County; JEFFREY R. SMITH, as Clerk of the
Court and Comptroller of Indian River County;
CLAYTON O. ROOKS, III, as Clerk of the Court and
Comptroller of Jackson County; KIRK REAMS, as Clerk
of the Court and Comptroller of Jefferson County;
STEVE LAND, as Clerk of the Court and Comptroller of
Lafayette County; GARY J. COONEY, as Clerk of the
Court and Comptroller of Lake County; KEVIN
KARNES, as Clerk of the Court and Comptroller of Lee
County; GWENDOLYN MARSHALL KNIGHT, as
Clerk of the Court and Comptroller of Leon County;
DANNY J. SHIPP, as Clerk of the Court and Comptroller
of Levy County; DANIEL STANLEY, as Clerk of the
Court and Comptroller of Liberty County; BILLY
WASHINGTON, as Clerk of the Court and Comptroller
of Madison County; ANGELINA COLONNESO, as
Clerk of the Court and Comptroller of Manatee County;
GREGORY C. HARRELL, as Clerk of the Court and
Comptroller of Marion County; CAROLYN TIMMANN,
as Clerk of the Court and Comptroller of Martin County;
JUAN FERNANDEZ-BARQUIN, as Clerk of the Court
and Comptroller of Miami-Dade County; KEVIN
MADOK, as Clerk of the Court and Comptroller of
Monroe County; JOHN A. CRAWFORD, as Clerk of the
Court and Comptroller of Nassau County; J.D.
PEACOCK II, as Clerk of the Court and Comptroller of
Okaloosa County; JERALD D. BRYANT, as Clerk of the
Court and Comptroller of Okeechobee County; TIFFANY
MOORE RUSSELL, as Clerk of the Court of Orange

County; PHIL DIAMOND, as Comptroller of Orange
County; KELVIN SOTO, as Clerk of the Court and
Comptroller of Osceola County; JOSEPH ABRUZZO, as
Clerk of the Court and Comptroller of Palm Beach
County; NIKKI ALVAREZ-SOWLES, as Clerk of the
Court and Comptroller of Pasco County; KEN BURKE,
as Clerk of the Court and Comptroller of Pinellas County;
STACY M. BUTTERFIELD, as Clerk of the Court and
Comptroller of Polk County; MATT REYNOLDS, as
Clerk of the Court and Comptroller of Putnam County;
DONALD C. SPENCER, as Clerk of the Court and
Comptroller of Santa Rosa County; KAREN E.
RUSHING, as Clerk of the Court and Comptroller of
Sarasota County; GRANT MALOY, as Clerk of the
Court and Comptroller of Seminole County; BRANDON
PATTY, as Clerk of the Court and Comptroller of St.
Johns County; MICHELLE R. MILLER, as Clerk of the
Court and Comptroller of St. Lucie County; GLORIA R.
HAYWARD, as Clerk of the Court and Comptroller of
Sumter County; BARRY BAKER, as Clerk of the Court
and Comptroller of Suwannee County; GARY
KNOWLES, JR., as Clerk of the Court and Comptroller
of Taylor County; KELLIE HENDRICKS RHOADES, as
Clerk of the Court and Comptroller of Union County;
LAURA E. ROTH, as Clerk of the Court of Volusia
County; GREG JAMES, as Clerk of the Court and
Comptroller of Wakulla County; ALEX ALFORD, as
Clerk of the Court and Comptroller of Walton County;
and LORA C. BELL, as Clerk of the Court and
Comptroller of Washington County,

*Defendants*.

# INTRODUCTION

1.       In November 2018, the citizens of Florida overwhelmingly approved Amendment 4 to the Florida Constitution, which restored voting rights to Florida residents who were previously disenfranchised by Article VI of the Florida Constitution because of a prior felony conviction. Prior to Amendment 4, Florida was one of just three states in the nation that permanently disenfranchised people with prior felony convictions.[1]   The passage of Amendment 4, now codified in Article VI, Section 4(a) of the Florida Constitution, brought Florida into the mainstream on this issue, where it joins nearly every other state and the District of Columbia in permitting some or all individuals previously convicted of felonies to exercise the right to vote.[2]

2.       More than 65% of Florida voters approved Amendment 4.  At the time it was passed, it was estimated that more than 1.4 million Floridians — almost 7% of the state's population — would have their rights restored and be able to participate in future elections.[3]  As such, it was hailed as one of the greatest victories for the right to vote since the passage of the Voting Rights Act of 1965.  Indeed, it enfranchised the largest number of voters since the U.S. Constitution was amended to lower the voting age to 18 in 1971.[4]

3.       As detailed herein, the State of Florida has failed to realize the promise of Amendment 4.  Since the Amendment was passed in 2018, the Defendants have created and perpetuated a bureaucratic morass that prevents people with prior felony convictions from voting,

---

[1] Erika L. Wood, *Florida: An Outlier in Denying Voting Rights*, Brennan Center for Justice, 3 (Dec. 16, 2016), https://www.brennancenter.org/our-work/research-reports/florida-outlier-denying-voting-rights.

[2] *See id.*; *see also Felon Voting Rights*, National Conference of State Legislatures, https://www.ncsl.org/elections-and-campaigns/felon-voting-rights (last updated April 6, 2023).

[3] Christopher Uggen, *6 Million Lost Voters: State-Level Estimates of Felony Disenfranchisement*, The Sentencing Project (2016), https://www.sentencingproject.org/app/uploads/2022/08/6-Million-Lost-Voters.pdf.

[4] Dexter Filkins, *Who Gets to Vote in Florida?*, New Yorker, Aug. 31, 2020, https://www.newyorker.com/magazine/2020/09/07/who-gets-to-vote-in-florida.

or even determining whether they are eligible to vote.  This is not simply the result of administrative failures or bureaucratic ineptitude.  Rather, the record reveals a years' long campaign of acts and omissions by the Defendants that have thwarted the aspirations of the citizens of Florida who enacted Amendment 4, and the aspirations of those whose rights it restored.

4.     The Defendants' conduct includes the provision of inaccurate, incomplete and misleading information to such citizens when they try to determine their eligibility to vote, and the perpetuation of a byzantine process in which, among other things, a potential voter's eligibility is often determined by local practices that vary depending on the county in which they live.  The result is confusion and uncertainty that deters them from registering to vote, as well as an unlawful system that permits or denies the fundamental right to vote based on one's geographic status within the state.

5.     To make matters worse, Defendants DeSantis, Byrd and Glass have employed an "election police" unit, formed in January 2022 at Defendant DeSantis's request, to mount an aggressive campaign to arrest people with prior felony convictions for having voted in the 2020 election, including people who apparently voted in good faith reliance on information received from the Defendant Secretary of State.  Through this campaign, the Defendants have created a climate of intimidation even among people who believe in good faith that they are eligible to vote: a fear that they may be criminally prosecuted if their belief turns out to be wrong.  This effort, coupled with the earlier-created roadblocks to registration, has turned the simple act of voting into a complicated and risky venture in the eyes of those who were re-enfranchised by Amendment 4, as well as others who have been affected by the Defendants' conduct.  As a result, Plaintiffs Rhoshanda Bryant-Jones, Angel Sanchez, Autumn Waite, and Brandon Walthour, among many other individuals, have been intimidated and made fearful of exercising their fundamental right to

vote.   Plaintiff Florida Rights Restoration Coalition, which is dedicated to ending the disenfranchisement of people with prior convictions, has also been intimidated in its efforts to aid and encourage its members, including the plaintiffs, to vote.

6.      Rather than take steps to counteract the intimidating message of these arrests, Defendant DeSantis, as head of the executive branch, has instead exacerbated that effect by declaring that the initial arrests were only the "opening salvo," and that "many more" such voting-related arrests will be made in the future.   More recently and with great public fanfare, he successfully urged the legislature to expand the jurisdiction of his new team of "election police," and has sought to dramatically increase the budget and headcount of this unit that operates under his direction.   These messages have only amplified the concerns of those who fear exercising their right to vote as a result of the Defendants' conduct.

7.      The result is a national embarrassment.   No other state in the country has so completely abdicated its responsibility to verify the voting eligibility of U.S. citizens and provide them with information about their voting eligibility on which they can rely.

8.      By way of comparison, the State of Alabama also disenfranchises U.S. citizens convicted of a wide array of felony offenses until they have completed all terms of their sentence, including outstanding fines, fees, restitution, probation, parole, and any other type of community control.[5]   But, unlike Florida, Alabama has established a centralized state data repository and unified process run by the Bureau of Parole and Pardons that advises any applicant within 44 days if the applicant is eligible to register to vote, and provides specific details explaining the basis for

---

[5] Ala. Code § 17-3-30.1 (listing the offenses under Article VIII of the Constitution of Alabama of 1901 that result in a loss of voting rights); Ala. Code §17-3-31 (establishing voting rights are restored upon the issuance of a "Certificate of Eligibility to Register to Vote" ); Ala. Code §15-22-36.1 (establishing an applicant must have completed all terms of sentence or obtained a pardon in order to obtain a Certificate of Eligibility to Register to Vote).

any denial.[6]  As part of the process, Alabama issues a voter information card to a person with a prior felony conviction once the Bureau of Parole and Pardons has confirmed that person's voting eligibility — a document upon which the voter may rely.  If Alabama can create a process to confirm the eligibility of its voters, Florida should be able to do so too.

9.     For the reasons discussed below, the Defendants, through their acts and omissions, have violated the rights of the Plaintiffs and others under the Voting Rights Act, the Equal Protection Clause of the Fourteenth Amendment, and the First Amendment of the United States Constitution.

## PARTIES

### I.     Plaintiffs

10.     Plaintiff FLORIDA RIGHTS RESTORATION COALITION ("FRRC") brings this action on behalf of itself and its members.  FRRC is a grassroots, non-profit, non-partisan membership organization incorporated in the State of Florida.  It is run by people with prior felony convictions who are dedicated to ending the disenfranchisement and discrimination against people with convictions, and creating a more comprehensive and humane reentry system that will enhance successful reentry, reduce recidivism, and increase public safety.  Its policy efforts include removing barriers to employment, housing, and opportunity; enacting reentry policies that promote community reintegration, safe neighborhoods, and personal dignity; promoting alternatives to arrest and incarceration; sentencing reform; enacting bail reform and changes to pretrial detention practices; implementing prison, jail, and supervision reforms; and ensuring full access to democracy.  As part of these efforts, FRRC championed the effort for the enactment of Amendment 4 and submitted the first draft of the initiative to the Florida Division of Elections.

---

[6] Ala. Code § 15-22-36.1.

11.     FRRC has 15,000 members and 17 chapters across the state.  FRRC has members in 63 of Florida's 67 counties, including many members whose voting rights were restored by Amendment 4 and who faced challenges registering to vote and voting after the passage of S.B. 7066, a state law intended to implement Amendment 4 which states that people with past felony convictions, prior to obtaining the right to vote under Amendment 4, must pay any "legal financial obligation" (LFO) that arises from their felony sentence (S.B. 7066 is discussed further below). These individuals include:

a.     FRRC members who were unable to determine whether they had outstanding LFOs that would prohibit the restoration of their voting rights, even after they expended hours of their time and other resources to determine their eligibility to vote.

b.     FRRC members who received inaccurate or incomplete information about their outstanding LFOs from state or local officials, and who were as a consequence dissuaded from registering or voting in recent elections.

c.     FRRC members who voted while mistakenly believing they were eligible to vote because Defendants issued them a voter information card, and now fear prosecution because of the state's inability to provide accurate information to its citizens.

d.     FRRC members who, given the uncertainties, refrained from registering to vote or voting due to a fear of making a mistake and facing possible legal action, and who were thus prevented from participating in recent elections.

e.     FRRC members who were erroneously notified that they were not eligible to vote and were prevented from participating in recent elections based on a credible fear of prosecution.

f.      FRRC members who were emancipated in their home states, satisfied their state laws, and had their voting rights restored, but who are unable to obtain a clear opinion from the state that they are eligible to vote in Florida, and so are now refraining from voting for fear of prosecution.

12.      In addition to its members, FRRC also serves and supports the broad constituency of people with prior felony convictions in Florida, through its programs and advocacy activities, helping its constituents resolve their LFOs, register to vote, provide jobs and employment, and ease their reentry.

13.      Consistent with its mandate and in support of its members and constituents, FRRC's staff trains and coordinates pro bono attorneys to research the case history of people with prior felony convictions who are uncertain about their eligibility.  Combined, this team of FRRC staff and pro bono attorneys dedicates thousands of hours each year to conducting such research.  This is a direct result of Amendment 4 and S.B. 7066 being implemented without a clear and accessible system or process where people can check their eligibility through the state government.  As a result of S.B. 7066, FRRC has had to divert resources that were originally intended to assist people with prior felony convictions successfully re-enter society, including by helping them access stable housing and obtain employment.  Once FRRC began to receive reports from its members and other concerned Floridians that people with prior felony convictions were receiving inaccurate, incomplete, or misleading information from the state regarding their right to vote, FRRC was forced to devote considerable time and resources to help such people navigate the newly enacted impediments to voting, including differences in implementation across different counties.

14.      To this end, FRRC has worked with county officials in an attempt to establish efficient processes for rights restoration; worked with people with prior felony convictions to file

requests for advisory opinions from the Department of State; assisted pro bono counsel in helping people with prior felony convictions assess and restore their voting eligibility; and educated people with prior felony convictions about the barriers to voting.

15.     In the wake of S.B. 7066, FRRC also maintained and raised funds for its Fines and Fees Funds program, which pays outstanding LFOs for people with prior felony convictions so that they become eligible to vote.  Many people with prior felony convictions have applied to this program for help in determining whether they owe outstanding LFOs and, if so, the amount they owe.  FRRC has encountered difficulties obtaining information for those individuals because many county clerks cannot provide an accurate assessment of outstanding LFOs that an individual with a prior felony conviction must pay to restore his or her voting eligibility.  For some of these applicants, the necessary state and county records to determine whether an applicant has unpaid financial obligations are unavailable.  Even where the records are available, the process for determining voting eligibility does not necessarily result in an accurate calculation of the applicant's unpaid LFOs.

16.     FRRC has also been overcharged when it has paid the LFOs of people with prior felony convictions, and many counties have refused to refund FRRC for excess payments.

17.     In other words, as a consequence of the Defendants' actions, FRRC now spends a large amount of its time and financial resources assisting people with prior felony convictions in navigating an incomprehensible state labyrinth in what should be an unnecessary effort to help them restore their voting rights.  As such, FRRC has been unable to allocate its resources to working on other policy initiatives that assist people with prior felony convictions, such as finding employment and housing, working on sentencing reform, promoting community reintegration

policies, pursuing bail reform, and countless other important, necessary activities that further FRRC's organizational purpose and improve the safety and welfare of our communities.

18.     The Defendants' conduct has also intimidated FRRC and its staff and volunteers from urging or aiding its members to vote.  As described above, FRRC, through its Fines and Fees Fund, has assisted members and constituents in determining whether they have unpaid LFOs and, in some cases, paying outstanding LFOs on such individuals' behalf.  But even where FRRC has paid an individual's outstanding LFOs, FRRC and its staff and volunteers have been intimidated from advising that individual that he or she is eligible to vote, or urging him or her to vote, because the Defendants, as described in detail below, have failed to provide a reliable mechanism to determine whether a person with a prior felony conviction has outstanding LFOs and, if so, the amount that remains outstanding; failed to abide by state laws that require, among other things, the Department of State to assess a voter's eligibility at the time of his or her registration; and arrested individuals who received voter registration cards from the Department of State and thereafter voted in good faith.  As a result of this broken system, FRRC, notwithstanding its resources and expertise in this area, cannot be certain that an individual's outstanding LFOs have been paid, and it has as a result been intimidated from urging or aiding its members to vote.

19.     Plaintiff RHOSHANDA BRYANT-JONES is a U.S. citizen, FRRC member, and veteran of the United States Army who was honorably discharged from service.  Between 1992 and 2004, Ms. Jones was convicted of felony offenses in Brevard County, Florida.  Ms. Jones's convictions were the result of a narcotics addiction, and since 2009 she has turned her life around. She has since obtained a bachelor's degree, worked at a drug treatment center, and become a

Certified Recovery Peer Specialist.[7]  Ms. Jones now runs her own business helping other people overcome addiction, homelessness, and related issues.

20.     Following Ms. Jones's last felony conviction, she accepted the court's offer to terminate her probation early as a result of her exceptional compliance.  To take advantage of that offer, Ms. Jones was required to pay off her outstanding LFOs.  She consulted the Brevard County Clerk of Court, who informed Ms. Jones that she owed a total balance of approximately $800 in LFOs, which Ms. Jones promptly paid.

21.     In 2021, Ms. Jones underwent a level 2 background screening, as required by Florida law, so that she could become a Certified Recovery Peer Specialist.  During the background check, and contrary to the Clerk of Court's earlier representation, Ms. Jones learned that she still owed thousands of dollars in LFOs from her previous convictions.  Ms. Jones promptly paid those fees as they were discovered so that she could continue with her background check and the process of becoming a Certified Recovery Peer Specialist.  In a letter dated October 20, 2021, Ms. Jones was advised by the State of Florida that she passed her background check and thereby became eligible to seek licensure and employment as a caretaker in the substance abuse and mental health professions.

22.     In approximately 2008, before Amendment 4 was passed, Ms. Jones was erroneously advised by an employee of the Florida Department of Motor Vehicles that she could lawfully register to vote and, if she received a voter information card from the state, she could lawfully vote.  Ms. Jones registered to vote in reliance on that erroneous advice, received a voter information card, and voted in the 2008 general election.  Shortly after the election, Ms. Jones

---

[7]   The Florida Certification Board, Credentials, Certified Recovery Peer Specialist (CRPS), https://flcertificationboard.org/certifications/certified-recovery-peers-specialist/ (last visited July 16, 2023).

received a letter informing her that she was in fact ineligible to vote because of her prior felony convictions, that her ballot would not be counted, and that she would be purged from the voter rolls.

23.     Following the passage of Amendment 4, Ms. Jones again registered to vote, received a voter information card from the state, and thereafter voted in primary and general elections in 2020.  Ms. Jones was proud to be registered to vote, and she posted about it on her Facebook page on October 23, 2020, writing "As a Returning Citizen I realize the importance of having my rights restored . . . my vote, my voice, giving God the glory, for He is truly good."

24.     In the fall of 2022, Ms. Jones saw press coverage and videos of the August 2022 arrests of people with prior felony convictions by officers from the Florida Department of Law Enforcement ("FDLE").  Ms. Jones understood that the arrestees had been charged with illegally voting in the 2020 election; that at least some of the arrestees believed in good faith that they were eligible to vote; and that at least some of the arrestees had been issued voter identification cards by the State of Florida.  Given Ms. Jones's prior felony convictions, her experience receiving erroneous advice from the Department of Motor Vehicles, and her experience with the Brevard County Clerk of Court while trying to satisfy her LFOs, Ms. Jones feared that she might also be arrested for voting and was therefore intimidated from doing so.  Ms. Jones is proud of her achievements in the years since her last felony conviction and has dedicated her life to helping others make similar changes in their lives.  She believes that, if she were to be convicted of voter fraud, she may lose her Recovery Peer Specialist certification, her business, and her ability to help others.  As a result, Ms. Jones refrained from voting in the 2022 midterm elections and will refrain from voting in future elections.  Given Ms. Jones's experiences with and observations about the voting process in Florida, Ms. Jones regards voting as a risk that she is unwilling to take.

25.     Plaintiff ANGEL SANCHEZ is a U.S. citizen, FRRC member, and former FRRC employee.  In 1997, when Mr. Sanchez was 15 years old, he was convicted of multiple felony offenses in Miami-Dade County, Florida.  In 1999, when he was 17 years old, he was convicted of additional felony offenses in Miami-Dade County and sentenced to concurrent terms of 30 years' imprisonment for violating the terms of his 1997 probation and his 1999 convictions.  While in prison, Mr. Sanchez successfully advocated on his own behalf, had his felony sentences reduced, and ultimately served approximately 12 years' imprisonment.  After Mr. Sanchez's release, he attended college while living in a homeless shelter, earned the University of Central Florida's most prestigious student award at graduation, and earned his J.D. from the University of Miami law school with honors.  He will begin an L.L.M. at Yale Law School in the fall of 2023.

26.     In connection with Mr. Sanchez's felony convictions, he was ordered to pay $1,698 in LFOs.  After Mr. Sanchez was released from prison, and while he was living in a homeless shelter, he made monthly payments toward his LFOs, first with money orders because he had no bank account, and later through JPay, a private LFO-payment company used by many Florida jurisdictions.  Florida Department of Corrections Probation Services records indicate that Mr. Sanchez paid $2,308.88 in LFOs between 2011 and 2014.

27.     In 2014, Mr. Sanchez was advised by his probation officer that he had paid all LFOs imposed in connection with his felony offenses.  Thereafter, on April 30, 2014, in light of Mr. Sanchez's extraordinary accomplishments, the Eleventh Judicial Circuit Court terminated Mr. Sanchez's term of probation, and Mr. Sanchez thereby completed the terms of his felony sentences.

28.     On January 8, 2019 — the day Amendment 4 became effective — Mr. Sanchez registered to vote.  Mr. Sanchez proudly voted in the Florida primary and general elections in 2020, a special election on November 2, 2021, and the general mid-term elections in 2022.

29.     In July 2020, while Mr. Sanchez was researching how much he had paid in LFOs, he discovered that the website for the Miami-Dade County Clerk of Court incorrectly indicated that he still owed outstanding LFOs.  Mr. Sanchez also discovered that LFOs imposed in connection with one of his felony offenses had been transferred to a debt collection agency at some point before the Eleventh Judicial Circuit Court terminated Mr. Sanchez's term of probation on April 30, 2014.  The debt collection agency never contacted Mr. Sanchez about his purported debt.

30.     Although Mr. Sanchez had records from the Florida Department of Corrections–Probation Services indicating that he had made LFO payments that exceeded the LFOs imposed in connection with his felony offenses, and a 2014 court order terminating his term of probation in part because he had completed paying off his LFOs, neither the Miami-Dade Clerk of Court nor the collection agency would correct their records to reflect that Mr. Sanchez had paid off his LFOs.

31.     Mr. Sanchez thereafter sought and received an advisory opinion from the Department of Elections dated August 17, 2020, in which the Department of Elections concluded that:

> [B]ased upon the resources available to the Division and based upon your statements herein as to the amounts that were confirmed to you (with such satisfaction affirmed by your attorney in a Motion to Modify Probation), and seeing no credible and reliable evidence to the contrary, the Division finds that your voting rights have been restored by operation of law by virtue of you having paid an amount exceeding the amounts ordered in your felony sentences.

Mr. Sanchez understands this language to mean that the State reserves the right to find that his right to vote was not in fact restored if the State becomes aware of additional information concerning his LFOs.  Mr. Sanchez understands that, under those circumstances, the advisory opinion he received from the Department of Elections may not protect him from prosecution.

32.     In August 2021 — more than a year after the Department of Elections issued Mr. Sanchez's advisory opinion — Mr. Sanchez began receiving notices from the Miami-Dade Clerk of Court accusing him of failing to pay his outstanding LFOs and threatening to suspend his driver's license and send the balance of his debt to a collections agency.  Mr. Sanchez, who had by this time received his J.D. with honors from the University of Miami, filed a pro se motion in the Eleventh Judicial Circuit Court seeking an order declaring all LFOs associated with his 22- and 24-year-old felony convictions satisfied.  The court issued such an order on August 27, 2021.

33.     Before the midterm elections in 2022, Mr. Sanchez saw videos and press coverage about the August 2022 arrests by the FDLE, and the related announcement by Defendant DeSantis that there would be more to come.  Mr. Sanchez learned from press reports that some of the individuals arrested in August 2022 had received voter information cards from the Department of Elections.

34.     The refusal of the Miami-Dade County Clerk of Court and the debt collections agency to adjust its records to reflect Mr. Sanchez's LFO payments, the lack of communication among agencies within Florida's executive branch (all controlled by Defendant DeSantis), the caveated advisory opinion Mr. Sanchez received from the Department of Elections, and the August 2022 arrests by the FDLE have led Mr. Sanchez to fear that he may be arrested for exercising his fundamental right to vote, notwithstanding his good faith belief that he is entitled to vote under Amendment 4 and S.B. 7066.  If Mr. Sanchez were to be prosecuted for voting fraud, he could lose his existing license to practice law in the District of Columbia and be unable to pass the character and fitness review necessary to obtain law licenses in other jurisdictions. Notwithstanding these concerns, Mr. Sanchez has vowed to continue voting because of its importance to our democratic system.  Mr. Sanchez believes he should not have to jeopardize his

career prospects or live in a constant state of fear because he chooses to exercise his fundamental right to vote.

35.     Plaintiff AUTUMN WAITE is a U.S. citizen and member of FRRC who was convicted of felony offenses in two 2018 criminal cases in Brevard County, Florida.  Ms. Waite has not been convicted of any other felony offenses, but had adjudications withheld for two earlier felony charges in Brevard County, Florida.

36.     By July 2021, Ms. Waite had completed her probation and the terms of her felony sentences and her right to vote was therefore restored under Amendment 4.  She registered to vote in December 2021.  Shortly after Ms. Waite registered to vote, she began conducting research into how she could get her driver's license reinstated.  During this research, Ms. Waite learned about the enactment of S.B. 7066.  Ms. Waite mistakenly believed that S.B. 7066 required her to pay all financial obligations owed to the State before she could vote, including obligations imposed in connection with cases that did not result in a felony conviction.

37.     In the fall of 2022, Ms. Waite learned about Defendants' prosecution of persons with prior felony convictions for voting, and she saw videos of officers from the FDLE arresting some of those individuals.  She understood that the arrestees had been charged with illegally voting in the 2020 election; that at least some of the arrestees believed in good faith that they were eligible to vote; and that at least some of the arrestees had been issued voter identification cards by the State of Florida.  Ms. Waite also learned of Defendant DeSantis's public announcement that additional such arrests were expected in the future, because of a new state-wide campaign against illegal voting.

38.     As a result, Ms. Waite developed a fear that, if she were to vote, she could face a risk of arrest and prosecution even if she did so in the good faith belief that she was eligible under

Amendment 4 and S.B. 7066.  Ms. Waite did not vote in the 2022 midterm election, and she is intimidated from voting in the future.  Now that Ms. Waite has successfully re-entered society and rebuilt her life, exercising her constitutional right to vote in Florida is, from what she has observed and experienced, not a risk that she is willing to take.[8]

39.     Plaintiff BRANDON WALTHOUR is a U.S. citizen and FRRC member and employee who registered to vote in Florida in 2004.  Mr. Walthour has never been convicted of a felony offense and therefore never lost his voting rights under Florida law.  He did, however, enter a plea of *nolo contendere* to one felony offense in a 2015 case in which adjudication was withheld in Orange County, Florida.  In that case, Mr. Walthour was also adjudicated guilty of two misdemeanor offenses for which fines and fees were imposed.

40.     Prior to 2022 — before and after the passage of Amendment 4 — Mr. Walthour exercised his right to vote without fear that his prior misdemeanor convictions affected his voting eligibility.  In 2022, however, Mr. Walthour saw the press coverage and videos relating to the August 2022 arrests of people with prior felony convictions by officers from the FDLE.  Mr. Walthour understood that the arrestees had been charged with illegally voting in the 2020 election; that at least some of the arrestees believed in good faith that they were eligible to vote; and that at least some of the arrestees had been issued voter identification cards by the State of Florida.  Mr. Walthour also learned of Defendant DeSantis's public announcement that further arrests were expected in the future in connection with a state-wide campaign against illegal voting.

41.     Having learned of these arrests and Defendant DeSantis's public statements, and notwithstanding the fact that he never lost his right to vote, Mr. Walthour developed a fear that, if

---

[8] In 2023, FRRC submitted an advisory opinion request on behalf of Ms. Waite but has not received the requested advisory opinion as of the date this complaint was filed.

he were to vote, he could face a risk of arrest and prosecution even if he believed he was eligible to vote. As a consequence, Mr. Walthour did not vote in the 2022 midterm election, and he is intimidated from voting in the future.[9]

## II.   **Defendants**

42.   Defendant RONALD DeSANTIS is sued in his official capacity as Governor of Florida. Defendant DeSantis is a person within the meaning of 42 U.S.C. § 1983 and acts under the color of state law. Defendant DeSantis was a gubernatorial candidate in Florida between January and November 2018, he won the gubernatorial election held on November 15, 2018, and he assumed office on January 8, 2019. Under Art. VI, sec. 1 of the Florida Constitution, the Governor "shall take care that the laws be faithfully executed, commission all officers of the state and counties, and transact all necessary business with the officers of government."[10] The Governor also serves as the head of the FDLE.[11]

43.   Defendant CORD BYRD is sued in his official capacity as Florida Secretary of State. Defendant Byrd is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law. Defendant Byrd was appointed by Governor DeSantis as Secretary of State on May 13, 2022. Pursuant to Fla. Stat. § 97.012, the Secretary of State is the chief election officer of the state. Defendant Byrd is thus responsible for "[o]btain[ing] and maintain[ing] uniformity in the interpretation and implementation of the election laws," and may adopt "uniform standards for the proper and equitable interpretation and implementation" of the election laws, including each of the provisions of S.B. 7066.[12] Defendant Byrd, through the Department of State, is also responsible

---

[9] In 2023, FRRC submitted an advisory opinion request on behalf of Mr. Walthour but has not received the requested advisory opinion as of the date this complaint was filed.

[10] Fla. Const. IV, § 1.

[11] Fla. Stat. § 20.201(1).

[12] *Id.* § 97.012(1). S.B. 7066 is codified in Fla. Stat. § 98.0751.

for identifying information from other agencies regarding voters who have been convicted of a felony to assess whether their voting rights have been restored, to review whether this information is "credible and reliable," and to share this information with Supervisors of Elections.[13]  Defendant Byrd is similarly responsible for undertaking comparable reviews of newly registered voters.[14]  Defendant Byrd is also responsible for "[c]onduct[ing] preliminary investigations into any irregularities or fraud involving voter registration [and] voting . . . and report his or her findings to the statewide prosecutor or the state attorney for the judicial circuit in which the alleged violation occurred for prosecution, if warranted."[15]  Defendant Byrd's statutory responsibilities include providing direction and opinions to the Supervisors of Elections.[16]  The Department of State also includes the Office of Election Crimes and Security, which is responsible for identifying and investigating allegations of election law violations, and referring allegations of elections fraud for prosecution.[17]

44.     Defendant RICKY D. DIXON is sued in his official capacity as Secretary of the Florida Department of Corrections.  Defendant Dixon is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law.  The Secretary of the Florida Department of Corrections is the head of the Department of Corrections and is responsible for planning, coordinating, and managing the corrections system of the state.[18]  The Secretary is statutorily responsible for ensuring that the programs and services of the department are administered in accordance with state and federal laws, rules, and regulations, with established program standards, and consistent

---

[13] Fla. Stat. § 98.075(5).

[14] *Id.* § 98.0751(3)(a).

[15] *Id.* § 97.012(15).

[16] *Id.* § 97.012(16).

[17] *Id.* § 97.022.

[18] *Id.* § 20.315(3).

with legislative intent.[19]   The Florida Department of Corrections is responsible, by statute, for identifying persons convicted of a felony and providing such information to the Department of State so the Department of State may remove such persons from voter rolls.[20]

45.     Defendants MELINDA N. COONROD, RICHARD D. DAVISON and DAVID A. WYANT are sued in their official capacities as Commissioners of the Florida Commission on Offender Review.  The Florida Commission on Offender Review is required by law to provide information to the Department of State regarding persons granted clemency, the date they were granted clemency, and other specific identifying information about such persons.[21]

46.     Defendant MARK GLASS is sued in his official capacity as the Commissioner of the FDLE.  The FDLE is required by law to provide information to the Department of State regarding registered voters "who have been convicted of a felony."[22]

47.     Defendants FLORIDA SUPERVISORS OF ELECTIONS ("Supervisor Defendants"), sued in their official capacity, are elected officials in each of Florida's 67 counties who are responsible for administering elections in their respective counties.  Among other election administration responsibilities, the Supervisor Defendants are charged by law with enforcing and maintaining voter registration lists,[23] and with notifying registered voters of potential ineligibilities that would result in their removal from voter rolls.[24]   The Supervisor Defendants are listed on Exhibit A.

---

[19] *Id*.

[20] *Id.* § 98.093(7).

[21] *Id.* § 98.093(6).

[22] *Id.* § 98.093(5).

[23] *Id.* §§ 98.065(1), 98.075(1).

[24] *Id.* § 98.075(7).

48.     Defendants FLORIDA COUNTY CLERKS OF COURT ("County Clerk Defendants") are responsible for computation of LFOs, crediting payments towards LFOs, and informing people with prior felony convictions, upon request, of the LFOs owed.  The Florida Division of Elections directs people with prior felony convictions to the County Clerk Defendants to "get a copy of his or her judgment(s) and sentence(s)" and "help the person find out how much has been paid and whether the amount paid equals or is more than the total amount of fines, fees, costs and/or restitution ordered."[25]   Under the Florida Constitution, "[a]ll fines and forfeitures arising from offenses tried in the county court shall be collected, and accounted for by [the County Clerk Defendants]."[26]   The County Clerk Defendants must "establish and maintain a system of accounts receivable for court-related fees, charges, and costs."[27]   The County Clerk Defendants are identified on Exhibit B.

## JURISDICTION AND VENUE

49.     Plaintiffs bring this action under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights secured by the Voting Rights Act, and the First and Fourteenth Amendments of the United States Constitution.

50.     The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the causes of action arise under the United States Constitution and the laws of the United States.

---

[25] Florida Division of Elections, *Constitutional Amendment 4 / Felon Voting Right*s, https://dos.myflorida.com/elections/for-voters/voter-registration/constitutional-amendment-4felon-voting-rights/ (last updated Oct. 14, 2020) (hereinafter "*Felon Voting Rights*").

[26] Fla. Const. art. V, § 20(c)(8).

[27] Fla. Stat. § 28.246(2).

51.     Plaintiffs bring this action to secure equitable relief under federal law providing for the protection of voting rights, pursuant to 28 U.S.C. §§ 2201 and 2202.

52.     This Court has personal jurisdiction over Defendants, who are sued only in their official capacities as officers of the State of Florida or its political subdivisions.

53.     Venue is proper in this Court under 28 U.S.C. § 1391(b).  Defendants Brenda D. Forman, Joe Scott, Karen Healy, Jerome Kaszubowski, Leslie R. Swan, Jeffrey R. Smith, Vicki Davis, Carolyn Timmann, Christina White, Juan Fernandez-Barquin, Joyce Griffin, Kevin Madok, Jerald D. Bryant, Melissa Arnold, Wendy Link, Joseph Abruzzo, Michelle R. Miller, Gertrude Walker reside in this District and all Defendants are residents of the State of Florida.  In addition, Plaintiffs Angel Sanchez and Rhoshanda Bryant-Jones reside in this District and are registered to vote in counties within this District.  Plaintiff FRRC has members in this District, and a substantial part of the events that gave rise to Plaintiffs' claims occurred in this District.

54.     This Court has the authority to enter a declaratory judgment and to provide preliminary injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

## FACTS

### I.     The Historical Disenfranchisement of Felons in Florida

55.     Prior to November 6, 2018, Article VI, Section 4 of Florida's Constitution provided that "[n]o person convicted of a felony . . . shall be qualified to vote or hold office until restoration of civil rights or removal of disability."   This disenfranchisement provision in Florida's Constitution dated to 1868 and was a legacy of the Reconstruction and Jim Crow periods.

56.     The provision remained the law in Florida for more than 150 years, until the passage of Amendment 4 in 2018.  Prior to the amendment's passage, Florida disenfranchised a higher

percentage of its adult citizens than any other state in the United States and was responsible for more than 25 percent of the approximately 6.1 million U.S. citizens disenfranchised nationwide on the basis of felony convictions.[28]   Florida was also one of just three states in 2018 that permanently disenfranchised its citizens for committing a single felony offense; the only path for restoration of such a citizen's civil rights was the state's clemency process.[29]

## II.    Florida Voters Return the Franchise to People with Prior Felony Convictions

57.    Between 2014 and November 6, 2018, voters in Florida — led by Plaintiff FRRC — pursued a successful campaign to amend the Florida Constitution and thereby return the franchise to Florida residents disenfranchised by Article VI, Section 4 of the Florida Constitution. The campaign culminated in the passage of Amendment 4 on November 6, 2018, with the overwhelming support of 65% of Florida voters.

### A.    Constitutional Amendments in Florida

58.    Florida's Constitution "is the charter of our liberties.   It cannot be changed, modified or amended by [governmental] fiat," and "[i]t provides within itself the only method for its amendment."[30]

59.    The method for amending the Florida Constitution is found in Article XI, section 3, which "reserve[s] to the people" "[t]he power to propose the revision or amendment of any portion or portions of th[e] constitution by initiative."[31]

60.    The Florida Constitution further instructs that the people of Florida can invoke this authority by "filing with the custodian of state records a petition containing a copy of the proposed

---

[28] Brief for The Sentencing Project as Amicus Curiae at *14-15, *Hand v. Scott*, No. 18-11388, 285 F. Supp. 3d 1289 (N.D. Fla. 2018), *vacated and remanded sub nom. Hand v. DeSantis*, 946 F.3d 1272 (11th Cir. 2020).

[29] *See* Wood, *supra* note 1 at 3.

[30] *Browning v. Fla. Hometown* Democracy, 29 So. 3d 1053, 1064 (Fla. 2010).

[31] Fla. Const. art. XI, § 3.

revision or amendment, signed by a number of electors in each of one half of the congressional districts of the state, and of the state as a whole, equal to eight percent of the votes cast in each of such districts respectively and in the state as a whole in the last preceding election in which presidential electors were chosen."[32]

61.    The Supreme Court of Florida has explained that this provision of the Florida constitution is "a self-executing constitutional provision, which was adopted to bypass legislative and executive control and to provide the people of Florida a narrow but direct voice in amending their fundamental organic law."[33]  It "provides an additional check and balance against legislative and executive power" in Florida.[34]

62.    In other words, under the Florida Constitution, neither the executive branch nor the legislative branch is authorized to override the will of Florida voters once they amend the Florida Constitution.

**B.    *The Initial Petition to Enfranchise More than 1.4 Million Floridians***

63.    In 2014, consistent with the requirements established by the Florida Constitution, more than 840,000 Floridians signed a petition expressing their support for the invocation of this constitutional authority in an effort to amend to Article VI, Section 4 of the state's Constitution.[35]

64.    At the time of the petition, Florida was one of only three states in the nation — along with Kentucky and Iowa — that permanently disenfranchised all citizens following a felony

---

[32] *Id.*; *see also* Florida Division of Elections, *Voting Restoration Amendment*, https://dos.elections.myflorida. com/initiatives/initdetail.asp?account=64388&seqnum=1 (last visited July 14, 2023) (describing initiative process and progress of Amendment 4) (hereinafter "FDE").

[33] *Browning,* 29 So. 3d at 1063 (citation and internal quotation marks omitted).

[34] *Id.* (footnote omitted).

[35] *See* FDE, *supra* note 32 (noting that proponents of the amendment received 842,796 signatures in favor of putting the amendment on the ballot).

conviction, irrespective of the crime of conviction.[36]   The Florida Constitution's disenfranchisement provision served to disenfranchise more than four times as many people as the provisions in Kentucky's and Iowa's constitutions combined.[37]

65.    In 2016, more than 10% of Florida's population, and more than 21% of the state's Black voters, were disenfranchised because of a prior felony conviction.[38]   This group of disenfranchised voters in Florida accounted for more than 27% of the United States' total population of voters who were disenfranchised because of a prior felony conviction,[39] even though Florida accounted for only approximately 6% of the United States' total population.[40]

66.    The amendment, later known as "Amendment 4," proposed in relevant part the following amendments to Article VI, Section 4 of the Florida Constitution (underlined):

> (a)  No person convicted of a felony, or adjudicated in this or any other state to be mentally incompetent, shall be qualified to vote or hold office until restoration of civil rights or removal of disability.  Except as provided in subsection (b) of this section, any disqualification from voting arising from a felony conviction shall terminate and voting rights shall be restored upon completion of all terms of sentence including parole or probation.
>
> (b)  No person convicted of murder or a felony sexual offense shall be qualified to vote until restoration of civil rights.[41]

---

[36] *See* Wood, *supra* note 1, at 1.

[37] *Id.* at 3.

[38] Morgan McLeod, *Expanding the Vote: Two Decades of Felony Disenfranchisement Reform*, The Sentencing Project, 6 (2018), https://www.sentencingproject.org/app/uploads/2022/08/Expanding-the-Vote-1997-2018.pdf.; *see also* Alexander Klueber & Jeremy Grabiner, *Voting Rights Restoration in Florida: Amendment 4 – Analyzing Electoral Impact and its Barriers*, Harvard Kennedy School of Government, 4 (Apr. 2020), https://ash.harvard.edu/files/ash/files/voting_rights_restoration_in_florida_-_amendment_4_final.pdf (hereinafter "Klueber & Grabiner").

[39] Klueber & Grabiner, *supra* note 38, at 4.

[40] *See* United States Census Bureau, *QuickFacts Florida*, https://www.census.gov/quickfacts/fact/table/FL/PST045222 (noting Florida population of 18.8 million in 2010 and 21.5 million in 2020); United States Department of Agriculture, Economic Research Service, *Percent Change in Population, 2020-22*, https://data.ers.usda.gov/reports.aspx?ID=17827 (noting U.S. population of 308.7 million in 2010 and 331.4 million in 2022).

[41] *See* Constitutional Amendment Petition Form, Voting Restoration Amendment, https://dos.elections.myflorida.com/initiatives/fulltext/pdf/64388-1.pdf (hereinafter "Petition").

67.     On April 20, 2017, the Supreme Court of Florida, pursuant to its authority in Article IV, Section 10 and Article V, Section 3(b)(1) of the Florida Constitution, issued an advisory opinion, holding that the proposed amendment satisfied the legal requirements of Article XI, Section 3 of the Florida Constitution, and was otherwise appropriate "for placement on the ballot."[42]

68.     Amendment 4 was thereafter scheduled to appear on the November 6, 2018 ballot.

## C.      *Defendant DeSantis's Opposition to Amendment 4*

69.      In the months prior to the November 6, 2018 election, Defendant DeSantis, then a candidate for governor in that same election, voiced his opposition to Amendment 4.

70.     In an interview with the Tampa Bay Times, published on September 2, 2018, for example, Defendant DeSantis explained, "I don't support automatic restoration of voting rights [for felons].  I'm going to be very tough on crime, and I'm never going to budge on that."[43]

71.     During a gubernatorial debate on October 24, 2018, Defendant DeSantis said, "I think it's wrong to automatically restore rights to felons who've committed very serious crimes. . . .  I want people to be redeemed.  But you've got to prove that you're getting back with the law."[44]

---

[42] *Advisory Opinion to the Att'y Gen. Re: Voting Restoration Amendment*, No. SC16-1785, 2017 WL 1409671 (Fla. Apr. 20, 2017).

[43] Adam C. Smith, *Ron DeSantis on gambling, charter schools, differing from Rick Scott, and his concerns with student testing*, Tampa Bay Times, Sept. 20, 2018, https://www.tampabay.com/florida-politics/buzz/2018/09/20/ron-desantis-on-gambling-charter-schools-differing-from-rick-scott-and-his-concerns-with-student-testing/.

[44] Steve Bousquet, *Campaign to win voting rights for Florida felons enters home stretch*, Tampa Bay Times, Oct. 25, 2015,   https://www.tampabay.com/florida-politics/buzz/2018/10/25/campaign-to-win-voting-rights-for-florida-felons-enters-home-stretch/.

72.     In a letter from Defendant DeSantis to the Florida Secretary of State dated June 28, 2019 — following the passage of Amendment 4 — Defendant DeSantis described Amendment 4 as "a mistake."[45]

**D.     *Florida Voters Overwhelmingly Approve Amendment 4***

73.     On November 6, 2018, despite Defendant DeSantis's opposition, Florida voters overwhelmingly approved Amendment 4.

74.     In total, 5,148,926 Floridians voted for Amendment 4, and 2,828,339 voted against it.  The amendment was ratified with more than 65% of the vote.

75.     Amendment 4 went into effect on January 8, 2019 and voter registrations in Florida surged as a result.[46]

**III.     The Defendants Fail to Comply with the Mandate of Amendment 4, and Effectively Prevent Hundreds of Thousands of Floridians from Voting with S.B. 7066**

76.     Shortly after Amendment 4 was ratified, Defendant DeSantis sought to delay the effective date of Amendment 4 by asserting that it required "implementing language" before it could take effect.[47]

77.     Defendant DeSantis was incorrect.   Article XI, Section 5(e) of the Florida Constitution instructs that an amendment to or revision of the Constitution of Florida "shall be effective . . . on the first Tuesday after the first Monday in January following the election," i.e., January 8, 2019 with respect to Amendment 4.  Further, the language of Amendment 4 made clear

---

[45] Letter from Governor Ronald DeSantis to Secretary of State Laurel Lee (June 28, 2019), https://www.flgov.com/wp-content/uploads/2019/06/6.282.pdf.

[46] *See* Klueber & Grabiner, *supra* note 38, at 13–14.

[47] James Call, *Critics angry after Ron DeSantis asks Florida lawmakers to review Amendment 4 implementation*, Tallahassee Democrat, Dec. 14, 2018, https://www.tallahassee.com/story/news/2018/12/14/ron-desantis-wants-lawmakers-have-look-amendment-4/2314818002/.

that its consequences were automatic, and not subject to legislative modification: ". . . any disqualification from voting arising from a felony conviction *shall* terminate and voting rights *shall* be restored upon completion of all terms of sentence including parole or probation."[48]  The summary of Amendment 4 on the November ballot made it clearer still that Amendment 4 would "restore[] the voting rights of Floridians with felony convictions after they complete all terms of their sentence including parole or probation" without any further action from the Florida legislature.[49]  Then-President of the Florida Senate, Republican Bill Galvano agreed, explaining, "[b]y a lot of accounts, there's no action even required for [Amendment 4's] implementation."[50]

78.     Notwithstanding the self-executing nature of Amendment 4, the Florida legislature responded to Defendant DeSantis's request for legislation by passing Senate Bill 7066 ("S.B. 7066").

79.     Defendant DeSantis signed S.B. 7066 into law on June 28, 2019.  S.B. 7066 defined the terms "felony sexual offense" and "murder," and the phrase "completion of all terms of sentence," as used in Amendment 4.  S.B. 7066 is codified at Florida Statutes § 98.0751.

80.     With respect to the phrase "completion of all terms of sentence," S.B. 7066 provides that a felon's vote may not be restored pursuant to Amendment 4 until he or she has completed any term of imprisonment, parole, probation or "community control," and paid in full all restitution, fines and fees imposed by the sentencing court," i.e., "any portion of a sentence that is contained in the four corners of the sentencing document."[51]

---

[48] Fla. Const. art. VI, § 4(a).

[49] Petition, *supra* note 41, at 1.

[50] *Amendment 4 Could Be Delayed 60 Days, DeSantis Says*, Spectrum News 13, https://www.mynews13.com/fl/orlando/news/2018/12/14/amendment-4-could-be-delayed-60-days--desantis-says (last visited July 17, 2023).

[51] Fla. Stat. § 98.0751(2)(a).

81.     By statute, "restitution" as used in S.B. 7066 is defined as "restitution ordered to a victim by the court as a part of the sentence," including restitution a defendant is ordered to pay to "a person or persons, the estate or estates thereof, an entity, the state, or the Federal Government." S.B. 7066 does not define the term "fines" or "fees."

## IV.     **The Defendants Sow Confusion Among People with Prior Felony Convictions by Making it Impossible to Determine Voting Eligibility**

82.     Since the enactment of S.B. 7066, the Plaintiffs and other people with prior felony convictions across Florida have been unable to determine their eligibility to vote because of administrative failings within the state's executive branch caused by the Defendants' acts and omissions.  As detailed below, the Defendants have created and encouraged a chaotic and broken system that is incapable of collecting and assessing the necessary information, particularly data related to LFOs, to determine the voting eligibility of people with prior felony convictions.

83.     These failures go far beyond mere failure to "locat[e] and provid[e] felons with the facts necessary to determine whether they have completed their financial terms of sentence."[52]  As described below, the Defendants have failed to comply with the express provisions of S.B. 7066 and this failure has resulted in a free-for-all by which various Defendants (1) apply inconsistent and often incorrect legal analyses to (2) inaccurate information concerning whether people with prior felony convictions have completed their financial terms of sentence, in a complex labyrinth of misadministration that can only be described as "so standardless that it invites arbitrary enforcement."[53]

---

[52] *Jones v. Governor of Fla.*, 975 F.3d 1016, 1049 (11th Cir. 2020) (emphasis omitted).

[53] *Id.* at 1046 (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)).

### A.     The Failures of the Department of State

84.     The State Department is an executive agency within the state of Florida.  The Secretary of State, Defendant Byrd, is appointed by the Governor of Florida, Defendant DeSantis, to head the Department.[54]  The Division of Elections is a division of the Department.[55]

85.     Under Florida law, Defendant Byrd, "as chief election officer of the state, shall be responsible for implementing, operating, and maintaining, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive, computerized statewide voter registration system as required by" federal law.[56]  The State Department, of which Defendant Byrd is the head, is charged with "protect[ing] the integrity of the electoral process by ensuring the maintenance of accurate and current voter registration records."[57]  With respect to each voter registration application received by the Department, the Department is required by statute to "identify those registered voters who have been convicted of a felony and whose voting rights have not been restored."[58]

86.     Notwithstanding the State Department's legal obligation to collect and maintain information about Florida citizens' eligibility to vote, and its legal obligation to inform ineligible registrants of their status, under Florida Statutes §§ 97.021(8), 98.075(5) and 98.075(7), the Department cannot reliably determine whether individuals previously convicted of a felony have outstanding financial obligations related to their conviction.

---

[54] Fla. Stat. § 20.10(1).

[55] *Id.* § 20.10(2)(a).

[56] *Id.* § 98.035(1).

[57] *Id.* § 98.075(1).

[58] *Id.* §§ 97.021(8), 98.075(5), 98.075(7); *see also* Letter from Jonathan Olson, Division Supervisor, State Attorney's Office, Lake County, Florida (Oct. 14, 2022), https://www.documentcloud.org/documents/23132338-lake-county-sex-offender-statement?responsive=1&title=1 ("Pursuant to Florida Statute 98.075, the department is required to notify the Supervisor of Elections if a person is ineligible to vote.").

87.     In the 18 months following the passage of Amendment 4, the State Department failed to review a single voter registration application from any registrant with a prior felony offense.[59]  The Defendants have failed to hire staff at the Department sufficient for the Department to satisfy its legal obligations to Florida registrants and taxpayers, and the Department has a backlog of tens of thousands of voter registration applicants that it has failed to review, in violation of its legal obligations.[60]

88.     In *Jones v. DeSantis*, which challenged the constitutionality of S.B. 7066, the district court in the Northern District of Florida found that, "even with a team of attorneys and unlimited time, [Florida] has been unable to show how much each [person with a felony conviction] must pay to" satisfy their outstanding financial obligations and become eligible to vote consistent with the requirements of S.B. 7066.[61]  For older convictions, records concerning outstanding financial obligations have been lost or are otherwise unavailable to the Department, or to the individuals previously convicted of felonies.  These failures have not been addressed in the three years since the district court issued its opinion on the merits in *Jones*.

89.     The State Department's website expressly advises people with prior felony convictions that they may seek an advisory opinion from its Elections Division concerning any outstanding financial obligations that may disqualify them from voting pursuant to Fla. Stat. § 106.23(2) and Rule 1S-2.010.[62]

90.     This advisory opinion process is authorized under Fla. Stat. § 106.23(2) and was established prior to the passage of Amendment 4.  In 2020, Defendants (including then-Secretary

---

[59] *Jones v. DeSantis*, 462 F. Supp. 3d 1196, 1228 (N.D. Fla.), *rev'd and vacated sub nom. Jones v. Governor of Fla.,* 975 F.3d 1016 (11th Cir. 2020).

[60] *Id.* (noting that the Department could review only 57 applications per day and had a backlog of 85,000 applications).

[61] *Id.* at 1208.

[62] *See Felon Voting Rights*, *supra* note 25.

of State Laurel Lee) claimed that the advisory opinion process would be used to advise people with prior felony convictions of their voting eligibility and to protect those who inquired against criminal liability for illegal voting.[63]   Since then, however, the Department of State has not timely replied to requests for advisory opinions, nor has it applied consistent legal and accounting principles in the few advisory opinions related to LFOs that it has managed to issue.  In addition, the advisory opinions that have in fact been issued are so heavily caveated that a reasonable person would not be assured of their right to vote after receiving one.[64]

91.     For example, Opinion F-22-11 advises that "based on this case and only this case, you are eligible to vote.  Nothing in this opinion should be construed as evaluating your eligibility with respect to any other felony convictions."[65]   Opinion F-22-8 advises that the Division's findings are "based solely upon the cases located from the personal identifying information you provided . . . and the Division does not opine as to whether any other convictions exist nor whether any such other convictions would interfere with your eligibility."[66]  And Opinion F-20-19 advises that "the finding in this opinion is based upon cases located from the personal identifying and

---

[63] *Jones,* 462 F. Supp.3d at 1241–42.

[64] The Secretary of State's website also instructs people with prior felony convictions to consult with their public defender or private attorney before requesting an advisory opinion.  However, public defenders are not required to advise people with prior felony convictions on the status of their sentence after they have been released from incarceration, and S.B. 7066 does not require or otherwise contemplate public defenders serving in an advisory role with respect to Amendment 4.  *See* Fla. Stat. § 27.51 (describing the duties of the public defender).  While the website for the Third Circuit's public defender contains a "Helpful Link" for "Restoration of Civil Rights", clicking on the link results in an error message.  *See* Law Offices of Cliff Wilson Jr., 3rd Circuit Public Defender, Helpful Links, https://flpd3.com/help-links/ (last accessed on July 17, 2023).  The website for the Twelfth Circuit's public defender refers people with prior felony convictions back to the Department of State.  *See* Office of the Public Defender, 12th Judicial Circuit of Florida, Felon Voting Rights, https://www.pd12.org/en/resources/felon-voting-rights (last accessed at July 17, 2023).  The website for the Second Circuit's public defender refers people with prior felony convictions to, among other entities, Plaintiff FRRC for "ReEntry Support."  *See* Law Offices of Jessica J. Yeary, Public Defender, Community Resources, https://flpd2.com/community-resources/ (last accessed on July 17, 2023).

[65] Fla. Dept. of State Advisory Opinion F-22-11 (Oct. 24, 2022), https://files.floridados.gov/media/706021/f-22-11-final_redacted.pdf.

[66] Fla. Dept. of State Advisory Opinion F-22-8 (Oct. 10, 2022), https://files.floridados.gov/media/705949/f-22-8-final_redacted.pdf.

county of conviction information you provided . . . the Division does not opine as to whether any other convictions exist nor whether any such other convictions would interfere with eligibility."[67]

92.     The Department of State has also taken inconsistent and conflicting positions in implementing its advisory opinion process.  For example, in some cases involving felony and misdemeanor offenses, the Department of State has allocated the fines and fees among the offenses and advised the person with a prior felony that they are required to pay only the fines and fees related to the felony offenses before being able to vote.[68]  In other cases, the Department has refused to make such an allocation.[69]  In the instances where the Department of State has failed to allocate fines and fees between felony and misdemeanor charges, such a failure is not consistent with Fla. Stat. § 98.0751, which only requires payments of fines, fees and restitution as part of a sentence for a "felony conviction" to restore an individual's voting rights.[70]  The Department's failure to allocate fines and fees between felony and misdemeanor charges is also inconsistent with the Department of State's own "First Dollar Policy," which states that amounts paid should always be credited first toward a felony obligation, given the importance of paying off LFOs.

93.     The Plaintiffs have been harmed by the Department of State's failures.  Plaintiff FRRC has submitted requests for 1,121 advisory opinions on behalf of its members since April 25, 2023, and as of the filing of this complaint it has received only 14 responses from the Department of State.  Although part of FRRC's mission is ending disenfranchisement of people with prior felony convictions, the failure of the Department of State to provide advisory opinions to FRRC

---

[67] Fla. Dept. of State Advisory Opinion F-20-19 (Nov. 23, 2020), https://files.floridados.gov/media/703686/final-response-to-ao-f-20-19-redacted.pdf.

[68] *See* Advisory Opinion F-22-8, *supra* note 66.

[69] *See* Fla. Dept. of State Advisory Opinion F-22-15 (Dec. 20, 2022), https://files.floridados.gov/media/706352/f-22-15_redacted.pdf.

[70] *See* Fla. Stat. § 98.0751(1), (5)(a)–(b).

members, as required by law, has intimidated FRRC in its efforts to accomplish that non-partisan mission, and to encourage its members to vote, irrespective of their party affiliation.  FRRC reasonably fears that it may provide information to a member about voting eligibility in good faith that turns out to be incorrect, thereby exposing the FRRC member to arrest and prosecution.  Ms. Jones, Ms. Waite, and Mr. Walthour are among those on whose behalf FRRC has requested, but not yet received, advisory opinions.

94.    Mr. Sanchez received an advisory opinion from the Department of State in August 2020, but his experience highlights the extraordinary difficulties lay persons face when seeking guidance about their voting eligibility.  At the time Mr. Sanchez requested an advisory opinion, he had already graduated with honors from the University of Miami law school, and his request to the Department of Elections reflects his skill and training as a lawyer.  The advisory opinion that the Department of Elections provided to Mr. Sanchez expressly relies on the detailed factual information and representations provided by Mr. Sanchez and on the "affirm[ation] by [Mr. Sanchez's] attorney in a Motion to Modify Probation."  And, although Mr. Sanchez's advisory opinion provides more guidance than those discussed above, it still does not purport to definitively resolve the question of his voting eligibility.

**B.**    ***The Failures of the Department of Corrections and the Commission of Offender Review***

95.    Florida's inability to provide prompt, accurate and reliable LFO information to people with prior felony convictions extends to the Department of Corrections and the Commission of Offender Review.  Under state law, the Department of Corrections is required to "inform and educate inmates and offenders on community supervision about the restoration of civil rights and

the restoration of voting rights resulting from the removal of the disqualification to vote pursuant to [Amendment 4]."[71]

96.     In addition, upon a person's release from the supervision of the Department of Corrections, the Department is required to advise the person in writing of "all outstanding terms of the inmate's sentence at the time of [release or termination of probation] to assist the inmate in determining his or her status with regard to the completion of all terms of sentence, as that term is defined in s. 98.0751."[72]

97.     Similarly, the Commission on Offender Review is required to inform people who have completed a term of parole of "all outstanding terms at the time of termination to assist the offender in determining his or her status with regard to the completion of all terms of sentence, as that term is defined in s. 98.0751."[73]

98.     The Department of Corrections and the Commission on Offender Review routinely fail to meet these obligations to provide people with prior felony convictions accurate written information about outstanding LFOs.  For instance, upon information and belief, the Department of Corrections does not inform Clerks of Court of payments made during incarceration, and people with prior felony convictions are only provided with information concerning LFOs that arise from their current sentence (but not outstanding LFOs incurred prior to the current sentence).

99.     Instead of complying with its statutory obligations, the Department of Corrections has recently begun to disclaim such responsibility, by updating its "Instructions to the Offender"

---

[71] *Id.* § 940.061.

[72] *Id.* §§ 944.705(7)(a) (requiring the Department of Corrections provide advice on voting rights restoration to people with prior felony convictions released from incarceration), 948.041 (requiring the Department of Corrections provide advice on voting rights restoration to people with prior felony convictions released from probation or community control).

[73] *Id.* § 948.041.

form to warn: "The Florida Department of Corrections cannot provide legal advice or determine if you are eligible to vote."[74]   In addition, the Department requires people with prior felony convictions to sign an Instructions to the Offender form, which states:

> By signing this letter, you agree that you alone are solely responsible for determining if you are legally able to register to vote, and that you must solely determine if you are lawfully qualified to vote.[75]

100.    Finally, to make matters worse, the Department of Corrections' Instructions to the Offender Form further instructs people with prior felony convictions with questions about their voting eligibility to refer to the Department of State's website.[76]

101.    These failures have harmed Plaintiff FRRC.  FRRC routinely assists individuals who have recently completed terms of imprisonment and probation, and who received the disclaimer above from the Department of Corrections.  As a result of the Department of Corrections' failure to satisfy its legal obligation to accurately "inform and educate" such individuals about the restoration of their right to vote; its failure to ensure that inmates' LFO payments are properly credited by Clerks of Court; and its assertion, contrary to Florida law, that individuals with prior convictions are "solely responsible" for assessing their eligibility to vote, FRRC expends time and money in pursuit of its mission that it would not otherwise be required to expend.  For example, FRRC assists individuals recently released from Department of Corrections custody obtain the information that the Department of Corrections has failed to provide them, and "informs and educates" such individuals about the requirements for re-enfranchisement under Amendment 4.  The failures of the Department of Corrections also intimidate FRRC in its non-

---

[74] Fla. Dept. of Corrections, *Instructions to the Offender*, https://www.documentcloud.org/documents/23218842-updated-instructions-to-offender#document/p2/a2167543 (last visited July 14, 2023).

[75] *Id.*

[76] *Id.*

partisan effort to encourage individuals with prior convictions to vote, irrespective of their party affiliation, for fear that FRRC may provide advice to such an individual in good faith that turns out to be incorrect, thereby exposing the individual to arrest and prosecution.

### C. *The Failures of the County Clerks*

102.     The Department of State's website, in addition to referring people with prior felony convictions to its ineffective advisory opinion program (and to public defenders, who have no role in assessing the amount of LFOs), also refers them for LFO data to their local County Clerks.[77]

103.     County Clerks' offices, however, lack the expertise and access to information to help people with prior felony convictions determine their LFOs.  Florida has no centralized database that reflects how much an individual owes in fines and court fees.[78]  Records kept by individual counties and the state often vary significantly on how LFOs are calculated, and records even within the same county office are often at odds with each other.[79]  In this regard, Defendant Byrd has failed to enforce the State Department's statewide guidance on the computation of LFOs, with the result that County Clerks routinely improperly compute LFOs by including supplemental fees and charges that people with prior felony convictions have incurred after they were convicted — charges not properly allocable as LFOs.

104.     For example, some County Clerks assess fees for local enforcement or judicial initiatives (including, for example, "Crime Stoppers," municipal investigative or education costs, drug abuse prevention funds, rape crisis funds, domestic violence funds, compensation funds, teen court fees), Florida Department of Law Enforcement investigative costs, and county detention

---

[77] *See Felon Voting Rights*, *supra* note 25.

[78] Daniel Tilley, *We're Going to Court on April 27 to Strike Down This Poll Tax For Good*, ACLU, April 24, 2020, https://www.aclu.org/news/voting-rights/were-going-to-court-on-april-27-to-strike-down-this-poll-tax-for-good.

[79] *Id.*

programs (such as juvenile centers, teen courts, or law libraries, etc.), while others do not.  Some County Clerks charge late fees, "conversion" charges, or monthly service charges for LFOs not paid in full within 30 days of release from incarceration, and consider those fees to be LFOs, while other County Clerks do not treat those fees as LFOs.[80]  If the costs are unpaid after 90 days, the clerk of court may refer the charges to a collection agency, in which case the person may be liable for a collection fee up to 40% of the outstanding balance; some County Clerks treat these as LFOs, while others do not.[81]  Additional costs included by some (but not all) counties as LFOs include the costs of incarceration[82] and interest that accrues on restitution orders.[83]  According to Department of State guidance, such charges are not to be considered in computing LFOs for purposes of voting eligibility, as they are outside of the "four corners" of the sentencing document and thus not within S.B. 7066's definition of LFOs.  Nonetheless, many clerks include such charges in their LFO computations, and/or fail to maintain records that distinguish between LFOs and other such financial charges.

105.    If assessments have been converted to a lien or placed on a payment plan, some County Clerks continue to track what the underlying basis for the charge was, while other County Clerks only note that the amount is a "conversion," making it nearly impossible to determine whether a particular assessment is an LFO.  Similarly, some counties classify all amounts owed as "felony court" fines or costs and other counties classify all amounts owed as "fees" regardless of the underlying charge.

---

[80] Fla. Stat. § 28.246(5)(d).

[81] *Id.* § 28.246(6).

[82] *Id.* § 960.293(2).

[83] *Id.* § 775.089(5).

106.    To make matters worse, County Clerks do not have and cannot track information on payments made to recipients other than the County Clerk, such as payments made to the Department of Corrections.

107.    County Clerks also vary in how they apply payments to LFOs.  While Defendant Byrd has adopted a "First Dollar Policy" that states that every dollar paid by a person with a prior felony conviction should be applied first to the payment of felony LFOs, many clerks do not apply this policy when determining which financial obligations have been paid.

108.    While many County Clerks advise as to whether there is any balance owed after payment, others (most notably the Miami-Dade County Clerk) do not.

109.    In short, at the county level, the ability to assist people with prior felony convictions in identifying their LFOs is inconsistent and unreliable, and there is little or no statewide guidance or oversight.  As a result, a person's eligibility to vote may be improperly determined by the particular practices followed (or not followed) in the county in which he or she lives, rather than a statewide protocol.  This process only exacerbates the uncertainty and confusion among people with prior felony convictions when they attempt to determine their eligibility to vote.

110.    The Plaintiffs have been harmed by the failures of County Clerks of Court.  As described above, Ms. Jones believed in good faith that she had paid her LFOs in full around the time the court terminated her term of probation, and thereafter she voted in 2020 primary and general elections in reliance on that belief.  Ms. Jones only discovered that the Brevard County Clerk of Court had erroneously advised her about her outstanding LFOs in the course of a 2021 background check conducted by the State of Florida in connection with Ms. Jones's efforts to become a Certified Recovery Peer Specialist.  As also described above, the Miami-Dade County Clerk of Court refused to amend its records to reflect that Mr. Sanchez had paid his LFOs in full,

notwithstanding a court order terminating Mr. Sanchez's term of probation early in part because he had satisfied his LFOs.  Even after the Department of Elections issued an advisory opinion to Mr. Sanchez in August 2021, indicating that Mr. Sanchez had paid his LFOs and was therefore eligible to vote, the Miami-Dade County Clerk of Court sent notices to Mr. Sanchez accusing him of failing to pay his LFOs and threatening to suspend his driver's license.

111.   Plaintiff FRRC, despite its sophistication and expertise in determining how to obtain information about outstanding LFOs, frequently encounters errors made by the Defendant Clerks of Court when attempting to pay off LFOs to help restore voting rights of its members. Because FRRC's grant money is specifically donated to help restore voting rights, its payments are meant only to pay LFOs required to restore voting rights, and not misdemeanor costs, collection costs, fees outside of the sentencing guidelines, incarceration fees, supervision fees, or any other fees.  Below is a non-exhaustive list of examples where the FRRC, in reliance on information provided by the Defendant Clerks of Court, overpaid, or was unable to ascertain what sums to accurately pay, when trying to pay off members' LFOs to restore their voting rights.

- In Indian River County, FRRC was improperly charged incarceration fees not part of the original sentencing document, as well as fees to establish payment plans and late fees.

- In Lee County, FRRC was improperly charged fees to pay off collection agencies, non-felony misdemeanor charges, charges for cases downgraded from felony to misdemeanor charges, charges for cases not identified in the system, and duplicate charges. When FRRC realized the discrepancy while auditing the fees paid, it raised the concern with a Lee County official.  The official stated that some fees had been refunded but that amount did not constitute the total

that FRRC was overcharged.  The fees not refunded include amounts related to cases reduced to misdemeanors, duplicative charges, and supervision fees, among others.  By FRRC's calculations, it is owed a further $9,456.57 that Lee County refuses to return.

- In Leon County, FRRC was improperly charged for payment plan establishment fees, late fees, and lien conversion charges.

- In Marion County, FRRC was improperly charged for collection costs, duplicate charges, and fees outside of the sentencing guidelines.

- In Orange County, FRRC was charged for misdemeanor courts costs, "D6" driver's license suspension fees, monthly collection fees, and "conversion" fees.

- In St. Lucie County, FRRC was improperly charged incarceration fees and duplicate charges.

- In Volusia County, FRRC was improperly charged non-felony misdemeanor fees.  The County Clerk of the Court further asserted it was not their responsibility to determine whether cases had been downgraded to misdemeanors.

112.    FRRC has limited resources, both to pay off LFOs and to conduct extensive audits to determine if it is being overcharged and/or charged for fees it does not intend to pay.  If FRRC and its pro bono attorney volunteers are unable to effectively navigate individual counties' systems for paying LFOs despite their resources, expertise, and experience, then a person with a prior felony without such outside assistance cannot be expected to do so on his or her own.  Further, the inability of County Clerks of Court to accurately calculate outstanding LFOs for individuals

inhibits FRRC's ability to fulfill its mission of ending disenfranchisement for individuals with prior felony convictions.  Even after FRRC has paid a County Clerk of Court in an amount that the Clerk represents will satisfy the individual's LFOs, FRRC cannot be certain that its payment on that individual's behalf has in fact satisfied that individual's LFOs.  FRRC is therefore intimidated in its non-partisan effort to encourage such individuals to vote even after FRRC has paid what it believes to be all of the individual's outstanding LFOs.

113.    Another effect of the improper overcharging of LFOs is that a person with a prior felony conviction who is assessed fees that are not owed may conclude that the amount owed presents an insurmountable barrier to voting.  Organizations like FRRC, which help their members by paying off LFOs, have limited funds and every dollar overcharged by a county is a dollar that cannot be spent on a properly assessed LFO.

### D.    *The Failures of the Supervisors of Elections*

114.    When the Department of State reviews a voter registration application and makes an initial determination of voter eligibility, the Department is then required to forward its collected information to the applicable Supervisor of Elections, who is then required to make a final determination as to the person's eligibility under Amendment 4.[84]  But neither the Department of State nor the Supervisors of Election, after completing their required reviews, notify people with prior felony convictions when they have successfully had their voting rights restored and are therefore eligible to vote.

115.    Florida Statutes Section 98.075(5), also requires the Department of State to retroactively identify people with prior felony convictions who are already registered in the voting rolls, but whose voting rights have been denied after a review of information received from the

---

[84] *Id.* § 98.0751(3)(a).

Clerk of the Circuit Court, the Board of Executive Clemency, the Department of Corrections, the Department of Law Enforcement, a United States Attorney's Office, or other sources.[85]   The Department of State is required to review such information, determine whether the information is credible and reliable, and then notify the Supervisor of Elections about the potential ineligibility of the registered voter.[86]   Once the Supervisor is notified that a person who is registered to vote may in fact not be eligible, the Supervisor has seven days to notify the registered voter of that potential ineligibility.[87]   The notice must include: a statement of the basis of the registered voter's potential ineligibility, a statement that failure to respond within 30 days after receipt of the notice may result in a determination of ineligibility and removal of the voter's name from the statewide voter registration system, a return form requiring the registered voter to admit or deny the accuracy of the information underlying the potential ineligibility, information regarding the voter's right to request a hearing, and instructions for the registered voter to contact his or her county Supervisor if assistance is needed.[88]   If the Supervisor determines that a registered voter is actually ineligible, the supervisor must remove the voter's name from the statewide voter registration system and notify the registered voter of the supervisor's determination and action.[89]

116.    Upon information and belief, Supervisors are not following these procedures and are not notifying voters subject to this review process when the Supervisors have concluded that persons with prior felony convictions are ineligible to register to vote or are improperly registered to vote.  The Supervisors' failures have harmed the Plaintiffs.  For example, after Mr. Sanchez and

---

[85] *Id.* § 98.075(5) ("The department shall identify those registered voters who have been convicted of a felony and whose voting rights have not been restored…").

[86] *Id.* § 98.075(5)(a).

[87] *Id.* § 98.075(7)(1).

[88] *Id.* § 98.075(7)(1)(a)-(g).

[89] *Id.* § 98.075(7)(a)(5).

Ms. Jones registered to vote, neither were alerted by the relevant Supervisors — of Miami-Dade and St. Lucie Counties, respectively — of their purportedly outstanding LFOs.

> **E.**     ***The 2019 Recommendations of the State's Voting Rights Work Group***

117.     Many of the problems that are central to the Defendants' failures to properly implement Amendment 4 and S.B. 7066 as described above were identified over three years ago by the Restoration of Voting Rights Work Group ("Work Group"), which was established pursuant to S.B. 7066.[90]    The stated purpose of the Work Group at formation was to conduct a comprehensive review of the Department of State's process of verifying registered voters who have been convicted of a felony, but who may be eligible for the restoration of their voting rights.[91] The Work Group was also directed to develop recommendations for the legislature, focused on the consolidation of all relevant data necessary to verify eligibility, and develop a process to appropriately inform voters of their status.

118.     The Work Group submitted a report to the Legislature in November 2019.  The Work Group made 18 recommendations and a number of findings relating to Amendment 4.

119.     In its report, the Work Group found that the existing mechanisms to support the implementation of S.B. 7066 were deficient and recommended that the relevant arms of the State Department work together to align the implementation of S.B. 7066 with the spirit of Amendment 4.[92]    Little, however, has been done by the Defendants in the past three and a half years to implement the Work Group's recommendations.

---

[90] Ch. 2019-162, § 33 (2019), https://www.flsenate.gov/Session/Bill/2019/7066/BillText/er/HTML.

[91] *Id.*

[92] Fla. Dept. of State, *Report by the Restoration of Voting Rights Work Group to the President of the Florida Senate and the Speaker of the Florida House of Representatives*, 22 (Nov. 2019), https://files.floridados.gov/media/702245/11119-19-rvr-final-report.pdf.

120.    For example, the Work Group found there is no single source where information detailing LFOs is captured, and that payments are not uniformly tracked by any particular entity.[93] The Work Group specifically recommended that the Clerks of the Court be tasked with receiving and tracking all LFO payments, and that the Clerks' financial accounting system be enhanced such that it tracks the payment of financial obligations; includes a breakdown of financial obligations by category such as restitution, fines, fees, and court costs; and segregates original amounts ordered as terms of the sentence from any cost and fees accrued after the sentence, such as interest or costs of collections.  The Work Group further recommended that the Florida Legislature provide funding to Clerks of the Court for temporary additional manpower to enable the Clerks to bring more records into electronic form.[94]  And the Work Group recommended that the Commission on Offender Review work with the Secretary of State to "create a uniform process" for determining LFOs, including for information "not available or ascertainable through Clerk of Court and/or the Florida Department of Corrections records."[95]   These recommendations have not been implemented.

121.    The Work Group also found that "the more opportunities for a citizen to receive consistent restoration of voting rights information, the better."[96]   The Work Group further recommended that the information pertaining to the loss of voting rights be initially provided to a defendant during a plea colloquy, as well as included with the notice provided by the Department of Corrections.[97]  This recommendation has not been implemented.

---

[93] *Id.* at 18.

[94] *Id.* at 19.

[95] *Id.* at 24.

[96] *Id.* at 20.

[97] *Id.* at 22.

122.     The Work Group explicitly acknowledged the role that stakeholder agencies such as the Department of State, the Florida Department of Corrections, Supervisors of Elections, and the Florida Commission on Offender Review must play in the process of informing a registered voter of his or her eligibility for restoration.[98]  It further identified mechanisms by which arms of the Department of State should centralize information to ease the burden placed upon individual agencies as well as people with prior felony convictions themselves.   Specifically, recommendation B.4 states that "all stakeholder agencies in the process, including the Florida Department of State, the Florida Department of Corrections, Supervisors of Elections, and the Florida Commission on Offender Review, likewise designate restoration of voting rights liaisons to further assist in inter-agency information sharing."[99]   Recommendation A.5 states that the Florida Legislature should "explore the option of developing, implementing and funding an automated and interconnected system for consolidating relevant data and tracking financial obligations related to criminal offenses for use by government agencies" or "[a]lternatively . . . explore an avenue of creating a public interface component to the existing CCIS system."[100]   The legislature has not explored, much less implemented, these recommendations.

123.     While the Work Group recommended that "restitution payments, and all other fines, fees, and costs, be made through the Clerks of Court to allow for tracking," this system still does not exist.[101]   Instead, County Clerks still lack the necessary information and routinely direct applicants to other agencies, who are not able to find the needed information.

---

[98] *Id.*

[99] *Id.*

[100] *Id.* at 19.

[101] *Id.* at 24.

124.    Many of the other Work Group recommendations — including those to provide for the patching of internal systems and more robust information sharing with the people with prior felony convictions — also have not been implemented.

\* \* \* \* \* \*

125.    As detailed above, the Defendants, through their acts and omissions, have created and perpetuated barriers to the automatic restoration of voting rights pursuant to Amendment 4 by providing incomplete, inconsistent, and unreliable information, or refusing to provide any information at all, to citizens with prior felony convictions.  This is a national embarrassment, notwithstanding the presence of a clear solution to the problem.  As recently as April 2023, Defendant Byrd acknowledged to Florida legislators that he "would love to see a statewide database" collecting the data necessary for the state to fulfill its statutory duty to people with prior felony convictions.[102]  Although Defendant Byrd asserted that he "envision[s] a day that the state of Florida will take the lead and ha[ve] one centralized way that we can do this," the Defendants have abdicated their responsibilities and failed to demonstrate such leadership or to make reasonable efforts to pursue this obvious and attainable solution.  The Defendants' decisions, inactions and failures since November 2018 have succeeded in creating a system that directly contravenes the spirit and mandate of Amendment 4, and that effectively prevents many people with prior felony convictions, including Plaintiffs Rhoshanda Jones, Angel Sanchez, and Autumn Waite, from exercising their constitutional right to vote without fear of arrest and prosecution.

---

[102] Ashley Lopez, *Advocates in Florida Clamor for a Fix for the Formerly Incarcerated Who Want to Vote*, NPR.org, May 4, 2023, https://www.npr.org/2023/05/04/1173786694/felon-voting-database-florida-registration-card-disclaimer.

## V.     Defendants DeSantis, Byrd, and Glass Launch a Campaign of Arrests to Deter People with Prior Felony Convictions from Voting

126.    Faced with mounting public criticism and concern about the failures of the State of Florida to properly verify the eligibility of prospective voters, the Defendants doubled down. Rather than take action to correct the problems they helped create, the Governor, Secretary of State, and FDLE Commissioner initiated a statewide law enforcement campaign to intimidate people with prior convictions from voting.  This new initiative capitalized on and magnified the statewide fear and uncertainty among people with prior convictions by promoting the belief that criminal consequences would follow if they, even mistakenly and in good faith, voted when they were not eligible.  As described below, this effort by the Defendants further intimidated and deterred people with prior convictions from voting and attempting to vote, including Plaintiffs Jones, Sanchez, Waite, and Walthour, and from urging and aiding and attempting to urge and aid others to vote, including FRRC.

### A.     The Creation of the Office of Election Crimes and Security

127.    In January 2022, during Defendant DeSantis's televised State of the State address, he called for the creation of "an election integrity unit whose sole focus will be the enforcement of Florida's election laws."[103]

128.    On April 25, 2022, Defendant DeSantis signed Senate Bill 524 into law, creating the Office of Election Crimes and Security (the "OECS") within the State Department.[104]  Senate Bill 524 authorized the OECS to "[r]eceiv[e] and review[] notices and reports generated by

---

[103] Lori Rozsa & Beth Reinhard, *Florida governor proposes special police agency to monitor elections*, Wash. Post, Jan. 18, 2022, https://www.washingtonpost.com/nation/2022/01/18/florida-governor-proposes-special-police-agency -monitor-elections/.

[104] The Florida Senate, CS/CS/S.B. 524: Election Administration | Bill History, https://www.flsenate.gov/Session/Bill /2022/524/?Tab=BillHistory (last visited July 14, 2023).

government officials or any other person regarding alleged occurrences of election law violations or election irregularities in this state."[105]

129.    Defendant DeSantis explained that the creation of the OECS was "my idea, because people weren't getting prosecuted."[106]  He further explained that "[n]ow we have the ability with the attorney general and statewide prosecutors to bring these cases on behalf of the state."[107]

130.    At the time the OECS was created, there was no need for an "election integrity unit" in Florida because (a) other state and local law enforcement agencies — including agencies within Florida's executive branch controlled by Defendant DeSantis and local prosecutors elected by Florida voters — were and are authorized to investigate and prosecute election-related crimes; and (b) the number of election-related crimes committed in Florida is insignificant.[108]

**B.    *Defendants DeSantis, Byrd, and Glass Orchestrate and Publicize the Arrests of 20 People with Prior Felony Convictions, and Announce that there are "Many More" Such Arrests to Come***

131.    On August 18, 2022, at the direction of Defendant DeSantis and the OECS, FDLE officers arrested 20 individuals who voted in elections in 2020, each of whom had previously been convicted of murder or a felony sexual offense and charged them with felony voter fraud and false registration.

---

[105] Fla. Stat. § 97.022(1)(a).

[106] Lori Rozsa & Tim Craig, *DeSantis's New Election Crimes Unit Makes Its First Arrests*, Wash. Post, Aug. 18, 2022, https://www.washingtonpost.com/politics/2022/08/18/desantis-florida-election-arrests/.

[107] Michael Wines, *DeSantis Hails Voter Fraud Crackdown, but Start is Slow*, N.Y. Times, Aug. 18, 2022, https://www.nytimes.com/2022/08/18/us/desantis-election-voter-fraud.html.

[108] Nearly 11 million Floridians voted in the 2020 election, *see Florida Election Results*, Politico, Jan. 6, 2021, https://www.politico.com/2020-election/results/florida/, and, since the OECS's inception, it has prosecuted just 26 cases, one of which was not related to voting.

132.     Some of the individuals were arrested at their homes, at gunpoint, placed in handcuffs and taken away in police cars.[109]

133.     The defendants were prosecuted by the Office of the Statewide Prosecutor ("OSP"). The OSP is a prosecutor's office within Florida's executive branch, controlled by Defendant DeSantis.  The OSP's jurisdiction extends only to crimes that have occurred in, or affected, "two or more judicial circuits" in Florida.[110]

134.     In October 2022, pursuant to public records requests made by the press in Florida,[111] law enforcement agencies released video footage made by arresting officers' body-worn cameras, of some of the 20 arrests on August 18, 2022.

135.     The videos were published widely in the local and national press.

136.     During the arrests, both the arresting officers and the arrestees appear confused and uncertain about the charges, and the arrestees can be heard explaining that they believed they were eligible to vote in light of Amendment 4.[112]  The circumstances of the arrests and the arrestees' statements make it clear to any reasonable observer that at least some of the arrestees had no intent to violate the law and believed in good faith they were eligible to vote.  Indeed, some of the arrestees had been issued voter identification cards by the state, and/or had been advised by state representatives that they were eligible to vote (advice that turned out to be inaccurate, since each

---

[109] Sam Levine, *Man Arrested at Gunpoint in DeSantis Voter Fraud Crackdown, Video Shows*, The Guardian, Jan. 12, 2023, https://www.theguardian.com/us-news/2023/jan/12/florida-police-man-arrest-voter-fraud-body-camera.

[110] Fla. Stat. § 16.56.

[111] Sergio Bustos, *Crist Decries Voting-Fraud Arrests After Body Cam Video Shows Voters Shocked by Felony Charges*, USA Today, Oct. 19, 2022, https://www.tallahassee.com/story/news/politics/elections/2022/10/19/charlie-crist-ron-desantis-voting-fraud-arrests-police-body-camera-florida/10539631002/.

[112] *See, e.g.*, Lawrence Mower, *Police cameras show confusion, anger over DeSantis' voter fraud arrests*, Tampa Bay Times, Oct. 18, 2022, https://www.tampabay.com/news/florida-politics/2022/10/18/body-camera-video-police-voter-fraud-desantis-arrests/.

of the arrestees had a prior felony conviction for murder or a sexual offense: disqualifying offenses under Amendment 4).

137.    For example, FDLE officers arrested Tony Patterson at his Tampa home at approximately 8:40 am on August 18, 2022.  In the video of the arrest, one of the arresting officers approaches Mr. Patterson and says, "um, so, apparently, uh, apparently, I guess you have a warrant?"[113]  When Mr. Patterson asked "for what?," another arresting officer said "it's for voter stuff, man.  It's . . . what it is, it . . . I think the agents with FDLE talked to you last week about some voter fraud, voter stuff, when you weren't supposed to be voting, maybe?"  In a tacit concession that the Defendants and OECS viewed these arrests as a political act, rather than a matter of public safety, one officer explained, unprompted, that "they have reduced your bond quite a bit," and, although "it's two felony charges for voter fraud," "they've reduced it to $500 bonds."  The officer explained, "unfortunately, right now, we're gonna have to take you to jail, but you've got a bond right away.  You don't have to go to first appearance, nothing like that."

138.    As one of the officers placed Mr. Patterson in handcuffs, Mr. Patterson asked, "why they doing this to me?  I didn't do nothing to nobody, man.  Voter fraud!?  What is voter fraud?"  One of the officers responded, "voting when you're not supposed to, sir, is what our understanding of the warrant is.  Because of your sex offender status, you're not supposed to be voting."  Mr. Patterson responded, "I don't know this!  So what kind of felony that is?"  An officer responded, "I believe it's a F3, so the lowest felony there is."  Mr. Patterson said, "Voter fraud!?  Why is y'all doing this now and this [voting] happened years ago?"  An officer responded, "I don't know.  I have no idea, man."  Mr. Patterson said, "what is wrong with this state, man?! . . . Y'all said

---

[113] ABC Action News, *Bodycam Footage of Florida Man Being Arrested for Voter Fraud*, YouTube (Oct. 20, 2022), https://youtu.be/v2jTPsPQ6Dc.

anybody with a felony could vote, man.  What you mean, I couldn't vote?  I don't know this! . . .

I'm outta this state, man.  I'm done, I'm trying my best to get the hell outta this state, man . . . .

Y'all put me in jail for something I didn't know nothing about."

139.    Mr. Patterson asked, "When [did] this law came out?" to which one of the officers

responded, "I don't know . . . I'm not sure, bud."  Mr. Patterson said, "my brother told me to vote

. . . And then I thought . . . felons were able to vote.  That's what I signed a petition for, if I

remember.  Why would y'all let me vote if I wasn't able to vote?"  The officer responded, "I'm

not sure, buddy."  The officer later explained, "there's a stipulation in the law that sex offenders

and murderers are not allowed to vote, so . . . there's fine print, as far as my understanding goes."

Moments later, while the officer was on the phone, he said, "I've never seen these charges before

in my entire life."

140.    Ramona Oliver's arrest on August 18, 2022 proceeded much like Mr.

Patterson's.[114]  After arresting officers informed Ms. Oliver that there was a warrant for her arrest

for "voter fraud," one of the officers explained, again unprompted, that it was an "ROR [i.e., Ms.

Oliver would be released on her own recognizance, without a bond] . . . you go in, you get booked,

and then they're gonna release you from booking.  You're gonna be right back out."  Ms. Oliver

explained, "I voted, but I ain't commit no fraud."

141.    Defendant DeSantis held a press conference on August 18, 2022 to announce the

charges against Mr. Patterson, Ms. Oliver and 18 other individuals with prior felony convictions

for sex offenses or murder.  Defendant DeSantis asserted that the individuals were arrested because

they had committed offenses that rendered them ineligible to vote under Amendment 4.

---

[114]  CBS News, *Arrest Shows Confusion Over Florida's Voting Law*, YouTube (Oct. 18, 2022),
https://youtu.be/Cjt9Yuplkp8.

142.     At the press conference, Defendant DeSantis threatened, "[t]his is just the first step. There are many more in the pipeline . . .  We are not just going to turn a blind eye to this.  The days of that happening in Florida are over."[115]  Defendant DeSantis promised that the arrestees would "pay the price."[116]

143.     The arrests and Defendant DeSantis's press conference received extensive coverage in Florida and beyond, with stories appearing in every major Florida paper[117] and

---

[115] Matt Dixon, *Defendants targeted in DeSantis' voter fraud crackdown were told they could vote*, Politico, Aug. 26, 2022, https://www.politico.com/news/2022/08/26/desantis-voter-fraud-defendants-florida-00053788.

[116] Sara Boboltz, *Bodycam Video Shows Florida Police and Citizens Baffled During Voter Fraud Arrests*, HuffPost, Oct. 18, 2022, https://www.huffpost.com/entry/florida-voter-fraud-arrests-body-camera-video_n_ 634f1868e4b0b7 f89f5ba545.

[117] *See, e.g.*, Douglas Soule, *First voter fraud case dismissed; DeSantis' election crimes unit faces major setback*, Stuart News, Oct. 25, 2022; Wayne Washington, *Videos bring renewed criticism of crackdown on election fraud*, Pensacola News Journal, Oct. 24, 2022; Wayne Washington, *Election fraud crackdown gets criticism*, Gainesville Sun, Oct. 23, 2022; Lawrence Mower, *Florida's voting laws are 'broken,' felon advocates say following fraud arrests*, Mia. Herald, Oct. 19, 2022; Lawrence Mower, *Cameras show confusion, anger over voter fraud arrests*, Orlando Sentinel, Oct. 19, 2022; Lawrence Mower, *Police cameras show confusion, anger over DeSantis' voter fraud arrests*; *Local police carrying out the arrests were patient, understanding - almost apologetic*, Tampa Bay Times, Oct. 14, 2022; Skyler Swisher, *Arrests reveal 'broken system' Advocates pushing for flaws in voter fraud check to be addressed*, South Fla. Sun-Sentinel (Fort Lauderdale), Sept. 3, 2022; Zac Anderson, *DeSantis defends voter fraud prosecutions; Governor faces increasing criticism*, The Fla. Times-Union (Jacksonville), Sept. 1, 2022; Zac Anderson, *DeSantis defends voter fraud prosecutions that have drawn scrutiny*, Panama City News Herald, Sept. 1, 2022; Zac Anderson, *DeSantis defends voter fraud crackdown; Charges against some felons attract scrutiny*, Tallahassee Democrat, Sept. 1, 2022; Zac Anderson, *DeSantis defending voter fraud prosecutions; 20 felons face charges; move draws criticism*, Naples Daily News, Sept. 1, 2022; Zac Anderson, *Governor defends voter fraud charges*, St. Augustine Record, Sept. 1, 2022; Zac Anderson, *DeSantis announces voter fraud charges; 20 felons facing up to five years in prison*, Sarasota Herald Tribune, Aug. 20, 2022; Zac Anderson, *DeSantis announces voter fraud charges*, The News-Press (Fort Myers), Aug. 20, 2022; Zac Anderson, *DeSantis announces voter fraud charges*, Fla. Today (Brevard County), Aug. 20, 2022; Zac Anderson, *Gov. DeSantis announces 20 charged with voter fraud*, Ocala Star Banner, Aug. 20, 2022.

publications in at least thirty other states.[118]  Further, videos of the arrests were published in national news outlets and viewed by hundreds of thousands of individuals.[119]

144.    It was widely reported that, after the passage of Amendment 4 and prior to the 2020 election, the State Department issued voter registration cards to many of the individuals arrested in August 2022 (a fact that further highlighted the lack of intent on the part of the arrestees to break the law).  This was itself a violation of the Department's obligation under Florida Statutes §§ 97.021(8), 98.075(5) and 98.075(7) to identify individuals who are ineligible to vote because of a prior felony offense, and to remove them from the voter rolls.[120]

145.    Following the August 2022 arrests, state and county officials began to receive phone calls from people with prior felony convictions who were concerned about getting charged with voter fraud.[121]  One county supervisor indicated that, in the month immediately after the arrests, his office received a record number of calls from concerned individuals about being

---

[118] These states include Alabama, Alaska, Arizona, California, Colorado, Georgia, Illinois, Iowa, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, New Mexico, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, and Wisconsin. *See, e.g.*, Lori Rozsa, *The first arrests from DeSantis's election police take extensive toll*, Phila. Tribune, May 1, 2023; Gary Fields, Anthony Izaguirre, & Sudhin Thanawala, *State voter fraud units finding few cases from midterms*, Daily Press (Newport News, Va.), Nov. 27, 2022; LZ Granderson, *The 'election police' don't need to be right to be effective*, L.A. Times Online, Oct. 27, 2022; Michael Wines, *Voter Fraud Inquiry Nets 17 Arrests, DeSantis Says*, N.Y. Times, Aug. 19, 2022; Chloe Folmar, *DeSantis announces 20 charges of voter fraud by new election security office*, CBS – 9 WNCT (Greenville), Aug. 18, 2022.

[119] *See, e.g.*, *New Body Cam Footage Sheds Light On DeSantis 'Election Integrity' Arrests* (MSNBC Oct. 18, 2022); *'What the hell': Confusion over voter fraud arrests in DeSantis' crackdown* (CNN Oct. 19, 2022); *Florida governor announces voter fraud charges in ongoing investigation* (ABC News Aug. 19, 2022); *"What is voter fraud," asks a man arrested in DeSantis crackdown on voter fraud* (CBS News Oct. 18, 2022); *New Bodycam Video Shows Florida Residents Confused Over Voter Fraud Arrests* (NBC News Oct. 19, 2022); *Bodycam: Florida felons confused over voter fraud arrests* (NewsNation Oct. 19, 2022).

[120] Lawrence Mower, *Tampa Woman takes plea deal in DeSantis voter fraud case,* Tampa Bay Times, Nov. 28, 2022, https://www.tampabay.com/news/florida-politics/2022/11/28/tampa-woman-takes-plea-deal-desantis-voter-fraud-case/.

[121] Matt Shuham, *Some Eligible Ex-Felons Fear Voting Because of Ron DeSantis*, HuffPost, Oct. 28, 2022, https://www.huffpost.com/entry/ron-desantis-florida-former-ex-felon-voter-fraud-arrests_n_635c084ae4b0cf522df862a8.

prosecuted for voter fraud.[122]  The county supervisor noted that all of the individuals from whom he received calls were people with prior felony convictions who were eligible to vote.[123]

146.    According to a former Supervisor of Elections in Leon County, the arrestees included individuals who were "told by a government official that they could vote."  Moreover, "[m]any, if not all, of them also received voter information cards from the state, bolstering their belief that they were eligible to vote.  Still the 'election police' criminalized these honest mistakes as voter fraud."[124]  Indeed, an investigation into alleged illegal voting by persons with prior felony convictions in Alachua County found that the arrestees "were either told [by County election officials] or believed they were able to legally register and/or vote."[125]

147.    To date, prosecutors have agreed to resolve the charges against some of the 20 individuals arrested on August 18, 2022 in ways that confirm that the arrests were not viewed as matters of public safety or election integrity.

148.    For example, prosecutors agreed to resolve the charges against Ms. Oliver with a plea of "no contest" to a felony charge of voting fraud, for which she was not required to admit wrongdoing.  In exchange, prosecutors dismissed the other felony charge against Ms. Oliver and agreed to a sentence of time served for the few hours Ms. Oliver spent in county jail on the day of her arrest, with no parole, probation or community service.  Prosecutors also agreed that Ms. Oliver

---

[122] *Id.*

[123] *Id.*

[124] Sancho, Ion, *Florida Makes it Impossible to check voter eligibility, then pulls out handcuffs*, Orlando Sentinel, May 1, 2023.

[125] Investigative Summary: Election Laws - Voter Fraud, Alachua County Supervisor of Elections, Fla. Dep't of Law Enf't, Case No. JA-32-0008, 8th Jud. Cir. of Fla. (Feb. 3, 2022), at 13.

would not have to pay any of the fees that Florida law requires individuals to pay following a criminal conviction.[126]

149.    Prosecutors agreed to resolve the two felony charges against James Tolison, another individual arrested on August 18, 2022, in exchange for Mr. Tolison's agreement to plead "no contest" — again with no admission of wrongdoing — to the second-degree misdemeanor of disorderly conduct, in violation of Fla. Stat. § 877.03.

150.    Defendants DeSantis, Byrd, and Glass did not issue a press release or other announcement concerning the resolution of Ms. Oliver's or Mr. Tolison's cases, in contrast to Defendant DeSantis's public statements about the arrests on August 18, 2022.

151.    In contrast to the August 2022 prosecutorial decisions made by OECS described above, a local Florida prosecutor just two months later considered similar charges and declined to prosecute them.  In October 2022, the State Attorney for the Fifth Judicial Circuit in Florida — encompassing Citrus, Hernando, Lake, Marion, and Sumter Counties — announced that he was declining to prosecute six individuals who had previously been convicted of felony sex offenses for voting in the 2020 elections.  The State Attorney explained that the individuals had been issued voter registration cards by the Division of Elections in violation of Florida Statute § 98.075, and each "appear to have been encouraged to vote by various mailings and misinformation."  The State Attorney concluded that "the evidence fails to show willful actions on a part of these individuals," as required to prove a violation of the offenses set forth in Fla. Stat. §§ 104.011(1), 104.011(2), and "[t]herefore, the State is unable to file charges."[127]

---

[126] Lawrence Mower, *DeSantis Voter Fraud Case Ends with 'No Contest Plea' and No Punishment*, WLRN.org, Nov. 29, 2022, https://www.wlrn.org/news/2022-11-29/a-desantis-voter-fraud-case-ends-with-no-contest-plea.

[127] Letter from Jonathan Olson, Division Supervisor, State Attorney's Office, Lake County, Florida (Oct. 14, 2022), https://www.documentcloud.org/documents/23132338-lake-county-sex-offender-statement?responsive=1&title=1 ("Pursuant to Florida Statute 98.075, the department is required to notify the Supervisor of Elections if a person is ineligible to vote.").

**C.**     ***Defendants DeSantis and Byrd Expand their Authority to Arrest and Intimidate
People with Prior Felony Convictions***

152.     In the wake of the arrests by OSP described above, Defendants DeSantis, Byrd, and

Glass have taken steps to further expand their authority to charge individuals with voting crimes

and thereby to deprive locally elected prosecutors from exercising prosecutorial discretion in

considering and declining such charges.  These steps, too, were publicly promoted by Defendant

DeSantis, which has only increased the intimidation and fear of arrest among the population of

people with prior felony convictions in Florida who are hoping and intending to vote.

153.     As noted above, the OSP, at the direction of Defendant DeSantis, is responsible for

the prosecution of the individuals arrested on August 18, 2022, following the OECS's investigation

of those individuals.  As also noted above, prior to the August 18, 2022 arrests, the OSP's

jurisdiction was limited to prosecuting certain conduct that occurs in or affects two or more of

Florida's 20 judicial circuits.[128]

154.     At least three of the individuals arrested on August 18, 2022 have had their cases

dismissed on the ground that the OSP lacked jurisdiction over the defendants' conduct, because

the defendants' purportedly criminal acts occurred entirely within a single judicial circuit.[129]

---

[128] Fla. Stat. § 16.56 (2020).

[129] Joseph Ax, *Florida man's voter fraud charges dismissed in blow to DeSantis*, Reuters, Oct. 21, 2022, https://www.reuters.com/legal/florida-mans-voter-fraud-charges-dismissed-blow-desantis-2022-10-21/;   *see  also*
Colin Kalmbacher, *Another Florida Voter has Illegal Voting Charges Dropped in Wake of DeSantis-Backed Election Fraud Crackdown*, Law & Crime, Nov. 22, 2022, https://lawandcrime.com/voting-rights/another-florida-voter-has-illegal-voting-charges-dropped-in-the-wake-of-desantis-backed-election-fraud-crackdown/.

155.    In response to these dismissals, the jurisdiction of the OSP has been expanded expressly to encompass voting-related crimes.[130]   On February 14, 2023, Defendant DeSantis signed Senate Bill 4B into law, expanding the OSP's jurisdiction to "include any crime involving" voting in a state or federal election and voter registration, among other offenses.[131]

156.    As a result of Senate Bill 4B, Defendant DeSantis has authority to direct OSP to prosecute voting-related crimes anywhere in the State of Florida, including where locally elected prosecutors have exercised their discretion to decline prosecution, as in the Fifth Judicial Circuit, as described above.  As one Republican legislator explained, the purpose of the bill is "to ensure that [voting] crimes are in fact prosecuted in case there is a state attorney who decides not to prosecute.  There have been many instances where prosecutors have not prosecuted [voting] crimes, crimes where they did have evidence to go forward and they just didn't do it."[132]

157.    Defendant DeSantis has also requested a substantial budget increase for the OECS and publicized that request in connection with a purported crackdown on voting related crimes.

158.    For the 2022-2023 fiscal year — July 1, 2022 to June 30, 2023 — the OECS had a budget of $1,205,583 and a staff of 15 employees.[133]   During the 2022 calendar year, the OECS

---

[130] Michael Moline, *New measure could grease the skids on DeSantis' elections-crimes prosecutions,* Fla. Phoenix, Feb. 15, 2023, https://floridaphoenix.com/2023/02/15/new-measure-could-grease-the-skids-on-desantis-elections-crimes-prosecutions/ (quoting Florida legislator who explained that bill was intended "to ensure that crimes are in fact prosecuted in case there is a state attorney who decides not to prosecute.  There have been many instances where prosecutors have not prosecuted crimes, crimes where they did have evidence to go forward and they just didn't do it.").

[131] *See* The Florida Senate, S.B. 4-B, Statewide Prosecutor, https://www.flsenate.gov/Session/Bill/2023B/4B/BillText/er/HTML.

[132] Michael Moline, *New measure could grease the skids on DeSantis' elections-crimes prosecutions*, Fla. Phoenix, Feb. 15, 2023, https://floridaphoenix.com/2023/02/15/new-measure-could-grease-the-skids-on-desantis-elections-crimes-prosecutions/.

[133] Governor Ron DeSantis, Framework for Freedom, Fiscal Year 2023-2024, Office of Elections Crimes and Security, http://www.floridaleadsbudget.com/web%20forms/Budget/BudgetIssueDetail.aspx?p=office%20of%20election&AgencyTitle=STATE%20%3E%20ELECTIONS%20(Program)%20%3E%20OFFICE%20OF%20ELECTION%20CRIMES%20AND%20SECURITY%20%3E%20&si=45100500&pc=1601000000&icd=8500A20&title=OFFICE%20OF%20ELECTION%20CRIMES%20AND%20SECURITY.

investigations led to the arrest of just 26 individuals, including those discussed above, at an approximate cost of more than $46,000 per arrest.

159.    Although the OECS was involved in just 26 arrests in 2022 fiscal year, Defendant DeSantis has requested that its budget be more than tripled for the 2023-2024 fiscal year, to $4,283,630, and that its headcount be increased to 42 employees.

160.    In a press release issued on February 2, 2023 announcing Defendant DeSantis's proposed 2023-2024 budget, Defendant DeSantis publicized his request for an additional "$3.1 million and 27 positions to fully staff the" OECS in order "to investigate alleged violations and maintain the rule of law in Florida's elections."[134]

161.    The requested increase in the OECS budget was the first item listed on Defendant DeSantis's press release.

162.    Neither the press release nor Defendant DeSantis's 34-page 2023-2024 "Framework for Freedom" budget summary includes any request for additional funding for the Department of State or the Division of Elections to meet the Defendants' obligations to effectively implement Amendment 4 or S.B. 7066, or to assist people with prior felony convictions in their efforts to determine their eligibility to vote.[135]

---

[134] Press Release, Fla. Dep't of State, The Governor's 2023-2024 Fiscal Year Budget Expands the Office of Election Crimes and Security, and Assists with Election Preparedness (Feb. 2, 2023), https://dos.myflorida.com /communications/press-releases/2023/press-release-governor-ron-desantis-framework-for-freedom-budget-builds-on-election-integrity-and-boosts-arts-culture-and-historic-preservation/.

[135] Framework for Freedom, Fiscal Year 2023-2024, Framework for Freedom Budget Statewide Overview and Taxes, http://www.freedomfirstbudget.com/content/Current/Reports/BudgetHighlights.pdf.

**D.** **The Defendants Provide False Information that Further Exacerbates Fears of Arrests**

163. As noted above, the State Department maintains a webpage for the "Florida Online Voter Registration System." The web page provides various instructions and requirements about voter registration in Florida and a link through which a Florida resident can register to vote.[136]

164. With regard to the criminal penalties that can ensue from voting while ineligible, the Department's website, which is operated and controlled by Defendant Byrd, currently advises that "[i]t is a 3rd degree felony to submit false information" in connection with voter registration.[137]

165. This assertion incorrectly suggests that even the mistaken or unintentional submission of information that turns out to be false would constitute a felony under Florida law. That is not the law in Florida.[138]

166. By statute, only the "willful" submission of false information is a felony offense.[139] Under Florida law, the term "willful" refers to an act "that is voluntarily and intentionally performed with specific intent and bad purpose to violate or disregard the requirements of the law."[140] As Florida courts have explained, the "willfulness" requirement assures that "no one will

---

[136] Fla. Dep't of State, *Florida Online Voter Registration System – Welcome*, https://registertovoteflorida.gov/home.

[137] *Id.*

[138] *See* Fla. Stat. §§ 104.011(1) ("A person who *willfully* swears or affirms falsely to any oath or affirmation, or willfully procures another person to swear or affirm falsely to an oath or affirmation, in connection with or arising out of voting or elections commits a felony of the third degree. . . ." (emphasis added)), 104.011(2) ("A person who *willfully* submits any false voter registration information commits a felony of the third degree. . . ." (emphasis added)); 104.15 ("Whoever, *knowing* he or she is not a qualified elector, *willfully* votes at any election is guilty of a felony of the third degree. . . ." (emphasis added)).

[139] *See id.*

[140] *Fugate v. Fla. Elections Comm'n*, 924 So. 2d 74, 75 (Fla. 1st DCA 2006) (construing the term "willful" as used in Fla. Stat. Ch. 104); *see also United States v. Pomponio*, 429 U.S. 10, 12 (1976) (defining "willfulness" to "mean[] a voluntary, intentional violation of a known legal duty") (citation omitted); *Haner v. United States*, 315 F.2d 792, 794 (5th Cir. 1963) ("'Willful' generally means intentional, knowing, or purposeful, *as opposed to* careless, thoughtless, heedless, or inadvertent.").

be convicted of a crime because of a mistake or because he does something innocently, not realizing what he was doing."[141]

167.    As a result of this false and misleading public description of Florida law — on a website to which people with prior felony convictions are directed for advice — people with prior felony convictions are being further misled into believing that they could be criminally prosecuted and convicted if they register to vote and vote based on a mistaken, even if innocent, belief about their LFOs or other eligibility status.

168.    The Department's website also provides misleading information about the scope of Amendment 4.  It asserts that, "[t]o be eligible to register to vote, you must. . . [n]ot be a person convicted of a felony without having your right to vote restored."[142]  That assertion is followed immediately by the admonition that "[i]t is a 3rd degree felony to submit false information. Maximum penalties are $5,000 and/or 5 years in prison."

169.    This advice is also misleading and intimidating, because it suggests that the right to vote has not *already* been restored to people with prior felony convictions by Amendment 4, and that they may be charged with a felony, fined and imprisoned for voting without some further legal action.  Stated differently, the advice on the Department's website incorrectly suggests that a person with a prior felony conviction who has completed the terms of his or her felony sentences must take some additional legal step before they are entitled to vote.

---

[141] *Corrales v. State*, 84 So. 3d 406 (Fla. 1st DCA 2012) (citing *United States v. Hall*, 346 F.2d 875, 879 (2d Cir. 1965)).

[142] *See Florida Online Voter Registration System – Welcome*, *supra* note 136.

## CONCLUSION

170.     As described above, the conduct of the Defendants has had significant and lasting impacts on the Plaintiffs in this case; others with prior felony convictions who are confused and uncertain about their eligibility to vote; and still others who have been intimidated and discouraged from voting because they fear that exercising that fundamental right could lead to arrest and criminal prosecution.  The Defendants have used the legislative process, criminal enforcement, and taxpayer dollars to frustrate the will of Florida voters, as expressed in their overwhelming support for Amendment 4, to return the franchise to more than 1.4 million citizens in Florida.  The Defendants have continued to disenfranchise these citizens by abandoning the state's legal obligation to determine voters' eligibility; providing false information to potential voters; premising voter eligibility on the payment of financial obligations unrelated to their right to vote; and creating a new law enforcement agency that has orchestrated a campaign of arrests that have sent a message that voting, even in good faith, may result in arrest and prosecution.  Above all, the Defendants have defeated the promise of Amendment 4, which was to bring about an historic end to a 150-year constitutional injustice in Florida.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Intimidating Voters and Potential Voters in Violation of Section 11(b) of the Voting Rights Act of 1965

171.     Plaintiffs reallege and incorporate by reference paragraphs 1–170 of this Complaint as though fully set forth herein.

172.     Section 11(b) of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10307(b), prohibits voter intimidation and provides that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any

person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote. . . .”

173.    Defendants DeSantis, Byrd, and Glass violated Section 11(b) by taking actions that would intimidate a reasonable voter and, in fact, did and continue to intimidate Plaintiffs Jones, Sanchez, Waite, and Walthour for voting or attempting to vote.

174.    Defendants DeSantis, Byrd, and Glass also violated Section 11(b) by taking actions that would intimidate reasonable individuals and entities from urging and aiding individuals with prior felony convictions from voting or attempting to vote and, in fact, did and continue to intimidate FRRC.

175.    The Plaintiffs have been and will continue to be injured by Defendants' unlawful actions unless this court grants relief.

## SECOND CLAIM FOR RELIEF

### Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983
### Arbitrary and Disparate Treatment of Voters in Different Counties

176.    Plaintiffs reallege and incorporate by reference paragraphs 1–170 of this Complaint as though fully set forth herein.

177.    The U.S. Supreme Court prohibits the arbitrary allocation of the right to vote and prohibits "arbitrary and disparate treatment" either in the "allocation of the franchise" or "the manner of its exercise." *Bush v. Gore,* 531 U.S. 98, 104–06 (2000) (concluding that where "standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county" the state had violated the state's "obligation to avoid arbitrary and disparate treatment of the members of its electorate."). "Having once granted the right to vote on equal terms, the state may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 104–05; *see also Wexler v. Anderson,*452 F.3d 1226, 1231–32

(11th Cir. 2006) (identifying as "the question that is of constitutional dimension" under Supreme Court precedents as "[a]re voters in [some] counties less likely to cast an effective vote than voters in [other] counties.")

178.    The bedrock principle that arbitrary treatment of voters violates principles of equal protection is well-established.  *Dunn v. Blumstein,* 405 U.S. 330, 336 (1972) ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); *Louisiana v. United States,* 380 U.S. 145, 150–53 (1965) ("The cherished right of people in a country like ours to vote cannot be obliterated by the use of laws like this, which leave the voting fate of a citizen to the passing whim or impulse of an individual registrar."); *Reynolds v. Sims,* 377 U.S. 533, 563 (1964) ("Weighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable."); *Wesberry v. Sanders,* 376 U.S. 1, 7–8 (1964) ("[A]s nearly as is practicable[,] one man's vote in a congressional election is to be worth as much as another's.")

179.    Defendants' implementation of Amendment 4 in restoring the voting rights of people with prior felony convictions violates this fundamental principal of equal protection in numerous ways.  The State Defendants have not issued directives or enforced their guidance, leaving individual county officials to provide inconsistent assessments of which amounts constitute LFOs; use different protocols for allocating LFO payments for fines associated with felony offenses; and use different practices with respect to applying payments to fees such as collection agency fees that are not necessary to resolve to restore voting rights.  Individual county officials also provide inconsistent information on whether offenses have or have not been reclassified as misdemeanors and have different practices as to what specific information they provide to people with prior felony convictions.  Thus, in many instances, whether a voter's LFO

will restore voting rights depends entirely on the individual, disparate practices of different counties.

180.    The Defendant Secretary of State has compounded this lack of uniformity among counties by failing to provide guidance to the counties that will ensure that voters in different counties will be treated according to the same standards.

181.    This disparate and inconsistent application of procedures to resolve LFOs subjects voters to arbitrary and disparate treatment based solely on the where they reside, in violation of the Equal Protection Clause.

182.    At all relevant times, Defendants have acted under color of state law.

183.    Defendants have violated and will continue to violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. §1983.

### THIRD CLAIM FOR RELIEF

**First and Fourteenth Amendments to U.S. Constitution and 42 U.S.C. § 1983**
**Absence of Justification for Burden on the Right to Vote**

184.    Plaintiffs reallege and incorporate by reference paragraphs 1–170 of this Complaint as though fully set forth herein.

185.    The right to vote is a constitutional right protected by both the First and Fourteenth Amendments to the United States Constitution.

186.    State and local election laws and practices may not place burdens upon the constitutional right to vote unless relevant and legitimate interests of sufficient weight necessarily justify the magnitude and character of the burdens imposed. *See Democratic Exec. Comm. of Fla. v. Lee,* 915 F.3d 1312, 1318–19 (11th Cir. 2019).

187.    Laws imposing burdens on the ability of people with prior felony convictions to restore their civil rights are subject to judicial scrutiny for compliance with principles of equal protection. *Shepherd v. Trevino,* 575 F.2d 1110, 1114–15 (5th Cir. 1978).

188.    Defendants' implementation of Amendment 4 imposes burdens on people with prior felony convictions by depriving people with prior felony convictions of their right to vote by failing to implement a comprehensive or timely advisory opinion process, by failing to confirm whether new voters are eligible to vote before issuing them a voter information card, and by creating an atmosphere of fear and intimidation through the prosecution of persons with prior felony convictions for voting, including individuals who have been issued a voter information card.

189.    Defendants' implementation of Amendment 4 has imposed burdens on the right to vote of people with prior felony convictions who have paid off their LFOs, and are eligible to vote under Florida law, by failing to accurately acknowledge or document the payment of their LFOs. Defendants' implementation of Amendment 4 has imposed burdens on the right to vote of people with prior felony convictions who have not paid their LFOs, but wish to do so, by failing to provide a system where people with prior felony convictions can identify the LFOs that they owe.

190.    Defendants' implementation of Amendment 4 has also imposed burdens on the right to vote of people with prior felony convictions, regardless of whether or not they have paid their LFOs,  by creating an undue fear of arrest, fines and imprisonment as a result of the state's highly public and unnecessary campaign to arrest individuals for voting.

191.    The state has no legally sufficient justification for burdening the right of people with prior felonies to vote.

192.    At all relevant times, Defendants acted under color of state law in implementing S.B. 7066.

193.    Defendants' implementation of Amendment 4 thus violates the First and Fourteenth Amendment to the Constitution by imposing burdens on the right to vote of people with prior felony convictions without adequate justification.

### FOURTH CLAIM FOR RELIEF

### Equitable Accounting

194.    Plaintiffs reallege and incorporate by reference paragraphs 1–170 of this Complaint as though fully set forth herein.

195.    Florida law recognizes an action for equitable accounting when transactions are so complex as to preclude an adequate remedy at law.  *Kee v. Nat'l Reserve Life Ins. Co.*, 918 F.2d 1538, 1540 (11th Cir. 1990).   An action for equitable accounting is appropriate when the transactions "are so complicated that a jury would not be able to ascertain damages and a remedy at law is inadequate."  *Managed Care Sols, Inc. v. Essent Healthcare, Inc.*, 694 F. Supp. 2d 1275, 1280 (S.D. Fla. 2010).

196.    Plaintiff FRRC has, in reliance on information from Defendant County Clerks of Court, made payments to County Clerks of Court with the understanding that these payments were solely for the purpose of paying off LFOs of FRRC members to restore their voting rights.  Instead, County Clerks of Court used these funds to pay off misdemeanor costs, collection costs, fees outside of the sentencing guidelines, incarceration fees, supervision fees, and other fees, none of which were necessary to restore FRRC members' voting rights.

197.    FRRC, despite extensive audits and sophistication and expertise in paying off LFOs to restore voting rights, has in many instances learned, only after the fact, that it overpaid LFOs,

paid for fees it was not intending to pay, or was unable to ascertain if it overpaid and how much it needed to pay to resolve its members' outstanding LFOs.

198.    FRRC has repeatedly tried to work with Defendant County Clerks of Court to be reimbursed for fees paid that were not for valid LFOs and thus not intended to be covered by FRRC payments, and to work with counties to ascertain its members' actual LFO amounts due.  However, due to the refusal and/or inability of Defendants to provide accurate LFO information, FRRC has, in many instances, been unable to ascertain the actual amounts necessary to resolve their members' LFOs.

199.    There is not an adequate remedy at law.  The only way Plaintiff FRRC will be made whole is an equitable accounting of the thousands of transactions that occurred to determine exactly how much Plaintiff has overpaid.

200.    Plaintiff FRRC was and will continue to be harmed by the Defendants' conduct. Defendants' conduct has limited the amount of FRRC funds that are available to pay off LFOs and has otherwise hampered its efforts to carry out its mission.

201.    Plaintiff FRRC has been and will continue to be injured by the Defendants' unlawful actions unless this court grants relief.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectful request that this Court:

a)      Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' implementation of Amendment 4 violates Section 11(b) of the Voting Rights Act and the First and Fourteenth Amendments to the United States Constitution;

b)      Issue an injunction preliminarily and permanently ordering Defendants, their respective agents, officers, employees and successors, and all persons acting in concert with each

or any of them, to comply with their obligations under Florida law, including the Florida Constitution and Amendment 4 thereto and Florida Statutes Sections 98.075 and 98.0751, and federal law, including the United States Constitution, and the Voting Rights Act, including by completing the following within 60 days of the Court's order:

      i.      Establish a reliable state-wide database that allows individuals with prior felony convictions to determine if they have outstanding LFOs; the amount of any outstanding LFOs; the jurisdiction to which they owe any outstanding LFOs; and where payment may be made to satisfy any outstanding LFOs;

      ii.      For individuals with prior felony convictions registered to vote as of the date of the Court's order, make findings regarding the eligibility of each such registered voter consistent with Florida Statutes Section 98.075(5), and inform each such voter of the result of the review performed pursuant to Florida Statutes Section 98.075(7);

      iii.      For individuals with prior felony convictions found to be eligible to vote following the review described in (ii), issue an affirmative declaration from the Secretary of State to each such individual that they are eligible to vote, which the citizen can rely upon as a defense against any prosecution, fines or penalties;

      iv.      For all individuals with prior felony convictions who register to vote on or after the date of the Court's order, follow the procedures set forth in Florida Statutes Sections 98.075(5), 98.075(7) and 98.0751 and, for each such individual found to be eligible to vote in accordance with those procedures, issue an affirmative declaration from the Secretary of State to each such individual that they are eligible to vote, which such individual can rely upon as a defense against any prosecution, fines or penalties;

c)     Appoint a monitor to coordinate and oversee Defendants' development of and compliance with the means of remedying the problems described herein;

d)     Issue an order requiring the Secretary of State and the County Clerks to provide an accounting of funds paid by and on behalf of people with prior felony convictions and disgorgement of all monies accepted that were not applied in accordance with the Department of State's "First Dollar Policy," or were not necessary to restore the voting rights of people with prior felony convictions;

e)     Issue an order requiring Defendants to pay Plaintiffs' costs, expenses, and reasonable attorneys' fees incurred in the prosecution of this action, as authorized by, inter alia, 42 U.S.C. § 1988 and other applicable laws; and

f)     Grant such other and further relief as may be just and equitable.

Respectfully submitted,

*/s/ Edward Soto*
Edward Soto (Fla. Bar No. 265144)
Edward.soto@weil.com
Samuel Mendez (Fla. Bar No. 1022231)
Samuel.mendez@weil.com
Nathalie Sosa (Fla. Bar No. 1019126)
Nathalie.sosa@weil.com
**WEIL, GOTSHAL & MANGES LLP**
1395 Brickell Avenue
Suite 1200
Miami, Florida 33131
Telephone: (305) 577-3100

*- and –*

Carey Dunne *(pro hac vice forthcoming)*
carey@freeandfairlitigation.org
Michele Roberts *(pro hac vice forthcoming)*
michele@freeandfairlitigation.org
Kevin Trowel *(pro hac vice forthcoming)*
kevin@freeandfairlitigation.org

Martha Reiser *(pro hac vice forthcoming)*
martha@freeandfairlitigation.org
**FREE & FAIR LITIGATION GROUP**
266 W 37th Street
20th Floor
New York, NY 10018
Telephone: (646) 434-8604

*- and –*

John A. Freedman *(pro hac vice forthcoming)*
John.freedman@arnoldporter.com
Jeremy Karpatkin *(pro hac vice forthcoming)*
Jeremy.karpatkin@arnoldporter.com
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave NW
Washington, DC 20001-3743
Telephone: (202) 942-5000

*Attorneys for Plaintiffs*