**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

|  |  |  |
|---|---|---|
| FLORIDA RIGHTS RESTORATION COALITION, *et al.*, | ) ) ) |  |
| Plaintiffs, | ) ) | Case No. 1:23-cv-22688- |
| v. | ) ) | CMA |
| RONALD DESANTIS, in his official capacity as Governor of Florida, *et al.*, | ) ) ) |  |
| Defendants. | ) ) ) |  |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

ARGUMENT ....................................................................................................................6

I.     Plaintiffs Have Article III Standing to Bring Each of Their Claims.............................6

     A.     FRRC Has Alleged Injury in Fact...........................................................7

          1.     FRRC Has Diverted Resources Because of Defendants' Unlawful Acts, and It Therefore Has Organizational Standing. .................................7

          2.     FRRC Has Associational Standing Because the Individual Plaintiffs Have Standing. ....................................................9

     B.     The Individual Plaintiffs Have Suffered Injury in Fact. .........................................10

     C.     Plaintiffs' Injuries are Traceable to, and Redressable by, Defendants. .................12

II.     Sovereign Immunity Does Not Bar Plaintiffs' Claims and the State Defendants are Proper Defendants under *Ex parte Young*....................................................15

     A.     Sovereign Immunity Does Not Bar Plaintiffs' First Claim for Relief. .................15

     B.     No Defendant Is Entitled to Sovereign Immunity with Respect to Plaintiffs' Other Federal Claims. ....................................................16

     C.     The Supervisor Defendants Are Not Entitled to Sovereign Immunity. .................20

     D.     The State Defendants are Appropriate Defendants Under *Ex Parte Young*. .........20

III.     The *Jones* Litigation Does Not Provide a Basis to Dismiss. .............................................25

IV.     Each of the Complaint's Four Counts States a Claim......................................................26

     A.     Claim One: Plaintiffs Have Stated a Claim under § 11(b) of the Voting Rights Act. ....................................................26

     B.     Claim Two: Plaintiffs Have Stated a Claim for Relief Under the Equal Protection Clause. ....................................................28

1.      Plaintiffs Are Not Required to Allege Discriminatory Intent. ...................28

2.      Defendants' Remaining Challenges to Claim Two Are Inappropriate at the Pleading Stage. ........................................31

C.      Claim Three: Plaintiffs Have Stated an Undue Burden Claim Under the First and Fourteenth Amendments. ..........................................................33

D.      Claim Four: Plaintiffs' Have Stated a Claim for an Equitable Accounting. ..........34

V.      The Complaint Satisfies Rule 8. .............................................................................37

VI.      The Clerks' Remaining Arguments for Dismissal Lack Merit. .........................................38

A.      The Clerks' Job Description Relies on Disputed Facts. ..........................................38

B.      Plaintiffs Are Not Required to "Exhaust" State Remedies Before Asserting Federal Claims. ...............................................................................40

VII.      The Supervisors' Arguments for Dismissal Lack Merit. ...................................................41

A.      Plaintiffs Adequately Allege § 1983 Liability. ......................................................41

B.      The Supervisors' Joinder Argument Fails. .............................................................43

C.      Plaintiffs' Claim Against the Supervisors Is Neither Threadbare nor Conclusory. ..............................................................................................45

D.      Plaintiffs Have Stated an Equal Protection Claim Against the Supervisors. .........45

CONCLUSION ...............................................................................................................................47

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Acosta v. Democratic City Comm'n*,
   288 F. Supp. 3d 597 (E.D. Pa. 2018) ....................................................................17

*Ala. State Conf. of NAACP v. Alabama*,
   949 F.3d 647 (11th Cir. 2020) ......................................................................16, 27

*Alacare, Inc.-N. v. Baggiano*,
   785 F.2d 963 (11th Cir. 1986) .............................................................................40

*Alexander v. Fulton Cnty.*,
   207 F.3d 1303 (11th Cir. 2000) ...........................................................................43

*Alexander v. Sandoval*,
   532 U.S. 275 (2001).............................................................................................27

*Allen v. City of Graham*,
   No. 20-cv-997, 2021 WL 2223772 (M.D.N.C. June 2, 2021) ..............................26

*Am. Coll. of Emergency Physicians v. Blue Cross & Blue Shield of Ga.*,
   833 F. App'x 235 (11th Cir. 2020) ........................................................................9

*Andrews v. D'Souza*,
   No. 1:22-CV-04259-SDG, 2023 WL 6456517 (N.D. Ga. Sept. 30, 2023).............27

*Ariz. All. for Retired Ams. v. Clean Elections USA*,
   No. 22-cv-1823, 2022 WL 15678694 (D. Ariz. Oct. 28, 2022)..............................26

*Ariz. Democratic Party v. Ariz. Republican Party*,
   No. 16-cv-3752, 2016 WL 8669978 (D. Ariz. Nov. 4, 2016) ...............................27

*Attwood v. Clemons*,
   818 F. App'x 863 (11th Cir. 2020) ......................................................................21

*Bailey v. Janssen Pharm., Inc.*,
   288 F. App'x 597 (11th Cir. 2008) ......................................................................37

*Balsam v. Guadagno*,
   No. 14-01388 (SRC), 2014 WL 4054051, *5 (D.N.J. Aug. 14, 2014) ..................17

*Balsam v. Sec'y of the State of N.J.*,
   607 F. App'x 177 (3d Cir. 2015) .........................................................................17

*Barnett v. MacArthur*,
  956 F.3d 1291 (11th Cir. 2020) .................................................................42

*Baxter v. Roberts*,
  54 F.4th 1241 (11th Cir. 2022) ................................................................42

*Bedoyan v. Samra*,
  352 So. 3d 361 (Fla. Dist. Ct. App.2022) ...............................................35

*Black v. McGuffage*,
  209 F. Supp. 2d 889 (N.D. Ill. 2002) .......................................................29

*Bonner v. City of Prichard*,
  661 F.2d 1206 (11th Cir. 1981) ...............................................................33

*Bowyer v. Ducey*,
  506 F. Supp. 3d 699 (D. Ariz. 2020) .......................................................18

*Braggs v. Dunn*,
  257 F. Supp. 3d 1171 (M.D. Ala. 2017) ..................................................22

*Brown v. Ga. Dep't of Revenue*,
  881 F.2d 1018 (11th Cir. 1989) ..........................................................16, 18

*Bush v. Gore*,
  531 U.S. 98 (2000) ............................................................................ *passim*

*Campbell v. Knight*,
  109 So. 577 (Fla. 1929) ............................................................................36

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
  408 F.3d 1349 (11th Cir. 2005) .........................................................12, 18

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
  No. 04-CR-1780 (N.D. Ga. Jun. 18, 2004) ..............................................18

*Citizen Center v. Gessler*,
  770 F.3d 900 (10th Cir. 2014) ..................................................................32

*City of South Miami v. Governor*,
  65 F.4th 631 (11th Cir. 2023) ..................................................................24

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ..................................................................................10

*Colo. Mont. Wy. State Area Conf. of NAACP v. U.S. Election Integrity Plan*,
  No. 22-cv-00581-CNS, 2023 WL 1338676 (D. Colo. Jan. 31, 2023) ..............................26, 27

iv

*Common Cause/Georgia v. Billups*,
  554 F.3d 1340 (11th Cir. 2009) ...............................................................7, 8, 11

*Cordoba v. DIRECTV, LLC*,
  942 F.3d 1259 (11th Cir. 2019) ........................................................................12

*Courthouse News Serv. v. Forman*,
  601 F. Supp. 3d 1236 (N.D. Fla. 2022)..................................................20, 23, 41

*Cowen v. Ga. Sec'y of State*,
  960 F.3d 1339 (11th Cir. 2020) ........................................................................34

*Curling v. Raffensperger*,
  403 F. Supp. 3d 1311 (N.D. Ga. 2019)..............................................................30

*Dang v. Honda Motor Co., Ltd*,
  No. 6:14-cv-2071, 2015 WL 12830489 (M.D. Fla. Mar. 25, 2015)....................37

*Davis v. Bos. Sci. Corp.*,
  No. 2:17-CV-682-FTM-38CM, 2018 WL 2183885 (M.D. Fla. May 11, 2018) ...................38

*DeKalb Cnty. Sch. Dist. v. Schrenko*,
  109 F.3d 680 (11th Cir. 1997) ...............................................................16, 18, 19

*Doe v. Comm'r, N.H. Dep't of Health & Hum. Servs.*,
  No. 18-CV-1039-JD, 2020 WL 7481735 (D.N.H. Dec. 18, 2020)........................19

*Double AA Int'l Inv. Grp., Inc. v. Swire Pac. Holdings, Inc.*,
  No. 08-23444-CIV, 2009 WL 10667843 (S.D. Fla. Apr. 3, 2009)........................11

*Dream Defs. v. DeSantis*,
  553 F. Supp. 3d 1052 (N.D. Fla. 2021)..................................................20, 23, 41

*Ex parte Young*,
  209 U.S. 123 (1908)......................................................................... *passim*

*Fair Fight, Inc. et al. v. True the Vote, Inc. et al.*,
  No. 20-cv-00302, at *22 (N.D. Ga. Jan. 1, 2021) ................................................26

*First Fam. Mortg. Corp. of Fla. v. White*,
  549 So. 2d 1049 (Fla. Dist. Ct. App. 1989) .......................................................35

*Fla. State Conf. of NAACP v. Browning*,
  522 F.3d 1153 (11th Cir. 2008) ......................................................................7, 9

*Fla. State Conf. of NAACP v. Lee*,
  566 F. Supp. 3d 1262 (N.D. Fla. 2021)..............................................................44

*Florida State Conf. of NAACP v. Lee*,
   No. 4:21-CV-187-MW/MAF, 2021 WL 4810630 (N.D. Fla. Oct. 8, 2021) .........................31

*Focus on the Fam. v. Pinellas Suncoast Transit Auth.*,
   344 F.3d 1263 (11th Cir. 2003) ...............................................................................12, 13

*Fortune v. Kings Cnty. Democratic Cnty. Comm.*,
   598 F. Supp. 761 (E.D.N.Y. 1984) ......................................................................................40

*Fraga v. UKG, Inc.*,
   No. 22-20105-CIV, 2022 WL 19486310 (S.D. Fla. May 10, 2022)........................................6

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000)..........................................................................................................6, 9

*Ft. Lauderdale Food Not Bombs v. Ft. Lauderdale*,
   No. 15-60185-CIV, 2016 WL 11700270 (S.D. Fla. Sept. 30, 2016)........................................8

*G.F.B. Enters., LLC v. Toyota Motor Sales U.S.A, Inc.*, No. 23-CV-20392-RAR,
   2023 WL 2631467 (S.D. Fla. Mar. 24, 2023) .......................................................................39

*Ga. State Conf. of NAACP v. DeKalb Cnty. Bd. of Registration & Elections*,
   484 F. Supp. 3d 1308 (N.D. Ga. 2020) ..........................................................................20, 41

*Ga. State Conf. of the NAACP v. Georgia*,
   No. 1:21-CV-05338, 2023 WL 7093025 (N.D. Ga. Oct. 26, 2023) ......................................16

*Garcia v. Chapman*,
   911 F. Supp. 2d 1222 (S.D. Fla. 2012) ...............................................................................43

*Ga. Latino All. for Hum. Rts. v. Gov. of Ga.*,
   691 F.3d 1250 (11th Cir. 2012) ............................................................................................9

*Gov't Emps. Ins. Co. v. AFO Imaging, Inc.*,
   No. 8:20-CV-2419-VMC-CPT, 2021 WL 734575 (M.D. Fla. Feb. 25, 2021).......................37

*Green v. Mansour*,
   474 U.S. 64 (1985)...............................................................................................................20

*Harper v. Va. State Bd. Of Elections*,
   383 U.S. 663 (1966)........................................................................................................28, 29

*Harris v. Mexican Specialty Foods, Inc.*,
   564 F.3d 1301 (11th Cir. 2009) ...........................................................................................25

*Hearns v. San Bernardino Police Dep't*,
   530 F.3d 1124 (9th Cir. 2008) ........................................................................................37, 38

*Hunter v. Hamilton Cty. Bd. of Elec.*,
  635 F.3d 219 (6th Cir. 2011) ........................................................29, 31

*I.L. v. Alabama*,
  739 F.3d 1273 (11th Cir. 2014) ............................................................40

*Jacobson v. Fla. Sec'y of State*,
  974 F.3d 1236 (11th Cir. 2020) ................................................ *passim*

*Johnson v. Meadows*,
  418 F.3d 1152 (11th Cir. 2005) ......................................................40, 41

*Jones v. Governor of Fla.*,
  975 F.3d 1016 (11th Cir. 2020) ................................................ *passim*

*Jones v. Hamilton Cnty. Gov't, Tenn.*,
  530 F. App'x 478 (6th Cir. 2013) .........................................................25

*JPMorgan Chase Bank, N.A. v. Hayhurst Mortg. Inc.*,
  2010 WL 3952005 (S.D. Fla. Oct. 8, 2010)............................................38

*Kee v. Nat'l Res. Life Ins. Co.*,
  918 F.2d 1538 (11th Cir.1990) .............................................................35

*Krabach v. King Cnty.*,
  No. 2:22-CV-1252-BJR, 2023 WL 7018431 (W.D. Wash. Oct. 25, 2023)............................26

*Kramer v. Union Free Sch. Dist. No. 15*,
  395 U.S. 621 (1969)..............................................................................1

*Kusper v. Pontikes*,
  414 U.S. 51 (1973)...............................................................................17

*Lake v. Hobbs*,
  623 F. Supp. 3d 1015 (D. Ariz. 2022) ..................................................18

*Lan Li v. Walsh*,
  No. 16-81871-CIV, 2017 WL 3130392 (S.D. Fla. July 24, 2017) .........................35

*League of United Latin Am. Citizens-Richmond Region Council 4614 v. Pub. Int.*
  *Legal Found.*,
  No. 1:18-CV-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ...................8, 10, 11, 27

*League of Women Voters v. Brunner*,
  548 F.3d 463 (6th Cir. 2008) ................................................................29

*League of Women Voters of Fla., Inc. v. Lee*,
  566 F. Supp. 3d 1238 (N.D. Fla. 2021)..............................................31, 34

*League of Women Voters of U.S. v. Fields*,
    352 F. Supp. 1053 (E.D. Ill. 1972) ........................................................................................29

*Lemons v. Bradbury*,
    538 F.3d 1098 (9th Cir. 2008) ...............................................................................................29

*Lezark v. I.C. Sys., Inc.*,
    No. 2:20-CV-00403-CCW, 2023 WL 4571457 (W.D. Pa. July 18, 2023) ......................13, 14

*Losch v. Nationstar Mortg. LLC*,
    995 F.3d 937 (11th Cir. 2021) .........................................................................................13, 14

*Luckey v. Harris*,
    860 F.2d 1012 (11th Cir. 1988) ..............................................................................................21

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)................................................................................................................12

*Managed Care Sols., Inc. v. Essent Healthcare, Inc.*,
    694 F. Supp. 2d 1275 (S.D. Fla. 2010) ..................................................................................35

*Manders v. Lee*,
    338 F.3d 1304 (11th Cir. 2003) ........................................................................................20, 43

*Massey v. Coon*,
    865 F.2d 264 (9th Cir. 1989) .................................................................................................18

*Mayers v. New York Cmty. Bancorp, Inc.*, No. CV-03-5837(CPS), 2005 WL
    2105810 (E.D.N.Y. Aug. 31, 2005)........................................................................................28

*Menashi v. Am. Home Mortg. Servicing, Inc.*,
    No. 8:11-CV-1346-T-23EAJ, 2011 WL 4599816 (M.D. Fla. Oct. 4, 2011) .........................35

*Meshal v. Wright*,
    651 F. Supp. 3d 1273 (S.D. Ga. 2022)...................................................................................23

*Mich. Welfare Rts. Org. v. Trump*,
    600 F. Supp. 3d 85 (D.D.C. 2022)....................................................................................26, 28

*MJM Elec., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
    No. 8:22-CV-2008-KKM-JSS, 2023 WL 2649059 (M.D. Fla. Mar. 27, 2023) ....................43

*Monell v. Dep't of Soc. Servs. of City of New York*,
    436 U.S. 658 (1978)..........................................................................................................41, 42

*Mraz v. I.C. Systems, Inc.*,
    No. 2:18-cv-254-FtM-38NPM, 2020 WL 5876947 (M.D. Fla. Oct. 2, 2020).........................10

*Nail v. Browning,*
    74 So. 315 (Fla. 1917)............................................................................................36

*Nat'l Coal. On Black Civic Participation v. Wohl,*
    498 F. Supp. 3d 457 (S.D.N.Y. 2020)........................................................8, 10, 27

*New Ga. Project v. Raffensperger,*
    484 F. Supp. 3d 1265 (N.D. Ga. 2020) ....................................................................8

*Nielsen v. DeSantis,*
    469 F. Supp. D 1261 (N.D. Fla. 2020)...................................................................44

*Olagues v. Russoniello,*
    770 F.2d 791 (9th Cir. 1985) .................................................................................27

*Parks v. City of Warner Robins,*
    43 F.3d 609 (11th Cir. 1995) .................................................................................30

*Patsy v. Board of Regents of the State of Florida,*
    457 U.S. 496 (1982)...............................................................................................40

*Pennhurst State Sch. & Hosp. v. Haldeman,*
    465 U.S. 89 (1984)...................................................................................... c*passim*

*People First of Ala. v. Merrill,*
    467 F. Supp. 3d 1179 (N.D. Ala. 2020)...........................................................12, 23

*Pers. Adm'r of Mass v. Feeney,*
    442 U.S. 256 (1979)...............................................................................................30

*Ramos v. Miami-Dade Co. Bd. of Co. Comm'rs,*
    2008 WL 11410102 (S.D. Fla. July 10, 2008)......................................................42

*Resnick v. AvMed, Inc.,*
    693 F.3d 1317 (11th Cir. 2012) ...............................................................................9

*Reynolds v. Sims,*
    377 U.S. 533 (1964)...............................................................................................28

*Rhodes v. Siver,*
    No. 19-cv-12550, 2021 WL 912393 (E.D. Mich. Mar. 10, 2021).........................26

*Rhodes v. Siver,*
    No. 19-12550, 2021 WL 1565137 (E.D. Mich. Feb. 1, 2021)...............................27

*Riddell v. Nat'l Democratic Party,*
    508 F.2d 770 (5th Cir. 1975) .................................................................................17

*Royal Indem. Co. v. Knott*,
    136 So. 474 (Fla. 1931)...............................................................................................35, 36

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) ...........................................................28

*Scott v. Caldwell*,
    37 So. 28 85 (Fla. 1948).....................................................................................................36

*Seward v. Kholmuradov*,
    No. 7:23-CV-220, 2023 WL 6811030 (W.D. Va. Oct. 16, 2023) ...........................33

*Shelby Advocates for Valid Elections v. Hargett*,
    947 F.3d 977 (6th Cir. 2020) ..........................................................................................7

*Shepherd v. Trevino*,
    575 F.2d 1110 (5th Cir. 1978) .................................................................................26, 33

*Shields v. Wells Fargo Bank NA*,
    No. 3:12-CV-1900-N, 2013 WL 6231395 (N.D. Tex. Dec. 2, 2013)....................33

*Smith v. State of Ind.*,
    904 F. Supp. 877 (N.D. Ind. 1995) ...............................................................................40

*Sosa v. Martin Cnty., Fla.*,
    No. 20-12781, 2023 WL 1776253 (11th Cir. Feb. 6, 2023) ....................................42

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966)............................................................................................................27

*Sturm v. Rasmussen*,
    No. 18-CV-01689-W-BLM, 2019 WL 626167 (S.D. Cal. Feb. 14, 2019)............33

*Support Working Animals, Inc. v. Governor of Fla.*,
    8 F.4th 1198 (11th Cir. 2021) .........................................................................................24

*Supreme Fuels Trading FZE v. Sargeant*,
    No. 23-80633-CIV, 2023 WL 6121909 (S.D. Fla. Sept. 19, 2023)........................26

*United Mine Workers v. Gibbs*,
    383 U.S. 715 (1966)............................................................................................................43

*United States v. Everglades Coll., Inc.*,
    No. 12-60185-CIV, 2013 WL 11976904 (S.D. Fla. May 10, 2013)........................38

*United States v. Lopez-Lukis*,
    102 F.3d 1164 (11th Cir. 1997) .....................................................................................36

*Universal Life Church Monastery Storehouse v. McGeever*,
    No. 2:21-CV-618-NR, 2022 WL 214238 (W.D. Pa. Jan. 25, 2022)........................41

*Vega v. Semple,*
    963 F.3d 259 (2d Cir. 2020)..................................................................................19

*Verizon Md., Inc. v. Pub. Serv. Comm'n,*
    535 U.S. 635 (2002)..................................................................................16, 21

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977)..................................................................................30

*Vote.org v. Byrd,*
    No. 4:23-CV-111-AW-MAF, 2023 WL 7169095 (N.D. Fla. Oct. 30, 2023)..........................6

*Walters v. Fast AC, LLC,*
    60 F.4th 642 (11th Cir. 2023) ........................................................................13, 14

*Warth v. Seldin,*
    422 U.S. 490 (1975)..................................................................................8

*Washington v. Davis,*
    426 U.S. 229 (1976)..................................................................................30

*Watt v. VirtuOx, Inc.,*
    No. 19-61084-CIV, 2021 WL 6062721 (S.D. Fla. Dec. 22, 2021)................................32

*Wells Fargo Armored Serv. Corp. v. Ga. Pub. Serv. Comm'n,*
    547 F.2d 938 (5th Cir. 1977) ........................................................................40

*Wexler v. Anderson,*
    452 F.3d 1226 (11th Cir. 2006) ......................................................................30, 32

*Wilding v. DNC Servs. Corp.,*
    941 F.3d 1116 (11th Cir. 2019) ......................................................................13

*Will v. Mich. Dep't of State Police,*
    491 U.S. 58 (1989)....................................................................................41

*Williams v. Taylor,*
    677 F.2d 510 (5th Cir. 1982) ........................................................................33

*Zerweck v. State Comm'n on Ethics,*
    409 So. 2d 57 (Fla. Dist. Ct. App. 1982) ............................................................36

## Constitutional Provisions

Amend 1, U.S. Const. ...............................................................................*passim*

Amend. 11, U.S. Const. .............................................................................*passim*

Amend. 14, U.S. Const. .............................................................................*passim*

Amend. 15, U.S. Const. ...................................................................................................27

Amend. 24, U.S. Const. ...................................................................................................25

Art. V § 16, Fla. Const. ...................................................................................................36

Art. V § 20(c)(8), Fla. Const. ..........................................................................................13

Amend. 4, Fla. Const. ............................................................................................... *passim*

## **Statutes**

42 U.S.C. § 1997e(a).........................................................................................................41

52 U.S.C. § 10308(f).........................................................................................................40

Fla. Stat. § 28.246(2).........................................................................................................13

Fla. Stat. § 98.075(7).........................................................................................................46

Fla. Stat. § 98.0751(3).......................................................................................................46

O.C.G.A. § 21-2-219(a) ....................................................................................................18

Voting Rights Act § 11(b)..........................................................................................*passim*

## **Rules**

Fed. R. Civ. P. 12(b)(6).............................................................................................*passim*

Fed. R. Civ. P. 20(a)(2).....................................................................................................43

9th Cir. Rule 36-3(c).........................................................................................................18

## **Other Authorities**

Brief for Appellants, *Jones v. Gov. of Fla.*,
    2020 WL 4201298 (11th Cir. July 20, 2020)....................................................1, 19

Charles W. Merritt, *Jurisdictional Prerequisites for an Equitable Accounting*, 6
    Fla. L. Rev. 2, 235–36 (1953)....................................................................................35

## INTRODUCTION

In 2018, more than 65% of Florida voters approved Amendment 4 to the Florida Constitution, re-enfranchising individuals previously convicted of felony offenses.  (¶¶ 1, 2[1]). By that overwhelming majority, the citizens of Florida brought their state into the mainstream on this issue, and now—on paper, at least—Florida joins nearly every other state and the District of Columbia in permitting some or all individuals with prior felony convictions to exercise the right to vote, the very "foundation of our representative society."  *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626 (1969).  But today, five years later, in *practice*, hundreds of thousands of Floridians of all political persuasions—including the four individuals named in the Complaint (the "Individual Plaintiffs") and the members and constituents of the Florida Rights Restoration Coalition ("FRRC")—*still* cannot exercise the right that the people of Florida sought to return to them.

Defendants bear responsibility for this failure.  In 2020, in a previous facial challenge to S.B. 7066, Florida's legislation implementing Amendment 4—*Jones v. Governor of Florida*, 975 F.3d 1016, 1025 (11th Cir. 2020) (en banc)—Defendant DeSantis, Defendant Byrd's predecessor, and a group of Defendant Supervisors of Elections represented to the U.S. Court of Appeals for the Eleventh Circuit that the existing Florida statutory and regulatory scheme was sufficient to protect the federal rights of citizens like the Individual Plaintiffs and FRRC's members and constituents.[2]  In the ensuing three years, however, Defendants have failed entirely to abide by those commitments.  Defendants, through their acts and omissions:  (i) cannot, or will not, tell people with prior felony convictions how much they must pay in legal financial

---

[1] All references to "Complaint" and "Compl." are to the Amended Complaint and references to "¶" are to specific paragraphs therein.  (CM/ECF Dkt. No. 9).  References to "Br." are to Defendants' corrected motion to dismiss.  (CM/ECF Dkt. No. 330).  References to the "State Defendants" are to Defendants DeSantis, Byrd, Dixon, Coonrod, Davison, Wyant, and Glass. References to the "Supervisor Defendants" or "Supervisors" are to the County Supervisors of Elections identified on Exhibit A to the Complaint.  References to the "Clerk Defendants" or "Clerks" are to the County Clerks of Court identified on Exhibit B to the Complaint.  The terms "Claim One Defendants," "Claim Two Defendants," and "Claim Four Defendants" have the same meaning as in the Complaint.  (Compl. pp. 60 & n.143, 61 & n. 144, 67 & n.145).  Unless otherwise noted, emphasis, internal quotations, brackets, citations, and footnotes have been omitted from quotations.

[2] *See* Brief for Appellants, *Jones v. Gov. of Fla.*, 2020 WL 4201298 (11th Cir. July 20, 2020) at 53–55.

obligations ("LFOs") so that they may exercise the franchise (¶¶ 82–116); (ii) have failed to standardize the means by which county officials calculate outstanding LFOs that must be paid by such citizens before they can exercise the franchise (¶¶ 4, 83, 102–13, 179–81); (iii) have failed to issue advisory opinions to hundreds of people with prior felony convictions who have sought to confirm their eligibility to vote (¶ 93) or have issued advisory opinions that are so heavily caveated that no reasonable person could rely on them (¶¶ 90–92); (iv) have arrested individuals with felony convictions and charged them with felony offenses for voting, even after issuing them voter registration cards (¶¶ 131–51); and (v) have threatened that those arrests are only the "opening salvo" (¶¶ 6, 142).

As set forth in the Complaint, these acts and omissions in the wake of *Jones* have subjected Plaintiffs to arbitrary and disparate treatment, selective disenfranchisement and undue burdens on their right to vote in violation of the First and Fourteenth Amendments, and to intimidation in violation of the Voting Rights Act.  In light of this history, the Court should reject Defendants' further invocation of the mere *existence* of state law as a defense to these new federal claims.  (Br. 2–4, 22, 29, 30, 31, 33–35).  Given the Eleventh Circuit's holding in *Jones*—that the state's existing statutes and regulations are constitutional on their face— Defendants cannot deny that they understand their federal obligations, but they have ignored them nevertheless, along with their prior representations to the federal courts, the mandate issued by Florida voters in 2018, and the needs of their own constituents.

Contrary to Defendants' hyperbolic assertions, Plaintiffs' claims are modest.  Plaintiffs do not seek a federal "takeover" of the state's election apparatus (Br. 1) and they do not assert that the enforcement of existing state law is the only means by which Plaintiffs' constitutional injuries may be remedied (Br. 9–13).  Plaintiffs simply want Defendants to abide by their *federal* constitutional and statutory responsibilities to assist them in determining their eligibility to vote in a uniform and nonarbitrary way, and to stop engaging in conduct that intimidates them and others for seeking to vote in the first place.  These claims are all cognizable under the Fourteenth Amendment, irrespective of Florida state law, and the Court can remedy the alleged wrongs in myriad ways, without recourse to any particular state statutes or processes.

For these reasons and others set forth below, the Court should deny Defendants' motion to dismiss.  As explained in Part I of this memorandum, Plaintiffs have adequately pleaded Article III standing to pursue their federal constitutional and statutory claims.  Part II

demonstrates that Defendants' claim to sovereign immunity is meritless; binding precedent and persuasive authority makes clear that the *Ex parte Young* exception to Eleventh Amendment immunity permits Plaintiffs to assert their federal claims for prospective injunctive relief against each Defendant.  As set forth in Part III, Plaintiffs' *as-applied* claims are not barred by the Eleventh Circuit's decision in *Jones*, which resolved a *facial* challenge to a Florida statute not at issue in this case.  Part IV establishes that each of Plaintiffs' four Claims for Relief are properly pleaded under Rule 12(b)(6) and Defendants misstate the law and reach beyond the Complaint in arguing to the contrary.  Part V demonstrates that the Complaint complies with Rule 8, and Parts VI and VII explain why the remaining arguments asserted by the County Supervisors of Elections and County Clerks of Court are meritless.

## BACKGROUND

The ratification of Amendment 4 to the Florida Constitution should have been a resounding victory for democracy.  By that referendum in 2018, the citizens of Florida *intended* to return the franchise to well over a million Floridians, some 7% of the state's population.  (¶ 2).  Amendment 4 represented the nation's most significant expansion of the franchise in nearly 50 years.  (*Id.*).  Instead, in the five years since Amendment 4 was ratified, Defendants have created and perpetuated a broken and arbitrary system, in which the actors charged with protecting Plaintiffs' federal rights disclaim responsibility, point fingers at other officials, and intimidate the very individuals Amendment 4 was intended to re-enfranchise.

For example, despite the Secretary of State's responsibility to "protect the integrity of the electoral process" in the state by "main[taining]. . . accurate and current voter registration records," he lacks the ability to assess voter registration applications for people with prior felony convictions, and has failed to process tens of thousands of such applications that have been submitted to him in the years since Amendment 4.  (¶¶ 85–88).  The Secretary also presides over the advisory opinion system—which he and other Defendants pointed to as a shield in the *Jones* litigation—but that system has ground to a halt, and it fails to offer any protection to Plaintiffs and others seeking in good faith to determine their eligibility to vote.  (¶¶ 88–94).  Rather than address those obvious and well-publicized failures, the Secretary directs aspiring voters to consult instead criminal defense attorneys, who have *no* role to play in ensuring the federal rights underlying Plaintiffs' claims (¶ 90), and County Clerks of Court, who are wholly unable to meet the challenge (¶ 102), as the Clerks concede in their motion to dismiss (Br. 32).

The Secretary's refusal to address this problem informs the approach of other Defendants who also play a critical role in protecting Plaintiffs' federal rights.  Although the Secretary of the Department of Corrections and the Commissioners of the Board of Offender Review are required to inform individuals about the restoration of their civil rights, and advise individuals of their outstanding LFOs, they do not.  (¶¶ 95–101).  They too disclaim responsibility and point the finger back at the Secretary of State.  (¶¶ 99–100).

The same is true of Defendant County Clerks of Court.  Although the Clerks are responsible for keeping records of LFOs, they fail to do so in a uniform manner, they are frequently unable to access relevant records, they miscalculate LFOs, they fail to account for payments made towards the satisfaction of LFOs, they fail to apply LFO payments as required by state law, and some simply refuse to tell individuals whether they even owe outstanding LFOs, much less accurately report what that balance is.  (¶¶ 102–13).  The Clerks join in the finger pointing, too, asserting in their motion to dismiss that because they cannot create a statewide database, they cannot possibly bear any responsibility for the violations of federal law described in the Complaint.  (Br. 32–33).  That is not the law, however, and their argument is relevant principally for what it reveals about the state of the State and its failure to take even the most basic steps to protect Plaintiffs and others like them—citizens whose rights Florida voters intended to restore with Amendment 4.

The Supervisors, for their part, cast blame on the Clerks (Br. 49) and assert an unfounded authority to treat residents of the county over which they preside in any way they want, as long as they treat everyone in their county the same.  (Br. 46–48).  As set forth below, the federal Constitution commands otherwise.

Finally, although Defendant Byrd has acknowledged the problem and a possible solution (¶ 125), he, together with Defendants DeSantis and Glass ("the Claim One Defendants"), have compounded the effect of the state's broken system by initiating a law enforcement campaign that has intimidated people with prior convictions for voting.  (¶ 46).  Under the direction and control of Defendants DeSantis and Byrd, the state has spent millions of taxpayer dollars to create an unnecessary "election integrity unit" to investigate and prosecute individuals with prior felony convictions for voting.  (¶¶ 126–30).  To that end, in August 2022, the Claim One Defendants orchestrated the highly publicized arrest of 20 such individuals and held a

contemporaneous press conference threatening that there are "many more [arrests] in the pipeline," and that such arrestees would "pay the price." (¶¶ 141–42).

This broken system has harmed the Individual Plaintiffs. For example, Plaintiff Rhoshanda Bryant-Jones is a U.S. Army veteran who turned her life around long ago and now helps others suffering from drug addiction. (¶ 19). Based on a representation from the Brevard County Clerk of Court, she believed in good faith that she had completed paying her LFOs years ago, only to learn in 2021 that she still had thousands of dollars in LFOs outstanding—which she promptly paid. (¶ 20–21). Before Amendment 4 was enacted, she was also incorrectly advised by a state employee that she was eligible to vote. (¶ 22). Ms. Jones's experience with the state's unreliable system, combined with the Claim One Defendants' threat that more arrests of individuals with prior felony convictions are to come, has impermissibly and unconstitutionally burdened Ms. Jones's right to vote, and intimidated her for exercising her right to vote. (¶ 24).

Plaintiff Angel Sanchez, who obtained a J.D. after completing his term of imprisonment and is now studying for an L.L.M. at Yale, also believed in good faith that he had completed all the terms of his sentence, including payment of LFOs, only to learn of additional obligations of which he was not previously aware. (¶¶ 25, 26, 29). Mr. Sanchez was first advised in 2014 by his probation officer that he had paid all his outstanding LFOs. (¶ 27). Nevertheless, in 2020, he learned that the Miami-Dade County Clerk of Court's records incorrectly indicated that Mr. Sanchez still owed outstanding LFOs and that certain of his LFOs had been transferred to a debt collection agency without notice. (¶ 29). Even after Mr. Sanchez presented the Miami-Dade Clerk of Court and the collections agency with a court order and records demonstrating that he had paid his LFOs in full, neither would correct their records to reflect that fact. (¶ 30). Mr. Sanchez has voted and will continue to do so because of its importance to our democratic system, but his experience with the state's broken system and the Claim One Defendants' law enforcement campaign against people with prior felony convictions have impermissibly burdened his right to vote and intimidated him for voting. (¶ 34).

Like Ms. Jones and Mr. Sanchez, Plaintiffs Autumn Waite and Brandon Walthour have prior criminal convictions. (¶¶ 35, 39). Following the arrests orchestrated by the Claim One Defendants in August 2022 and threats of more arrests to come, Ms. Waite and Mr. Walthour have been intimidated from exercising their right to vote by the Claim One Defendants' actions. (¶¶ 37, 38, 40, 41).

The broken system perpetuated by Defendants has also harmed Plaintiff FRRC, on its own behalf and on behalf of its members and constituents.  FRRC is a non-profit organization dedicated to ending the disenfranchisement of and discrimination against people with convictions (¶ 10), and each of the Individual Plaintiffs is a member (¶¶ 19, 25, 35, 39).  FRRC has expended and diverted significant resources in an effort to help its members and associates navigate the state's byzantine voter registration system, as described in the Complaint.  (¶¶ 13, 17).  FRRC has also suffered actual financial harm in the course of assisting its members and constituents in paying off outstanding LFOs in 63 of Florida's 67 Counties.  (¶¶ 16, 111, 112).  In the course of paying off those LFOs, FRRC has learned that County Clerks across the state often miscalculate the amount of members' and constituents' LFOs, or cannot calculate the amount of outstanding LFOs owed at all.  (¶ 111).  As a consequence of these errors by the Clerks, FRRC cannot be certain that payments made on behalf of its members and constituents have satisfied any outstanding LFOs, and in many instances, FRRC has been led to pay erroneous excessive amounts.  (¶¶ 112, 199–200).  The broken system created and perpetuated by Defendants, together with the Claim One Defendants' law enforcement campaign, has intimidated FRRC from fulfilling its non-partisan mission of encouraging and aiding its members and constituents to vote.  (¶ 112).

## ARGUMENT

### I.  Plaintiffs Have Article III Standing to Bring Each of Their Claims.

Plaintiffs have Article III standing to bring their as-applied challenge to Defendants' implementation of Amendment 4 and S.B. 7066.  To establish Article III standing, a plaintiff must show that "(1) it has suffered an injury in fact . . . ; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (internal quotation marks omitted).  At the pleading stage, a plaintiff need "only . . . allege facts plausibly showing standing" and the court must draw "all reasonable inferences in Plaintiffs' favor."  *Vote.org v. Byrd*, No. 4:23-CV-111-AW-MAF, 2023 WL 7169095, at *2 (N.D. Fla. Oct. 30, 2023); *Fraga v. UKG, Inc.*, No. 22-20105-CIV, 2022 WL 19486310, at *3 (S.D. Fla. May 10, 2022).

In asserting that Plaintiffs have failed to meet this standard, Defendants ignore Plaintiffs' well-pleaded allegations and rely on cases that provide no support for their argument.  (Br. 6–9,

36–37).  As set forth below, FRRC and the Individual Plaintiffs have each suffered injuries-in-fact that are traceable to and redressable by Defendants.  The Court should reject Defendants' contrary argument.

A.      <u>FRRC Has Alleged Injury in Fact.</u>

*1.      FRRC Has Diverted Resources Because of Defendants' Unlawful Acts, and It Therefore Has Organizational Standing.*

Defendants ignore FRRC's well-pleaded factual allegations in asserting that FRRC has failed to establish an injury in fact sufficient to confer organizational standing and associational standing.  (Br. 6–9).  Defendants' sole argument in this regard—that FRRC has failed to allege that it has had to divert resources from its mission as a result of Defendants' conduct (Br. 7)—is plainly refuted by paragraphs 13 and 17 of the Complaint, which Defendants do not cite or otherwise address.  Paragraph 13 alleges that FRRC has diverted resources from housing and employment-related aid to assist members in assessing their eligibility to vote, and paragraph 17 alleges that FRRC has diverted resources from efforts related to employment, housing, bail reform, sentencing reform, and community reintegration to assist members in assessing their eligibility to vote.  (¶¶ 13, 17).  This is more than sufficient to plead injury in fact.  *See, e.g.*, *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (holding that an organization establishes organizational standing at the pleading stage by alleging that "'the defendant's illegal acts impair [the organization's] ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts.'" (quoting *Fla. State Conf. of NAACP. v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008)).[3]

The out-of-circuit case on which Defendants principally rely—*Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977 (6th Cir. 2020) (Br. 7)—supports FRRC's standing.  In *Shelby*, the Sixth Circuit held that the organizational plaintiff lacked standing in part because the organization had *not* alleged that the defendants' conduct resulted in the plaintiff having to divert resources away from core mission activities.  947 F.3d at 982.  FRRC, by contrast, *has* alleged that it has diverted resources as a result of Defendants' unlawful actions (¶¶ 13, 17), and those

---

[3] Rather than discuss paragraphs 13 and 17 of the Complaint, Defendants focus exclusively on paragraph 111 (Br. 7), which relates to FRRC's request for an equitable accounting, as alleged in Claim for Relief Four (¶¶ 196–203 (identifying errors FRRC has encountered has it has used grant money to pay off LFOs)).  Paragraph 111 has no bearing on FRRC's standing to pursue Claims for Relief Two and Three against Defendants.

allegations are sufficient to confer standing under the Sixth Circuit's decision in *Shelby* and binding Eleventh Circuit precedent.  *See Common Cause*, 554 F.3d at 1350 (holding that NAACP had organizational standing because it had to divert resources away from regular activities such as "voter registration, mobilization, and education" in order "to educate and assist voters in complying with the [challenged statute]"); *see also New Ga. Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1286 (N.D. Ga. 2020) ("[I]n election law cases, an organization can establish standing by showing that it will need to divert resources from general voting initiatives or other missions of the organization to address the impacts of election laws or policies.").

Defendants not only fail to acknowledge allegations in the Complaint that are fatal to their standing argument, but they also fail to distinguish among the Claims for Relief brought by FRRC.  Indeed, Defendants do not reference or otherwise address FRRC's standing to bring a claim under § 11(b) of the Voting Rights Act (Claim One), or its claim for an equitable accounting (Claim Four), and there is no serious argument that FRRC lacks organizational standing as to either.  With respect the Plaintiffs' § 11(b) claim, FRRC has alleged not only that it has diverted resources to address Defendants' intimidation of its members, *see Nat'l Coal. On Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 471 (S.D.N.Y. 2020) (holding that the plaintiff organization had standing to bring § 11(b) claim on this basis), but also that FRRC has *itself* been intimidated "from urging or aiding its members to vote" in violation of § 11(b) and will continue to be so absent intervention from this Court (¶ 18).  Intimidation is the "prohibited act[]" under § 11(b), *id.*, and FRRC's well-pleaded allegation of intimidation confers standing on FRRC to pursue Claim One, *see, e.g., Ft. Lauderdale Food Not Bombs v. Ft. Lauderdale*, No. 15-60185-CIV, 2016 WL 11700270, at *4 (S.D. Fla. Sept. 30, 2016) ("'There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy.'") (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975))), *aff'd in relevant part*, 11 F.4th 1266, 1287 (11th Cir. 2021);[4] *League of United Latin Am. Citizens-Richmond Region Council 4614 v. Pub. Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) (holding that plausible allegation of intimidation is sufficient to survive motion to dismiss § 11(b) claim).

---

[4] In addition to affirming that the plaintiff organization had "standing in its own right," the Eleventh Circuit reversed the district court's grant of summary judgment in favor of the defendant.  11 F.4th at 1297.

Similarly, with respect to FRRC's claim for an equitable accounting (Claim Four), FRRC has alleged that the organization *itself* has suffered concrete financial harm as a result of the Claim Four Defendants' conduct in improperly calculating LFOs and overcharging FRRC for amounts it has paid on behalf of its members and others.  (¶¶ 16, 198–203).  Those allegations provide ample support for FRRC's standing to pursue Claim Four.  *See, e.g.*, *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (explaining that "monetary loss" constitutes an injury sufficient to confer Article III standing).

> 2.  *FRRC Has Associational Standing Because the Individual Plaintiffs Have Standing.*

FRRC also has associational standing to pursue Claims One, Two, and Three.[5]  "An association has standing to bring suit on behalf of its members when [(1)] its members would otherwise have standing to sue in their own right, [(2)] the interests at stake are germane to the organization's purpose, and [(3)] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Friends of the Earth*, 528 U.S. at 181.  Defendants do not dispute the second and third parts of the associational standing test:  the interests at stake in this litigation—the voting rights of people with prior felony convictions—are plainly germane to the purpose and mission of FRRC (¶ 10 (alleging that FRRC is an organization that is "dedicated to ending the disenfranchisement and discrimination against people with convictions")), and Plaintiffs' claims do not require the participation of individual FRRC members because FRRC is not seeking monetary damages on behalf of its members.  *See Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d at 1160 ("[W]e are mindful that when the relief sought is injunctive, individual participation of the organization's members is not normally necessary.").

---

[5] As discussed above, FRRC has standing to pursue the equitable accounting claim (Claim Four) on its own behalf, not on behalf of its members.  With respect to Claims One, Two, and Three, the Court may reject Defendants' challenge to FRRC's standing on the ground that FRRC has *either* organizational *or* associational standing; the Court need not address both.  *See, e.g.*, *Ga. Latino All. for Hum. Rts. v. Gov. of Ga.*, 691 F.3d 1250, 1260 n.6 (11th Cir. 2012) (explaining that where "several organizational plaintiffs" had sufficiently pled organizational standing under a diversion of resources theory, the court need "not address associational standing of the plaintiff organizations"); *Am. Coll. of Emergency Physicians v. Blue Cross & Blue Shield of Georgia*, 833 F. App'x 235, 239 n.6 (11th Cir. 2020) (explaining that because the plaintiff organizations "sufficiently pled associational standing, [the court] need not reach" the question of whether the organizations also sufficiently pled organizational standing).

The only issue in dispute concerns whether the four FRRC members identified in the Complaint have standing to sue "in their own right," which confers standing on FRRC to bring suit on their behalf.  (Br. 7–8.)  As set forth below, each Individual Plaintiff has standing to pursue Claims One, Two, and Three, and FRRC therefore also has associational standing to bring those claims on their behalf.

B.    The Individual Plaintiffs Have Suffered Injury in Fact.

Defendants' challenge to the Individual Plaintiffs' standing exclusively relies on *Clapper v. Amnesty International USA*, a case describing Article III standing requirements for a pre-enforcement facial challenge to a statute.  (Br. 8–9.)  *See* 568 U.S. 398, 401 (2013) (noting that plaintiffs sought a "declaration that [the statute], on its face, violates" various constitutional provisions).  But this case is not a pre-enforcement facial challenge.  Defendants have had five years to implement Amendment 4 and S.B. 7066 and, as alleged in the Complaint, they have done so in ways that have violated, and continue to violate, the Individual Plaintiffs' federal Constitutional and statutory rights.  Although Defendants argue that the Individual Plaintiffs have alleged "hypothetical, fear-based future injuries" (Br. 8–9), each Individual Plaintiff has alleged *actual* injuries caused by Defendants' implementation of its felon re-enfranchisement program, and those injuries are sufficient to establish Article III standing to pursue Claims One, Two, and Three.

In the First Claim for Relief, each of the Individual Plaintiffs alleged specific facts to support their allegation that they each have been intimidated in exercising or attempting to exercise their right to vote in violation of the Voting Rights Act ("VRA").  (¶¶ 24 (Jones), 34 (Sanchez), 38 (Waite), 41 (Walthour), 171–75).  These allegations describe an *actual* ongoing injury that burdens each Individual Plaintiff's exercise of their right to vote, defined by Congress in the VRA, that gives rise to Article III standing.  *See Wohl*, 498 F. Supp. 3d at 471, 476 (explaining that intimidation is the "prohibited act[]" under § 11(b)); *League of United Latin Am. Citizens*, 2018 WL 3848404, at *4 (same); *Mraz v. I.C. Systems, Inc.*, No. 2:18-cv-254-FtM-38NPM, 2020 WL 5876947, at *2 (M.D. Fla. Oct. 2, 2020) ("Intangible injuries . . . can be concrete . . . especially when identified by Congress as legally cognizable injuries.").

Defendants also improperly rely on facts outside the Complaint and conflate the standing analysis with the merits of Plaintiffs' § 11(b) claim.  (Br. 8–9.)  At this stage of the litigation, Plaintiffs have alleged facts sufficient to establish an injury in fact under § 11(b) based on:

(1) Plaintiffs' inability to determine with certainty whether they are eligible to vote (¶¶ 18, 20–24, 26–34, 36–38, 40–42); (2) the unwillingness and inability of Defendants to fulfill their constitutional obligations to assist Plaintiffs in that endeavor (¶¶ 82–125); (3) the many errors made by Defendants in carrying out state law obligations to Plaintiffs (¶¶ *id.*); (4) the sensationalized and highly publicized arrests of individuals with prior felony convictions, notwithstanding their receipt of voter registration cards (¶¶ 126–51); and (5) the threat that more arrests are to come, and that those who voted when they were not eligible would "pay the price" (¶ 142).  Defendants' standing argument is in fact an attempt to dispute Plaintiffs' well-pleaded allegations of intimidation, and to urge the Court to find that Plaintiffs were *not* intimidated *as a matter of fact*, based principally on unsupported assertions beyond the Complaint about the purported characteristics of the individuals arrested by Defendants and the likelihood that Defendants would arrest the Plaintiffs.  (Br. 8).  These arguments are unrelated to the question of standing and they are in any event improper in a motion to dismiss.  *See, e.g., Double AA Int'l Inv. Grp., Inc. v. Swire Pac. Holdings, Inc.*, No. 08-23444-CIV, 2009 WL 10667843, at *3 (S.D. Fla. Apr. 3, 2009) ("A motion to dismiss a complaint for failure to state a claim requires that a court accept the facts pleaded as true and construe them in the light most favorable to the plaintiff."); *League of United Latin Am. Citizens*, 2018 WL 3848404, at *4 (explaining that defendants' contention that their conduct did not rise to the level of "intimidation" under § 11(b) was improper at the motion to dismiss stage where the court must accept as true plaintiffs' allegations of "fear of harassment and interference with their right to vote").  These arguments provide no basis to dismiss any of Plaintiffs' claims.

In the Second Claim for Relief, the Individual Plaintiffs have alleged they have been deprived of the equal protection of the laws because the voting eligibility of a person in Florida with a felony conviction can depend entirely on the individual, disparate practices of different counties in Florida.  (¶¶ 20–21, 23 (Jones), 27, 29–32 (Sanchez), 36 (Waite), 39–40 (Walthour), 83, 176–83).  This disparate treatment has resulted in three of the Individual Plaintiffs not voting in the 2022 general election (with the fourth being significantly burdened in doing so) and all four Plaintiffs alleging impairment of their right to vote in the next election.  (*Id.*).  This is a concrete injury that is sufficient to confer Article III standing.  *See Common Cause*, 554 F.3d at 1351 ("For purposes of standing, a denial of equal treatment is an actual injury" even if the

burden on the voter is "slight[]" and the "complainant is able to overcome the challenged barrier.").

In the Third Claim for Relief, the Individual Plaintiffs allege that Defendants have placed an undue burden on their right to vote by making it effectively impossible for them to determine whether they are eligible to vote while simultaneously subjecting them to potential arrest. (¶¶ 20–21, 23 (Jones), 27, 29–32 (Sanchez), 36–37 (Waite), 39–40 (Walthour), 184–95). This burden, too, has resulted in three of the Individual Plaintiffs not voting in the 2022 general election (with the fourth being significantly burdened in doing so) and all four alleging impairment of their right to vote in the next election. (*Id.*). This is an actual injury sufficient to confer standing. *See Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005) ("A plaintiff need not have the franchise wholly denied to suffer injury."); *People First of Ala. v. Merrill*, 467 F. Supp. 3d 1179, 1198 (N.D. Ala. 2020) ("Simply put, a voter always has standing to challenge a statute that places a requirement on the exercise of his or her right to vote.").

Defendants' challenge to the Individual Plaintiffs' standing, and therefore to FRRC's associational standing, is predicated on cases concerning a facial challenge—a kind of claim not present in the Complaint. The Individual Plaintiffs and FRRC have established Article III standing to pursue each of their claims.

C.    Plaintiffs' Injuries are Traceable to, and Redressable by, Defendants.

Plaintiffs have adequately pleaded that their injuries are traceable to and redressable by each of Defendants. (*See* ¶¶ 42–48, 82–116, 125, 131–69). The State Defendants and Supervisors do not dispute that the traceability and redressability requirements are satisfied as to them; only the Clerks dispute this. (Br. 23–29, 36). The Clerk Defendants' arguments fail to address the relevant legal principles, are wrong, and should be denied.

To satisfy the traceability requirement, a plaintiff must plead a "causal connection" between the plaintiff's harm and the defendant's conduct. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Although a plaintiff must plead a "plausible causal chain" between a defendant's action and the resulting harm, "the traceability requirement is less stringent than proximate cause." *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1271–72 (11th Cir. 2019). "[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344

F.3d 1263, 1273 (11th Cir. 2003).  Plaintiffs easily meet this requirement with respect to the Clerk Defendants.

Plaintiffs allege that the Clerks are the *only* government officials with the statutory responsibility to track individuals' outstanding court fines and fees.  (¶ 48 (citing Fla. Const. art. V § 20(c)(8) ("All fines and forfeitures arising from offenses tried in the county court shall be collected, and accounted for by the clerk of the Court"); Fla. Stat. § 28.246(2) ("[County Clerks] shall establish and maintain a system of accounts receivable for court-related fees, charges, and costs.")); Br. 26 (citing same provisions)).  Plaintiffs further allege that their injuries are traceable, in part, to the Clerks' inability to reliably determine whether a person with a prior felony conviction has outstanding LFOs (*e.g.*, ¶¶ 3–4, 17), "not the result of the independent action of some third party not before the court," *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020).  Plaintiffs' injuries are also plainly redressable by the Clerks given their access to information and responsibility for accurately assessing LFOs.  *See id.*

None of the Clerks' arguments suggest otherwise.  It is irrelevant, for example, that the Clerks do not make final determinations as to individuals' voting eligibility because, as the Eleventh Circuit has explained, "[a] plaintiff [] need not show . . . that the defendant's actions are the very last step in the chain of causation" and "harms that flow indirectly from the action in question can be said to be fairly traceable for standing purposes."  *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125–26 (11th Cir. 2019).  Here, the Clerks are alleged to have failed to track court fines and fees in a way that makes it possible for individuals with prior felony offenses, or the government officials with responsibilities for ultimately determining voting eligibility (i.e., the Supervisor Defendants and Defendant Secretary of State), to reliably determine whether an individual has outstanding LFOs.  (¶¶ 102–13).  A Clerks' failure may not be the last causal link in the chain of failures, but it is a link nonetheless, and that is sufficient to satisfy the traceability requirement.

In light of this, the Clerks' attempt to point the proverbial finger at the Secretary of State and the Supervisors is without merit.  (Br. 26–27).  Article III's traceability requirement is "less stringent than the tort-law concept of 'proximate cause,'" *Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023), and a plaintiff's injury is fairly traceable to a defendant "so long as even a small part of the injury is attributable to [the defendant]," *Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 943 (11th Cir. 2021); *Lezark v. I.C. Sys., Inc.*, No. 2:20-CV-00403-CCW, 2023 WL

13

4571457, at *10 (W.D. Pa. July 18, 2023) (same).  The ultimate question for purposes of Article III standing is whether the Clerks can establish that they "caused *none*" of Plaintiffs' alleged injuries, *Losch*, 995 F.3d at 943, or whether Plaintiffs "would have been injured in precisely the same way without the [Clerk's] alleged misconduct," *Walters*, 60 F.4th at 650.  That question cannot be answered at the pleading stage.  The Complaint plausibly alleges that the Clerks bear some responsibility for the injuries alleged by Plaintiffs, and that is sufficient to establish traceability for purposes of Article III standing.

Similarly, the Clerks' assertion that they cannot redress Plaintiffs' alleged injuries fails to acknowledge the Eleventh Circuit's seminal decision concerning redressability—*Jacobson*, 974 F.3d 1236—which compels a finding that Plaintiffs adequately alleged redressability in the Complaint.  Like the Supervisors of Elections in *Jacobson*, the Clerks execute their duties with respect to tracking and computing court fines and fees "independent" of the control of the other defendants in this case, which means that the Clerks—and only the Clerks—can be directed by the Court to redress this aspect of the harm alleged by Plaintiffs. *See id.* at 1253.  In other words, an injunction directed only at the non-Clerk Defendants, such as the Secretary of State or the Supervisors of Elections, would not reach and could not address the Clerks' failure to "maint[ain] and report . . . account records as prescribed by law." (Br. 26).  Accordingly, the Clerks are necessary parties to provide redress to the Plaintiffs, and Plaintiffs therefore have standing to sue them.

The Clerks' concession that it is currently "impossible" for them to reliably determine whether an individual has outstanding LFOs because, in order to make that determination, the Clerks need additional information that is only in the possession of *other* Defendants, (Br. 28–29), demonstrates why all Defendants are necessary to provide redress; it does not absolve the Clerks of their responsibility for Plaintiffs' injuries and their essential role in providing such redress.  As the Eleventh Circuit explained, the relevant inquiry in this context is whether the Clerks are necessary participants in the redress Plaintiffs are seeking. *See Jacobson*, 974 F.3d at 1253.  Plaintiffs alleged that the Clerks are necessary for redress (¶¶ 102–13), and the Clerks have not presented any legal argument to the contrary.  Plaintiffs have Article III standing to sue them and the Court should deny their request to be dismissed on this basis.

**II.    Sovereign Immunity Does Not Bar Plaintiffs' Claims and the State Defendants are Proper Defendants under *Ex parte Young*.**

As to the State and Supervisor Defendants, the Complaint seeks to vindicate only *federal* constitutional and statutory rights, alleges only *federal* constitutional and statutory claims, and seeks only prospective injunctive relief against the Defendants obligated to protect those *federal* rights.  (¶¶ 171–203, pp. 69–71 (Prayer for Relief)).  Accordingly, the Court should reject the State and Supervisor Defendants' argument that Plaintiffs' claims against them are barred by sovereign immunity, and the assertion made by certain State Defendants that they are not proper defendants under *Ex parte Young*.  (Br. 9–18).[6]

Ad discussed below, no Defendant can or does assert sovereign immunity with respect to the First Claim for Relief—brought under ¶ 11(b) of the VRA—because it plainly does not implicate state law and, in any event, every Court of Appeals to have considered the question has held that the VRA abrogated the states' sovereign immunity under the Eleventh Amendment. Further, *Pennhurst State School & Hospital v. Haldeman*, upon which the State and Supervisor Defendants principally reply (Br. 9–13), provides no support for their assertion that they are entitled to immunity for Claims Two and Three.  Sovereign immunity extends to "pendent *state-law claim[s]*" alleging "violat[ions] of *state law*."  465 U.S. 89, 96, 103 (1984) (emphasis added).  The Complaint contains only federal claims, *Pennhurst* is therefore inapplicable, and no Defendant is entitled to sovereign immunity.  All of the State Defendants are also appropriate parties under *Ex parte Young*.

A.    Sovereign Immunity Does Not Bar Plaintiffs' First Claim for Relief.

The Claim One Defendants (Defendants DeSantis, Byrd, and Glass) do not assert sovereign immunity with respect to Plaintiffs' First Claim for Relief under § 11(b) of the VRA (¶¶ 171–75), and there is no basis for the Court to dismiss it on that ground.  In the relevant section of Defendants' brief, Defendants do not cite § 11(b) or any other part of the VRA; they do not cite the paragraphs of the Complaint in which the § 11(b) claim is set forth; they do not discuss the elements of the § 11(b) claim; and they do not discuss Plaintiffs' detailed allegations concerning the acts and omissions of State Defendants DeSantis, Byrd, and Glass in connection with that claim.  (Br. 9–13).  Nor could the Claim One Defendants assert sovereign immunity

---

[6] The Clerk Defendants do not assert sovereign immunity with respect to any of Plaintiffs' claims.

with respect to the § 11(b) claim, given that it does not implicate state law, and every Court of Appeals to have addressed the issue—including the Eleventh Circuit—has held that the VRA abrogated state sovereign immunity. *See Ala. State Conf. of NAACP v. Alabama*, 949 F.3d 647, 651 (11th Cir. 2020), *judgment vacated sub nom. Alabama v. Alabama State Conf. of NAACP*, 141 S. Ct. 2618 (2021) (joining the "the Fifth and Sixth Circuits—the only other circuits that have considered this issue—[to] h[o]ld that Congress validly abrogated state sovereignty in the VRA.").[7]

> **B.** <u>No Defendant Is Entitled to Sovereign Immunity with Respect to Plaintiffs' Other Federal Claims.</u>

The Court should reject the State and Supervisor Defendants' assertion that *Pennhurst* has any bearing on Plaintiffs' *federal* claims, much less that it compels this Court to hold that the claims are barred by the Eleventh Amendment. (Br. 9). *Pennhurst* and its progeny concern "state-law claims brought into federal court under pendent jurisdiction." 465 U.S. at 121. The Complaint contains no such claims against the State or Supervisor Defendants. The Eleventh Circuit explained *Pennhurst*'s holding succinctly in *DeKalb County School District v. Schrenko*: "a federal court may not entertain *a cause of action* against a state for alleged violations of state law, even if that state claim is pendent to a federal claim which the district court could adjudicate." 109 F.3d 680, 688 (11th Cir. 1997) (emphasis added) (cited by Defendants at Br. 10); *see also Brown v. Ga. Dep't of Revenue*, 881 F.2d 1018, 1023 (11th Cir. 1989) ("Under *Pennhurst*, however, the determinative question is not the relief ordered, but whether the relief was ordered pursuant to state or federal law."). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002). In this case, that "straightforward inquiry" leads to an equally straightforward answer: "since the plaintiff[s] allege[] . . . violation[s] of the federal Constitution, *Pennhurst* does not apply." *Brown,* 881 F.2d at 1023.

---

[7] *See also Ga. State Conf. of the NAACP v. Georgia*, No. 1:21-CV-05338, 2023 WL 7093025, at *7 (N.D. Ga. Oct. 26, 2023) (acknowledging that *Alabama NAACP* "was ultimately vacated [by the Supreme Court] as moot," but "conclud[ing] that the majority's analysis [in that case] remains persuasive").

The Complaint does not, as State and Supervisor Defendants' assert, "repackage" state law claims into Plaintiffs' federal constitutional claims merely because they point to relevant state laws.  (Br. 10).  Plaintiffs' claims concern their federal rights under the Voting Rights Act and the First and Fourteenth Amendment.  It is of course true that the "administration of the electoral process is a matter that the Constitution largely entrusts to the States," "[b]ut, in exercising their powers of supervision over elections and in setting qualifications for voters, the States may not infringe upon basic constitutional protections." *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973); *Riddell v. Nat'l Democratic Party*, 508 F.2d 770, 778 (5th Cir. 1975) (striking down Mississippi law and citing *Kusper*).  Here, Plaintiffs allege arbitrary and disparate treatment, selective disenfranchisement, and unjustified burden, all in violation of the First and Fourteenth Amendment, and violations of § 11(b) of the VRA.  Each of Plaintiffs' claims against the State and Supervisor Defendants flow from obligations arising under the *federal* Constitution or a federal statute; they do not merely recite claims to some entitlement under state law.

The cases upon which the State and Supervisor Defendants rely make this plain.  Indeed, far from supporting the State and Supervisor Defendants' argument, the Third Circuit's unpublished decision in *Balsam v. Secretary of the State of New Jersey*, 607 F. App'x 177, 183 (3d Cir. 2015) (cited at Br. 10), is fatal to it.  In *Balsam*, the court considered the plaintiffs' First and Fourteenth Amendment claims concerning New Jersey's "primary election system" in light of substantive law, not sovereign immunity.  Consistent with *Pennhurst*, the district court in *Balsam* dismissed only the plaintiffs' pendent *state law* claims—not any of the plaintiffs' *federal* claims—on grounds of sovereign immunity, *see Balsam v. Guadagno*, No. 14-01388 (SRC), 2014 WL 4054051, *5 (D.N.J. Aug. 14, 2014) (citing *Pennhurst* and explaining that "[c]laims premised upon New Jersey's state constitution and its civil rights statute, even if they are for prospective injunctive relief, could not by definition fit under the *Young* exception"), and the Third Circuit affirmed on sovereign immunity grounds only as to those *state law* claims, 607 F. App'x at 183 ("State Law Claims").  Similarly, in *Acosta v. Democratic City Commission* (cited at Br. 10), the district court rejected any claim of sovereign immunity as to the *federal* constitutional claims brought against state officials for prospective relief and held that sovereign immunity shielded state officials only from the plaintiffs' "state law claim for violation of the Pennsylvania Election Code."  288 F. Supp. 3d 597, 627–28 (E.D. Pa. 2018).  Nothing in *Balsam* or *Acosta*, or any of the other cases cited by the State and Supervisor Defendants, supports their

assertion that *Pennhurst* permits, much less compels, dismissal of Plaintiffs' claims seeking to vindicate their federal constitutional rights.[8]

Cases within the Eleventh Circuit provide no support for the understanding of *Pennhurst* the State and Supervisor Defendants urge the Court to adopt.  In *Brown*, for example, the plaintiff alleged a deprivation of his *federal* constitutional right to due process when the state terminated his employment without the hearing to which he was entitled under *state* law.  881 F.2d at 1019.  The district court agreed and ordered defendants to provide the plaintiff with the hearing required by state law as redress for the violation of federal law.  *Id.* at 1022.  On appeal, the Eleventh Circuit rejected the defendant's *Pennhurst* argument and affirmed, explaining that "[u]nder *Pennhurst*, . . . the determinative question is not the relief ordered, but whether the relief was ordered pursuant to state or federal law," and because the "the district court ordered the [state law] hearing under federal law," *Pennhurst* was not implicated.  *Id.* at 1023–24. *Charles H. Wesley Education Foundation* is also analogous: there the Eleventh Circuit affirmed entry of a preliminary injunction against Georgia state officials for voting-related claims brought under the National Voter Registration Act and the First and Fourteenth Amendments, 408 F.3d at 1351, notwithstanding the plaintiffs' citation to and reliance on certain Georgia statutes that supported their claim, *see* No. 04-CR-1780 (N.D. Ga. Jun. 18, 2004) (CM/ECF Dkt. No. 1 ¶ 17 (citing various provisions of Georgia law and asserting that O.C.G.A. § 21-2-219(a) supported the plaintiffs' claims because it "provide[s] simply that [the] state[] 'shall accept' NVRA registration applications for voter registration purposes").  In *DeKalb County School District v.*

---

[8] The remaining cases cited by the State and Supervisor Defendants bear no meaningful analogy to the federal constitutional claims alleged by Plaintiffs.  (Br. 10).  In *Massey v. Coon*—an unpublished Ninth Circuit decision that "may not be cited" within the Ninth Circuit, *see* 9th Cir. Rule 36-3(c)—the plaintiff alleged federal claims based on the state's alleged unlawful conduct in "assigning [the defendant] to serve as circuit court judge *pro tem* in plaintiffs' quiet title action in state court."  *Massey v. Coon*, 865 F.2d 264 (9th Cir. 1989).  In *Lake v. Hobbs*, the district court held that a claim concerning the type of voting machine used by the state was barred by the Eleventh Amendment because the decision was entirely within the discretion of the state.  623 F. Supp. 3d 1015, 1030 (D. Ariz. 2022), *aff'd sub nom. Lake v. Fontes*, 83 F.4th 1199 (9th Cir. 2023).  And in *Bowyer v. Ducey*, the district court rejected the plaintiffs request to "set aside the result of the 2020 General Election," and to, inter alia, "declare the election results unconstitutional, and seize all voting machines, equipment, software, and other election-related records and materials, including all ballots cast," because the plaintiffs' claims appeared to be "entirely based on state law" and, in any event, concerned only "past conduct," not ongoing violations.  506 F. Supp. 3d 699, 706–07, 716 (D. Ariz. 2020).

*Schrenko*, upon which Defendants rely (Br. 10–11), the Eleventh Circuit relied on *Pennhurst* to vacate a district court judgment awarding retroactive monetary costs and prospective adherence to "a state funding statute" concerning payment for school transportation, 109 F.3d at 690— relief that bears no resemblance to Plaintiffs' request for prospective injunctive relief.[9]

Against this legal backdrop, the State and Supervisor Defendants overlook the relevance of the *Jones* litigation and Florida state law in Plaintiffs' federal constitutional claims.  In *Jones*, a subset of the Defendants represented to the Eleventh Circuit that Florida's existing statutory and regulatory scheme was sufficient to protect the federal rights of individuals, like Plaintiffs, who need information and confirmation from the state concerning their eligibility to vote.  *See* Brief for Appellants, *Jones v. Gov. of Fla.*, 2020 WL 4201298 (11th Cir. July 20, 2020) at 53– 55.  There *Defendants* asserted that the state's existing mechanisms—including the ability to make inquiries to the Clerk Defendants and to request advisory opinions—would satisfy the state's constitutional obligations.  *See id.*  The Clerks make a similar representation to this Court in the motion to dismiss.  (Br. 32–33).

Now, despite Defendants' acknowledgement in *Jones* of their obligation to protect Plaintiffs' federal rights, and their representation that they would satisfy those obligations through the existing state procedures, they have failed to do so.  Defendants cannot have it both ways.  After successfully arguing in *Jones* that their state mechanisms were—on paper— constitutionally effective, they should not now be allowed to argue that their failure to effectively follow those very procedures cannot be assessed by a federal court in the context of a new, as-applied constitutional challenge.  Indeed, it would turn the Supremacy Clause on its head to

---

[9] *See also Vega v. Semple*, 963 F.3d 259, 283–84 (2d Cir. 2020) (rejecting argument that "*Pennhurst* . . . prohibits Plaintiffs' prayer for prospective relief for violations of federal law because Plaintiffs point to Connecticut law in discussing the federal constitutional standard allegedly violated," and explaining that "*Pennhurst* . . . does not compel dismissal of claims for prospective relief against state officers in their official capacities for alleged violations of federal law simply because the party seeking such relief refers to state law in order to bolster their federal claim"); *Doe v. Comm'r, N.H. Dep't of Health & Hum. Servs.*, No. 18-CV-1039-JD, 2020 WL 7481735, at *3 (D.N.H. Dec. 18, 2020) ("The plaintiffs are challenging th[e state's] practice as a violation of the due process clause of the Fourteenth Amendment, whether or not that practice also violates [cited state statutes]. . . .  Those references to the [state] statute as a benchmark do not convert their federal constitutional claim into a state law claim."), *aff'd sub nom. Doe v. Shibinette*, 16 F.4th 894, 904 (1st Cir. 2021) (holding that *Pennhurst* was not implicated because "even if [state] law were different than it now is . . . [Plaintiffs] would still be entitled under the Fourteenth Amendment to an injunction. . . .").

conclude that *Pennhurst* and its progeny immunize Defendants against Plaintiffs' *federal* constitutional claims where Defendants have acknowledged the *federal* interests that Plaintiffs are asserting, established a regulatory scheme to protect those *federal* rights, and thereafter refused to effectively implement that regulatory scheme on an as-applied basis.  *See Green v. Mansour*, 474 U.S. 64, 68 (1985) ("[T]he availability of prospective relief of the sort awarded in *Ex parte Young* gives life to the Supremacy Clause.").  Plaintiffs' requests for relief extend well beyond mere state law requirements, and include a request for "further relief as may be just and equitable."  (Compl. pp. 69–71).  Accordingly, as in *Doe*, *Vega*, and *Charles H. Wesley*, Plaintiffs are "plainly seeking more than just a direction that state officials must 'conform their conduct to state law,'" *Doe*, 16 F.4th at 904, and the Eleventh Amendment does not bar any of Plaintiffs' claims.

      C.     The Supervisor Defendants Are Not Entitled to Sovereign Immunity.

      In asserting sovereign immunity, the Supervisors acknowledge that they have been "enlisted to carry out state policy" in connection with the actions challenged in the Complaint. (Br. 13–15 (citing *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc)).  The *Ex parte Young* exception to the Eleventh Amendment applies to municipal officials in their official capacity carrying out state policy to the same extent it applies to state officials in *their* official capacity.  *See, e.g.*, *Courthouse News Serv. v. Forman*, 601 F. Supp. 3d 1236, 1244 (N.D. Fla. 2022) (finding that County Clerk of Court was acting as "arm of the state" and the plaintiff plausibly alleged a § 1983 claim under *Ex parte Young*); *Dream Defs. v. DeSantis*, 553 F. Supp. 3d 1052, 1086 (N.D. Fla. 2021) (same, as to county sheriff); *Ga. State Conf. of NAACP v. DeKalb Cnty. Bd. of Registration & Elections*, 484 F. Supp. 3d 1308, 1320 (N.D. Ga. 2020) (finding that, if local entity were entitled to immunity, it would not shield individual local officials from suit under *Ex parte Young*).  The Supervisors concede that they are charged with "carry[ing] out state policy under state control and regulation" (Br. 16) and, accordingly, the Court should deny their assertion of sovereign immunity because, like the State Defendants, they are subject to the *Ex parte Young* exception.

      D.     The State Defendants are Appropriate Defendants Under *Ex Parte Young*.

      The Court should reject the argument made by Defendants DeSantis, Dixon, Glass, Coonrod, Davison, and Wyant that they do not have a sufficient connection to the challenged conduct for the exception to sovereign immunity under *Ex parte Young* to apply.  (Br. 16–17).

As explained above, to determine whether *Ex parte Young* applies, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon*, 535 U.S. at 645.  The application of this "straightforward inquiry" demonstrates those requirements are clearly satisfied here, and none of the State Defendants' arguments suggest otherwise.

Defendants' argument is premised on a misunderstanding of *Ex parte Young*.  Where, as here, a plaintiff challenges a course of conduct rather than a particular statute, *Ex parte Young* requires only that a plaintiff plead "some connection" between the defendant and "the unconstitutional act or conduct complained of."  *Luckey v. Harris*, 860 F.2d 1012, 1015–16 (11th Cir. 1988); *see also Attwood v. Clemons*, 818 F. App'x 863, 868 (11th Cir. 2020) ("[A] constitutional deprivation need not be pursuant to the enforcement of a state law or policy [for the *Ex parte Young* exception to apply]; any act by a state official—as long as it is performed under color of state law—is sufficient.").  In other words, Defendants are wrong as a matter of law that the *Ex parte Young* exception only applies to officials responsible for enforcing a "particular provision" of a challenged statute.  (Br. 17–18).

Plaintiffs pleaded the requisite "connection" between these State Defendants and the unconstitutional conduct complained of to invoke *Ex parte Young*.  For instance, in Claim Two, Plaintiffs allege that the conduct of the Claim Two Defendants has resulted in the arbitrary and disparate treatment of voters in different counties in violation of their Equal Protection rights. (¶¶ 176–83).  Plaintiffs have included specific allegations describing the ways in which the conduct of each of the Claim Two Defendants has contributed to this harm, including the conduct of Defendant DeSantis, who is the only State Defendant named in Claim Two that is challenging his status as a defendant under *Ex parte Young*.  (¶¶ 176–83; Br. 16).  In particular, Plaintiffs have alleged that Defendant DeSantis has actively resisted and impeded restoration of returning citizens' voting rights, including by "not issu[ing] any directives" or "provid[ing] [any] guidance to the counties that will ensure that voters in different counties will be treated according to the same standards," and threatening that people who were confused would be prosecuted "and pay the price."  (¶¶ 76–81, 142–143, 179, 180).  In so doing, Defendant DeSantis has directly contributed to the arbitrary "free-for-all" that has harmed Plaintiffs. (¶¶ 82–83).  It is that persistent combination of acts and omissions—rather than any general supervisory authority inherent to the role of the governor—that renders him an appropriate Claim

21

Two defendant under *Ex parte Young*.  *See Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1265 (M.D. Ala. 2017) (finding state prison officials were appropriate defendants under *Ex parte Young* where the plaintiffs alleged a combination of acts and omissions by the defendants resulted in prisoners receiving constitutionally deficient medical care).

Plaintiffs also adequately pleaded the requisite connection between Defendants Dixon, Glass, Coonrod, Davison, and Wyant and the conduct challenged in Claim Three.  In Claim Three, Plaintiffs contend that Defendants have unduly burdened Plaintiffs' right to vote by creating and perpetuating a chaotic and broken system that makes it impossible for people with felony convictions to determine whether they are eligible to vote and by initiating a statewide law enforcement campaign to arrest and prosecute people with felony convictions for voting. (¶¶ 184–95).  Plaintiffs have included detailed allegations describing the role each Defendant plays in this conduct (*e.g.*, ¶ 192(a)–(g)).  Those allegations concerning the State Defendants include:

- Defendant DeSantis:  Defendant DeSantis has failed to ensure the executive branch complies with its constitutional obligations, including its obligations to comply with state law (*e.g.*, ¶¶ 82–83, 180, 192(a)).  Defendant DeSantis has also spearheaded a law enforcement campaign that has intimidated people with felony convictions from voting.  (¶¶ 126–62).  Defendant DeSantis has played a central role in this intimidation campaign both through his role as the head of FDLE (¶¶ 42, 131) and through specific exercises of his executive power (¶¶ 127–29 (alleging the Governor personally called for the creation of an election integrity unit and described the creation of OECS as "[his] idea, because people weren't getting prosecuted").  Defendant DeSantis has also made public statements that have magnified the fear and uncertainty among people with prior convictions who wish to vote (¶ 126), including statements at a press conference after the August 2022 arrests, in which he said the arrests were "just the first step" and that "many more [were] in the pipeline."  (¶ 142).

- Defendant Glass:  Defendant Glass serves as the head of FDLE, which has carried out the arrest campaign that has intimidated Plaintiffs.  (¶¶ 46, 131–51).  The FDLE is also required by law to provide information to the Department of State regarding registered voters "who have been convicted of a felony."  (¶ 46).

- Defendant Dixon:  Defendant Dixon serves as the Secretary of the Department of Corrections ("DOC"), which is responsible by law for identifying persons convicted of a felony and providing such information to the Department of State so the Department of State may remove such persons from voter rolls.  (¶ 44). The DOC is also required to advise a person in writing upon their release from supervision of "all outstanding terms of the inmate's sentence".  (¶ 96).  The Department of Corrections routinely fails to comply with these obligations, which

makes it impossible for many people with felony convictions to determine whether they have outstanding LFOs.  (¶¶ 95–101).

- <u>Defendants Coonrod, Davison and Wyant</u>:  Defendants Coonrod, Davison and Wyant are Commissioners of the Florida Commission on Offender Review, which is required by law to provide information to the Department of State regarding persons granted clemency, the date they were granted clemency, and other specific identifying information about such persons.  (¶ 45).  The Commission routinely fails to comply with these obligations, which makes it impossible for many people with felony convictions to determine whether they have outstanding LFOs.  (¶¶ 95–101).

These allegations establish that each of the State Defendants sued in Claim Three has "some connection" to the unconstitutional conduct that has injured Plaintiffs.  *See Ex parte Young*, 209 U.S. 123, 157 (1908).  Indeed, courts have concluded that where, as here, a plaintiff is challenging an ongoing unconstitutional practice or policy (as opposed to a particular statute), the officials overseeing the agencies that are engaging in the challenged conduct are appropriate defendants under *Ex parte Young*.  *See Meshal v. Wright*, 651 F. Supp. 3d 1273, 1282, 1286 (S.D. Ga. 2022) (finding the commissioner of Georgia's Department of Public Safety was an appropriate defendant under *Ex parte Young* where the plaintiff alleged the commissioner led a department that had an ongoing practice of executing seizures that violated the Fourth Amendment); *Courthouse News Serv.*, 601 F. Supp. 3d at 1244–45 (finding County Clerk was proper defendant under *Ex parte Young* where the plaintiff alleged the county's policy of delaying access to civil complaints until after clerical processing was completed resulted in an ongoing First Amendment violation).

The Eleventh Circuit's decision in *Jacobson* further confirms that the State Defendants are appropriate defendants under *Ex parte Young*.  In *Jacobson*, the Eleventh Circuit explained that although the question of whether *Ex parte Young* and Article III's traceability and redressability requirements are closely related, the bar for satisfying Article III's requirements is higher than the bar for satisfying *Ex parte Young*'s requirements.  *See* 974 F.3d at 1256.  Courts have interpreted this to mean that if a defendant is "sufficiently connected to the challenged [conduct] to establish traceability and redressability, they are necessarily sufficiently connected to satisfy the *Young* doctrine."  *People First of Ala.*, 467 F. Supp. 3d at 1204; *Dream Defs.*, 553 F. Supp. 3d at 1078 (explaining that the standing analysis and the *Ex parte Young* analysis "overlap[]" though "standing requires a more rigorous analysis").

Because Plaintiffs' injuries are both traceable to and redressable by the State Defendants, as in *Jacobson*, it would be impossible to obtain the relief Plaintiffs seek without the involvement of the State Defendants. *See Jacobson*, 974 F.3d at 1258. For instance, to resolve the arbitrary and disparate treatment described in Claim Two and the undue burden described in Claim Three, the Governor must stop undermining efforts to promote statewide uniformity concerning how LFOs should be calculated and how determinations should be made regarding voting eligibility; it will be impossible to remedy the challenged arbitrary and disparate treatment across counties without such standardized statewide guidance from Florida's executive branch. Further, Defendants DeSantis and Glass are necessary to remedy the undue burden alleged in Claim Three because that harm is traceable to their law enforcement campaign that is intimidating people with felony convictions from voting. Remedying the undue burden violation will also require the involvement of Defendants Dixon, Coonrod, Davison and Wyant because, as detailed above, the DOC and Commission on Offender Review each has information necessary to determine whether an individual has outstanding LFOs, and the DOC and Commission on Offender Review have failed to track and distribute that information so that other state actors—including the Clerks—have access to it. Therefore, not only are the State Defendants permissible defendants under *Ex parte Young*, but they are also necessary defendants under *Jacobson* because it would be impossible to obtain the relief Plaintiffs seek without them. *C.f. Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1205 (11th Cir. 2021) ("As we determined in *Jacobson*, a plaintiff's injury isn't redressable by prospective relief where other state actors, who aren't parties to the litigation, would remain free and clear of any judgment and thus free to engage in the conduct that the plaintiffs say injures them.").[10]

---

[10] Other recent Eleventh Circuit cases in which the court found certain state level defendants in Florida were not proper defendants in no way undermines this conclusion. For instance, in *City of South Miami v. Governor*, 65 F.4th 631, 640 (11th Cir. 2023), the Eleventh Circuit concluded the traceability and redressability requirements were not satisfied with respect to Florida's Governor and Attorney General because the challenged statute was enforced only by local officials and involved no action or decision-making by either the Governor or the Attorney General. *Id.* 641–42. That is entirely unlike the circumstances here, where Plaintiffs have included myriad allegations, detailed above, that describe the active role the State Defendants have played in contributing to Plaintiffs' harm.

III.     **The *Jones* Litigation Does Not Provide a Basis to Dismiss.**

Defendant Clerks assert that issues presented by this case have already been decided and are foreclosed.  (Br. 2, 3, 22, 30, 31, 34).  But in doing so, Defendants ignore critical differences between the *facial*, *pre-implementation* challenge brought in *Jones* focused on S.B. 7066 and the *as-applied* challenge brought by Plaintiffs in this case based on Defendants' conduct since *Jones* was decided.  These differences are significant.  "A facial challenge asserts that a law *always* operates unconstitutionally; therefore, a facial challenge will succeed only if the statute could never be applied in a constitutional manner." *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009).  In contrast, however, an as-applied challenge "addresses whether 'a statute is unconstitutional on the facts of a particular case or to a particular party.'" *Id.* "Because such a challenge asserts that a statute cannot be constitutionally applied in particular circumstances, it necessarily requires the development of a factual record for the court to consider." *Id.*; *see also Jones v. Hamilton Cnty. Gov't, Tenn.*, 530 F. App'x 478, 490 (6th Cir. 2013) ("Although the Policy is constitutional on its face, it can still be unconstitutional as implemented by the Commission.").

Critically, in *Jones*, the plaintiffs asserted that the LFO requirement for people with felony convictions violated the Equal Protection Clause of the Fourteenth Amendment and the Twenty-Fourth Amendment to the United States Constitution insofar as the requirement burdened felons who could not afford to pay the required amounts.  975 F.3d at 1025.  *Jones* unequivocally could not and did not address the later implementation of Amendment 4. Moreover, the *Jones* court made several critical assumptions about how the law would be implemented that Defendants have chosen not to follow.  This case focuses on that *implementation* of Amendment 4 in the four years since *Jones* and asserts that Defendants' conduct during that period has violated § 11(b) of the Voting Rights Act and the First and Fourteenth Amendments to the United States Constitution.  Plaintiffs' claims arise because Defendants' acts and omissions have imposed burdens on the Plaintiffs, who have been unable to determine: (1) their eligibility to vote, and (2) whether FRRC's members and constituents have completed the financial terms of their sentence to restore their voting rights.  (¶¶ 10–41, 82–116, 179–80, 189–90, 192).  Not only was the challenge in *Jones* different in nature than the challenge in the present case, but also the claims brought here were not adjudicated in *Jones*. The *Jones* litigants did not assert a § 11(b) claim or an equitable accounting claim, and the *Bush*

*v. Gore* Equal Protection claim, while brought in *Jones*, was not decided in that lawsuit. *Jones* also did not address an *Anderson-Burdick* undue burden claim by individuals who had paid their LFOs, and did not address the argument that Defendants' implementation of Amendment 4—as detailed in the Complaint—lacks a rational basis under *Shepherd v. Trevino.*

## IV.     Each of the Complaint's Four Counts States a Claim.

The Court should reject Defendants' perfunctory arguments that each of Plaintiffs' four Claims for Relief fail to state a claim under Rule 12(b)(6). Plaintiffs' claims are hardly "unadorned, the-defendant-unlawfully-harmed-me accusation[s]," or a mere collection of "labels and conclusions" with "a formulaic recitation of the elements of . . . cause[s] of action." *Supreme Fuels Trading FZE v. Sargeant*, No. 23-80633-CIV, 2023 WL 6121909, at *2 (S.D. Fla. Sept. 19, 2023). Accepting Plaintiffs' allegations as true and construing them in the light most favorable to Plaintiffs, the Complaint plainly "contain[s] sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Id.*

A.     Claim One: Plaintiffs Have Stated a Claim under § 11(b) of the Voting Rights Act.

Contrary to the Claim One Defendants' assertion, the overwhelming weight of authority confirms that § 11(b) of the Voting Rights Act (Claim One) gives rise to a private cause of action. (Br. 19–21). As courts across the circuits have held, "[s]ection 11(b) provides a private right of action to affected individuals." *Fair Fight, Inc. et al. v. True the Vote, Inc. et al.*, No. 20-cv-00302 (CM/ECF Dkt. No. 29), at *22 (N.D. Ga. Jan. 1, 2021). That conclusion, reached by at least ten other courts,[11] is consistent with the position taken by the United States Department of

---

[11] *See also Krabach v. King Cnty.*, No. 2:22-CV-1252-BJR, 2023 WL 7018431, at *3 (W.D. Wash. Oct. 25, 2023) ("[P]ersuasive authority across multiple districts has found congressional intent to create an implied right of action for § 11(b) specifically within the statutory text, meeting the 'high bar' for implied causes of action"); *Colo. Mont. Wyo. State Area Conf. of NAACP v. U.S. Election Integrity Plan*, No. 22-cv-00581-CNS, 2023 WL 1338676, at *4 (D. Colo. Jan. 31, 2023) ("Section 11(b) can be enforced through a civil action by a private individual."); *Rhodes v. Siver*, No. 19-cv-12550, 2021 WL 912393, at *2 (E.D. Mich. Mar. 10, 2021) (holding that private plaintiffs can sue for injunctive relief under § 11(b)); *Mich. Welfare Rts. Org. v. Trump*, 600 F. Supp. 3d 85, 104-106 (D.D.C. 2022) (concluding that Section 11(b) "creates a private right of action"); *Allen v. City of Graham*, No. 20-cv-997, 2021 WL 2223772, at *7 (M.D.N.C. June 2, 2021) (noting that "multiple courts" have deemed § 11(b) to "establish[] a private cause of action"); *Ariz. All. for Retired Ams. v. Clean Elections USA*, No. 22-cv-1823, 2022 WL 15678694, at *3 (D. Ariz. Oct. 28, 2022) ("It is well established that [§ 11(b)] . . . can be enforced through private litigation."), *opinion vacated for mootness, appeal dismissed*, No.

Justice, which recently explained that "[p]rivate plaintiffs may bring suit to enforce Section 11(b). That right is inherent in the text, structure, and history of the Voting Rights Act." Statement of Interest of the United States of America at 7–13, *Colo. Mont. Wyo. State Area Conf. of NAACP v. United States Election Integrity Plan*, No. 22-cv-00581-CNS (D. Colo. Jan. 3. 2023) (CM/ECF Dkt. No. 74).

The Court should reject the Claim One Defendants' invitation to ignore this overwhelming authority and instead to adopt the deeply flawed reasoning of a single district court. (Br. 19–21 (relying on *Andrews v. D'Souza*, No. 1:22-CV-04259-SDG, 2023 WL 6456517, at *11 (N.D. Ga. Sept. 30, 2023)). Indeed, the *Andrews'* analysis is foreclosed by binding Supreme Court and Eleventh Circuit precedent. In *Andrews*, the court asserted that private enforcement of the VRA is limited to those provisions in the law "that enforce the guarantees of the 14th and 15th Amendments," and that the authority for § 11(b) may have been derived from the Constitution's Elections Clause, rather than the Fourteenth or Fifteenth Amendments. *Id.* But this conclusion conflicts with *South Carolina v. Katzenbach*, 383 U.S. 301, 327 (1966), in which the Supreme Court explained that "Congress exercised its authority under the Fifteenth Amendment in an inventive manner when it enacted the Voting Rights Act of 1965," and with *Alabama State Conference of the NAACP*, 949 F.3d at 654, in which the Eleventh Circuit explained that "[t]he VRA was designed to implement the Fifteenth Amendment and, in some respects, the Fourteenth Amendment."[12] Because "§ 11(b) is . . . by its terms, a statute designed for enforcement of the guarantees of the Fourteenth and Fifteenth Amendments . . . it meets the [*Alexander v.*] *Sandoval*[, 532 U.S. 275 (2001)] test for an intent to

_____

22-16689, 2023 WL 1097766 (9th Cir. Jan. 26, 2023); *Wohl*, 498 F. Supp. 3d at 476 ("Consistent with Section 11(b)'s broad reach, both the government and private parties may sue to enforce Section 11(b)."); *League of United Latin Am. Citizens*, 2018 WL 3848404, at *3 (assuming there is a private right of action under 11(b)); *Ariz. Democratic Party v. Ariz. Republican Party*, No. 16-cv-3752, 2016 WL 8669978, at *4 (D. Ariz. Nov. 4, 2016) (stating that § 11(b) "does not exclude a private right of action for injunctive relief"); *Olagues v. Russoniello*, 770 F.2d 791, 805 (9th Cir. 1985) (assuming there is an implied private right of action for equitable relief under § 11(b)).

[12] As explained *supra*, *Alabama NAACP* was vacated by the Supreme Court on mootness grounds, but its reasoning remains persuasive. *See supra* note 7; *see also Wohl*, 498 F. Supp. 3d at 476 ("Section 11(b)'s reach is extensive, in accordance with the VRA's ambitious aims of encouraging true enforcement of the Fifteenth Amendment's promise of unencumbered access to the vote."); *Rhodes v. Siver*, No. 19-12550, 2021 WL 1565137, at *4 (E.D. Mich. Feb. 1, 2021) (finding § 11(b) "has roots in the Fifteenth Amendment").

create a private remedy."  *See Mich. Welfare Rts. Org.*, 600 F. Supp. 3d at 106 (internal quotations and citations omitted).

Section 11(b) of the VRA provides a private cause of action, as alleged in the First Claim for Relief, and the Court should deny the Claim One Defendants' request to dismiss that claim under Rule 12(b)(6).[13]

B.   Claim Two: Plaintiffs Have Stated a Claim for Relief Under the Equal Protection Clause.

The Court should reject Defendants' assertion that Plaintiffs have failed to state a claim under the Equal Protection Clause.  (Br. 20–21).  The Supreme Court has never adopted the view, urged by Defendants, that Plaintiffs are required to plead discriminatory intent to state a *Bush v. Gore* claim of disparate treatment of voters arising from arbitrary implementation of election procedures.  Moreover, contrary to Defendants' assertion, Plaintiffs seek only such relief as is required to remedy the alleged Equal Protection Clause violation alleged in Claim Two.

1.   *Plaintiffs Are Not Required to Allege Discriminatory Intent.*

Defendants' assertion that Plaintiffs have failed to plead discriminatory intent ignores binding Supreme Court precedent and persuasive authority across the circuits to the contrary. (Br. 21).  Plaintiffs' Equal Protection claim is premised on the arbitrary and disparate treatment of people in the administration of elections, as recognized by the Supreme Court in a long line of cases including *Bush v. Gore*, 531 U.S. 98 (2000), *Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966), and *Reynolds v. Sims*, 377 U.S. 533 (1964).  But those cases do *not* suggest, much less require, that a plaintiff asserting an Equal Protection claim arising from arbitrary government action demonstrate *intentional* discrimination.  *Bush v. Gore* itself makes this plain.  There the Court held that "the use of standardless manual recounts" by relevant state

---

[13] In any event, even if there were no private right of action under § 11(b)—which there unquestionably is—Plaintiffs would still be entitled to pursue their § 11(b) claim under § 1983. *See Schwier v. Cox*, 340 F.3d 1284, 1295, 1297 (11th Cir. 2003) ("Thus, we hold that the provisions of section 1971 of the Voting Rights Act may be enforced by a private right of action under § 1983.").  The fact that Plaintiffs did not explicitly reference § 1983 in Claim One of the Complaint in no way precludes this.  *See, e.g.*, *Mayers v. New York Cmty. Bancorp, Inc.*, No. CV-03-5837(CPS), 2005 WL 2105810, at *8 (E.D.N.Y. Aug. 31, 2005) ("Plaintiffs' complaint does not specifically reference 42 U.S.C. § 1983; however, it adequately sets forth facts, circumstances and allegations of constitutional violation from which a claim for relief under § 1983 can be inferred.").

and municipal actors violated the Equal Protection Clause—a conclusion the Court reached without any reference to or discussion of intent, much less discriminatory intent. *Id.* at 103; *see also Harper*, 383 U.S. at 666 (holding, without reference to intent, that a state violates the Equal Protection Clause "whenever it makes the affluence of the voter or payment of any fee an electoral standard"); *Hunter v. Hamilton Cty. Bd. of Elec.*, 635 F.3d 219, 234 n. 13 (6th Cir. 2011) ("a showing of intentional discrimination has not been required in these [Equal Protection] cases").

Lower courts have also rejected Defendants' argument that *Bush v. Gore* and its antecedents require a showing of discriminatory intent.[14]  *League of Women Voters v. Brunner*, 548 F.3d 463 (6th Cir. 2008), is instructive.  In that case, the plaintiffs brought an Equal Protection claim alleging that Ohio officials provided insufficient guidance in connection with Ohio's voting system, leaving implementation of non-uniform standards, processes, and rules to county officials.  *Id.* at 466–70.  The plaintiffs further alleged that this system resulted in unconstitutional variations across the state, which denied voters equal protection of the law.  *Id.* Citing *Bush v. Gore*, the Sixth Circuit rejected the defendants' argument, made at the pleading stage, that the plaintiffs' Equal Protection claim required "intentional and purposeful discrimination."  *Id.* at 476.  The court held instead that it was sufficient for a complaint to plead facts sufficient to establish that defendants "arbitrarily deny Ohioans the right to vote depending on where they live."  *Id.*

Defendants ignore this authority and fail to cite even a single case concerning a voting/election rights Equal Protection claim or applying *Bush v. Gore*.  They instead rely on

---

[14] *See, e.g.*, *Hunter v. Hamilton Cty. Bd. of Elec.*, 850 F. Supp. 2d 795, 835 (S.D. Ohio 2012) ("Plaintiffs must show only that the Board's actions resulted in the arbitrary and disparate treatment of the members of the electorate."); *Lemons v. Bradbury*, 538 F.3d 1098, 1106 (9th Cir. 2008) (analyzing Equal Protection claim under *Bush v. Gore* without reference to discriminatory intent); *Black v. McGuffage*, 209 F. Supp. 2d 889, 899 (N.D. Ill. 2002) ("Any voting system that arbitrarily and unnecessarily values some votes over others cannot be constitutional.  Even without a suspect classification or invidious discrimination, the right of suffrage can be denied by debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."); *League of Women Voters of U.S. v. Fields*, 352 F. Supp. 1053, 1055 (E.D. Ill. 1972) (holding that "the administration of valid state election laws in an uneven or unlawful manner could amount to such arbitrary administration that citizens would be denied federal rights to vote, to have their vote count equally, and to have substantially fair elections").

cases concerning race- and gender-based Equal Protection Claims (Br. 21 (citing *Parks v. City of Warner Robins*, 43 F.3d 609, 616 (11th Cir. 1995) (gender-based Equal Protection claim); *Pers. Adm'r of Mass v. Feeney*, 442 U.S. 256, 279 (1979) (same); *Washington v. Davis*, 426 U.S. 229, 242 (1976) (race-based Equal Protection claim)), but those cases are inapposite.  As the Complaint makes clear (¶¶ 176–83), Plaintiffs' well-pleaded Equal Protection claim is based on "*arbitrary* and disparate treatment," *Bush*, 531 U.S. at 105 (emphasis added)—a theory that does not turn on the kind of *intentional* action required to show race- or gender-based discrimination. *Compare, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 254 (1977) (explaining, in case alleging a "racially discriminatory" denial of zoning request, that "[p]roof of racially *discriminatory intent or purpose* is required to show a violation of the Equal Protection Clause" (emphasis added)), *with Wexler v. Anderson*, 452 F.3d 1226, 1231 (11th Cir. 2006) ("consider[ing] whether Florida's manual recount procedures, which vary by county according to voting system, accord *arbitrary and disparate treatment* to Florida voters, thereby depriving voters of their constitutional rights to due process and equal protection" (emphasis added)), *and Curling v. Raffensperger*, 403 F. Supp. 3d 1311, 1336 (N.D. Ga. 2019) (denying motion to dismiss Equal Protection claim and explaining that, "[t]o establish an undue burden on the right to vote, Plaintiffs need not demonstrate discriminatory intent behind the state's voting scheme because the issue concerns the constitutionality of a generalized burden on the fundamental right to vote, for which the court employs a balancing test instead of a traditional equal protection inquiry").

Plaintiffs' claim arising from the "arbitrary and disparate treatment [of] voters in [the state's] different counties," *Bush*, 531 U.S. at 107, is also fatal to the Supervisors' separate claim that Plaintiffs have failed to state an Equal Protection claim against them.  (Br. 46)  In light of the authority discussed above, the Supervisors' argument that Plaintiffs have failed to allege that any *individual* Supervisor has treated voters within their county differently is a non-sequitur.  The Supervisors do not acknowledge, much less distinguish, *Bush v. Gore*, its antecedents, and its progeny, and those cases provide ample support for Plaintiffs' Equal Protection claim arising from the absence of consistent treatment across the state's counties.  Further, the Supervisors do not meaningfully dispute that they are essential to any remedy the Court might order to address the "arbitrary and disparate treatment" alleged in the Complaint.  *See supra* Parts I.C, II.D (discussing *Jacobson*) and *infra* Section VII.B (same).  Accordingly, even if other Defendants

are more culpable in creating and perpetuating the "bureaucratic morass" alleged in the Complaint, Plaintiffs would still have adequately pleaded an Equal Protection claim against them. *See, e.g.*, *League of Women Voters of Fla., Inc. v. Lee*, 566 F. Supp. 3d 1238, 1254–55 (N.D. Fla. 2021) (explaining that, following *Jacobson*, Supervisors are appropriate parties to challenges in voting/election-related claims; *Fla. State Conf. of NAACP v. Lee*, No. 4:21-CV-187-MW/MAF, 2021 WL 4810630 (N.D. Fla. Oct. 8, 2021) (same).

The Complaint alleges, in sufficient factual detail, the arbitrary, disparate, and "unguided differential treatment," *Hunter*, 635 F.3d at 238, of individuals with prior felony convictions who wish to register to vote and vote (¶¶ 1–43, 47–125, 163–70, 177–83). Those allegations state an Equal Protection claim for arbitrary conduct under *Bush v. Gore*, 531 U.S. 98, its antecedents, and its progeny, and the Court should reject Defendants' contrary argument.

> 2.  *Defendants' Remaining Challenges to Claim Two Are Inappropriate at the Pleading Stage.*

In the remainder of Defendants' challenge to Claim Two, they improperly urge the Court to assess (1) the merits of the claim and (2) the scope of the requested remedy, in reliance on a mischaracterization of Plaintiffs' Equal Protection claim. (Br. 21). These arguments are inappropriate at the pleading stage, and they provide no basis to dismiss Claim Two.

Contrary to Defendants' assertion, Plaintiffs do not assert that the Equal Protection Clause requires a "county-by-county process for calculating, tracking, and then notifying felons of their outstanding [LFOs]." (Br. 21). Rather, consistent with *Bush v. Gore*, Plaintiffs allege that the Equal Protection Clause requires sufficient statewide standardization to prevent "arbitrary and disparate treatment" of individuals depending on where the prospective registrant resides. 531 U.S. at 105. Plaintiffs allege that the disparate practices of Florida's counties subject individuals with prior felony offenses to arbitrary and disparate treatment based solely on where they reside. (¶¶ 1–43, 47–125, 163–70, 177–83). As alleged, the problem created and perpetuated by Defendants "inheres in the absence of specific standards to ensure . . . equal application [across the state]. The formulation of uniform rules . . . based on these recurring circumstances is practicable and . . . necessary" under the Equal Protection Clause. *Bush*, 531 U.S. at 106.

Defendants are also wrong on the law. It is true that "[v]ariations from county-to-county are consistent with equal protection" in *some* circumstances. (Br. 21). But it is equally true that

variations "from county-to-county" are plainly *in*consistent with equal protection in other circumstances.  That, after all, is the holding of *Bush v. Gore*, which acknowledges that counties, "in the exercise of their expertise, may develop different systems for implementing elections," so long as those systems do not result in "arbitrary and disparate treatment of the members of [the state's] electorate."  531 U.S. at 105, 109; *see also id.* at 109 ("As seems to have been acknowledged at oral argument, the standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another.").

Whether the "bureaucratic morass" identified by Plaintiffs constitutes an Equal Protection violation concerns the *merits* of Plaintiffs' claim, not whether Plaintiffs have *stated* a claim under Rule 12(b)(6).  *See Watt v. VirtuOx, Inc.*, No. 19-61084-CIV, 2021 WL 6062721, at *1 (S.D. Fla. Dec. 22, 2021) ("The purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.").  This is clear from *Wexler v. Anderson*, relied upon by Defendants (Br. 21), which was decided following a bench trial, not at the pleading stage.  *See* 452 F.3d at 1230 (noting earlier Eleventh Circuit decision reversing district court's dismissal of the plaintiffs' complaint and affirming judgment "[f]ollowing a bench trial").  In *Wexler*, based on the trial record, the Eleventh Circuit concluded that the use of "different manual recount procedures according to the type of voting system a county uses" did not result in "arbitrary and disparate treatment," and were in fact "*necessary* given the differences in the technologies themselves and the types of errors voters are likely to make in utilizing those technologies."  *Id.* at 1231, 1233 (emphasis added).[15]  The Court should reject Defendants' assertion that the Court may resolve the merits of Plaintiffs' claims at this stage of the litigation.

---

[15] Defendants also cite to *Citizen Center v. Gessler,* 770 F.3d 900, 917–18 (10th Cir. 2014) (Br. 21), but that case does not support their argument and it conflicts with the Eleventh Circuit's holding in *Jacobson*, 974 F.3d 1253.  Indeed, in *Citizen Center*, the Tenth Circuit *confirmed* that the plaintiffs had stated an Equal Protection claim for disparate treatment across the state's counties, 770 F.3d at 913, and the court held only that such a claim was properly alleged against the Secretary of State, and not the individual county clerks because "each county clerk had power only within his or her county," *id.* at 917–19 & n.12.  The latter aspect of *Citizen Center* is, however, inconsistent with the Eleventh Circuit's decision in *Jacobson,* which requires the presence of the Clerk Defendants in this case because they are indispensable to the relief Plaintiffs seek.  *See supra* Section I.C (discussing application of *Jacobson* to County Clerks).

Finally, to the extent Defendants challenge the remedy sought by Plaintiffs, that, too, is inappropriate at the pleading stage.  "A plaintiff's ability to state a plausible claim for relief is independent of the specific remedies that she requests or ultimately obtains."  *Shields v. Wells Fargo Bank NA*, No. 3:12-CV-1900-N, 2013 WL 6231395, at *2 (N.D. Tex. Dec. 2, 2013) (collecting cases); *see also Seward v. Kholmuradov*, No. 7:23-CV-220, 2023 WL 6811030, at *1 (W.D. Va. Oct. 16, 2023) (collecting cases and explaining that "Rule 12(b)(6) does not permit the Court to dismiss a specific remedy sought in a complaint . . . .").  "[A] 12(b)(6) motion to dismiss challenges the legal sufficiency of the pleadings, not the appropriateness of the relief sought," *Sturm v. Rasmussen*, No. 18-CV-01689-W-BLM, 2019 WL 626167, at *2 (S.D. Cal. Feb. 14, 2019) (collecting cases), and here, again, Defendants fail to identify any deficiency in Claim Two.

C.   Claim Three: Plaintiffs Have Stated an Undue Burden Claim Under the First and Fourteenth Amendments.

Defendants' two-paragraph argument urging the court to dismiss Claim Three is premised on the assertion that the *Anderson-Burdick* balancing analysis is the only test that the Court could employ to assess Plaintiffs' undue burden claim, and that the *Anderson-Burdick* test cannot be applied in this case because "felons do not have a fundamental right to vote."  (Br. 22 (citing *Jones*, 975 F.3d at 1053)).  On this basis, Defendants urge the Court to conclude that "Plaintiffs thus have no claim of undue burden on the right to vote."  (Br. 22).

First, Defendants' argument completely ignores the fact that Claim Three also properly pleads a claim under *Shepherd v. Trevino*, 575 F.2d 1110.  (¶ 187).  In *Shepherd*, the pre-split Fifth Circuit held that the "selective disenfranchisement . . . of convicted felons" must "bear a rational relationship to the achieving of a legitimate state interest."  575 F.2d at 1115; *see also Williams v. Taylor*, 677 F.2d 510, 515–16 (5th Cir. 1982); *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (explaining that pre-split Fifth Circuit cases are binding in the Eleventh Circuit).  Here, Plaintiffs allege that Defendants lack even a rational basis for the obstacles they impose on individuals with prior felony convictions who seek to repay their LFOs, which include failing or refusing to inform returning citizens of the amount of LFOs owed, arbitrary calculation of LFOs, and arbitrary application of funds paid to reduce LFOs.  (¶¶ 189–93).  Defendants do not dispute that Plaintiffs have stated a claim under *Shepherd*, and there is therefore no basis to dismiss that aspect of Claim Three.

Second, the Defendants' unilateral declaration that Plaintiffs do not have a right to vote ignores the fact that each of the Individual Plaintiffs, and certain members of FRRC described in the Complaint, plausibly allege that they are *not* disenfranchised by virtue of their prior felony convictions.  (¶ 11 (FRRC members), ¶ 21 (Jones), ¶ 27 (Sanchez), ¶ 36 (Waite), ¶ 39 (Walthour)).  Rather, Plaintiffs allege that Defendants' conduct burdens those who have "paid off their LFOs, and are eligible to vote under Florida law" (¶ 189), as well as those who wish to pay off their LFOs but are unable to because Defendants have "fail[ed] to provide a system where people with prior felony convictions can identify the LFOs that they owe" (¶ 190).[16] Accordingly, Defendants' citation to *Jones* is simply inapt—*Jones* was a claim on behalf of returning citizens who could not "afford to pay their fines, fees, costs, and restitution," and who were therefore concededly ineligible to vote, 975 F.3d at 1029; conversely, Plaintiffs here include individuals who can and wish to pay off their LFOs, and have made good faith efforts to do so, but are thwarted from doing so by Defendants' conduct.[17]

Finally, Defendants ignore the fact that an *Anderson-Burdick* claim generally turns on fact-based determinations of the benefits and burdens of particular government policies and cannot be resolved at the pleading stage.  *See, e.g.*, *League of Women Voters of Florida*, 566 F. Supp. 3d at 1258 ("Because the *Anderson-Burdick* test 'emphasizes the relevance of context and specific circumstances,' it is particularly difficult to apply at the motion to dismiss stage") (citing *Cowen v. Ga. Sec'y of State*, 960 F.3d 1339, 1346 (11th Cir. 2020)).  Here, whether the facts are ultimately to be reviewed under a "narrowly tailored" or a "rational basis" test, the myriad failings described in the Complaint are more than sufficient to state a claim.

D.    Claim Four: Plaintiffs' Have Stated a Claim for an Equitable Accounting.

Plaintiff FRRC has stated a claim under Florida law for an equitable accounting. (¶¶ 196–203).  Defendants contend, incorrectly, that, under Florida law, a claim for an equitable accounting requires a contractual or fiduciary relationship, and that neither exists.  (Br. 22–23). Defendants' argument is wrong on the law and the facts.

---

[16] Indeed, Plaintiff Walthour is burdened even though he has not been convicted of a felony offense.  (¶¶ 39–41).

[17] Defendants' declaration that Plaintiffs and others like them lack the right to vote is ironic indeed in the context of this case, where the central problem to be remedied is Defendants' inability to determine *whether* such individuals have in fact been successfully re-enfranchised pursuant to Amendment 4.

Contrary to Defendants' assertion, neither a fiduciary duty nor a contract is a prerequisite to an equitable accounting. As the Eleventh Circuit has explained, "[u]nder Florida law, a party seeking an equitable accounting must show the existence of a fiduciary relationship *or a complex transaction* and must demonstrate that the remedy at law is inadequate." *Kee v. Nat'l Res. Life Ins. Co.,* 918 F.2d 1538, 1540 (11th Cir. 1990) (emphasis added). Florida "case law . . . appears to require merely a fiduciary relationship *or in the alternative* a complex transaction as the first element and an inadequate remedy at law as the second." *Id.* 1540 n.2 (emphasis added)); *Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, 694 F. Supp. 2d 1275, 1280 (S.D. Fla. 2010) (same); *Bedoyan v. Samra*, 352 So. 3d 361, 365 (Fla. Dist. Ct. App. 2022) (same). Accordingly, a claim for an equitable accounting must not be dismissed where, as here, "the evidentiary facts alleged in a complaint" show "complexity" and the "inadequacy of a legal remedy." *Managed Care Sols*, 694 F. Supp. 2d at 1279–80. The Court should deny Defendants' motion to dismiss Claim Four because it cannot "determine the level of complexity of the [alleged transactions] until a factual record is developed." *See, e.g.*, *Lan Li v. Walsh*, No. 16-81871-CIV, 2017 WL 3130392, at *7 (S.D. Fla. July 24, 2017).

It is true that many cases involving claims for an equitable accounting involve a contractual relationship between the parties, but the existence of a binding *legal* instrument between the parties is plainly not a requirement to state a cognizable *equitable* claim. *See, e.g.*, *First Fam. Mortg. Corp. of Fla. v. White*, 549 So. 2d 1049, 1050 (Fla. Dist. Ct. App. 1989) ("a court of equity has a broad discretion in forming decrees to adapt the relief to the circumstances of the particular case"). Indeed, the existence of a contract between the parties is generally a bar to an equitable accounting because "the need for an equitable remedy vanishes" where there is an adequate remedy at law in the form of a breach of contract claim. *Menashi v. Am. Home Mortg. Servicing, Inc.*, No. 8:11-CV-1346-T-23EAJ, 2011 WL 4599816, at *3 (M.D. Fla. Oct. 4, 2011). No case cited by Defendants expressly holds that a contract is necessary to support a claim for an equitable accounting. (Br. 22–23). Rather, Florida has long followed the "general rule that equity will take jurisdiction of cases in which the claims between the litigants involve extensive, mutual, *or* complicated accounts," and that "[c]omplexity alone will support jurisdiction," even in the absence of mutuality. Charles W. Merritt, *Jurisdictional Prerequisites for an Equitable Accounting*, 6 Fla. L. Rev. 232, 235–36 (1953); *see also, e.g.*, *Royal Indem. Co. v. Knott*, 136 So.

474, 478 (Fla. 1931) (involving surety bond); *Campbell v. Knight*, 109 So. 577, 579 (Fla. 1929) (involving will).[18]

In any event, the nature of the Clerks' obligation to FRRC is a question of fact that cannot be decided at the pleading stage.  As the Clerks concede, they are elected constitutional officers.  *See* Fla. Const. Art. V § 16 (Br. 24–25 (discussing Clerks' constitutional authority)).  And under Florida law, like all public officials, the Clerks have a "fiduciary duty to the public." *Zerweck v. State Comm'n on Ethics*, 409 So. 2d 57, 60 (Fla. Dist. Ct. App. 1982); *see also United States v. Lopez-Lukis*, 102 F.3d 1164, 1169 (11th Cir. 1997) ("Elected officials generally owe a fiduciary duty to the electorate."); *Nail v. Browning,* 74 So. 315, 316 (Fla. 1917) ("Diligence in the discharge of their duties is required of public servants, particularly where the rights of owners of property can be jeopardized by their neglect, and their obligation to the public is not discharged by a mere perfunctory performance of official acts.").  In *Scott v. Caldwell*, for example, the court permitted an equitable accounting with respect to funds retained by a deceased public officer in apparent violation of his statutory duty.  *See* 37 So. 2d 85, 87 (Fla. 1948) (rejecting defendant's "contention that the record fails to disclose an existing fiduciary relation between the parties so as to confer jurisdiction of the subject matter on a court of equity" because the subject of the accounting was an elected official).  The contours of the Clerks' duty to FRRC not to retain funds paid to the Clerks for a specific purpose for which those funds were not used is a question of fact not amenable to decision on the pleadings.  The motion to dismiss Claim Four should be denied.

---

[18] The Clerks provide no citation to the Complaint to support their assertion that Plaintiffs assert claims for "unjust enrichment" and "disgorgement," because the Complaint contains no such claims.  (Br. 36).  In urging the Court to dismiss claims that Plaintiffs have not made, the Clerks also mischaracterize the gravamen of Plaintiffs' Complaint.  Plaintiffs do not "essentially . . . allege" that "they would not have paid LFOs that were owed if they were aware that the payment would not specifically restore voting rights."  (*Id.*).  Rather, they assert merely that Defendants should be required to account for "monies accepted" by the Clerks that were not appropriately allocated to LFOs in accordance with the Defendant Secretary's "First Dollar Policy."  (Compl. p. 70).  Whether the Court should exercise its equitable power to remedy the Clerks' misapplication of funds paid by FRRC concerns the *merits* of Claim Four, not the adequacy of Plaintiffs' pleading.  Accordingly, this argument is beyond the scope of Defendants' motion and it provides no basis to dismiss Claim Four.

## V.      The Complaint Satisfies Rule 8.

Defendants' assertion that the Complaint fails to comply with the requirements of Rule 8 is both internally inconsistent and conclusory, and the Court should reject it.  (Br. 17–19, 44–45). Indeed, it is not even clear what argument Defendants are urging the Court to adopt, given that they assert that the Complaint is both "loquacious" with excessive "factual detail" (Br. 18) *and* "threadbare" (Br. 19, 39, 44).  Neither argument has merit or provides a basis to dismiss the Complaint.

First, in the section of Defendants' brief alleging that Complaint is "excruciatingly particular[]" (Br. 18),  they make no attempt "to identify particular allegations as immaterial or unnecessary," nor do they "assert that the Complaint fails to set forth cognizable causes of action, that the legal theories are incoherent, or that they cannot tell which causes of action are alleged against which Defendants."  *Hearns v. San Bernardino Police Dep't*, 530 F.3d 1124, 1130 (9th Cir. 2008).  Indeed, Defendants fail to offer a single citation to the Complaint in this part of their brief (*see* Br. 17–19), and the remainder of their brief makes clear that they understand the nature of Plaintiffs' claims, which parties the claims are asserted against, and the conduct underlying each claim.

What remains is the suggestion that the Complaint fails to comply with Rule 8 simply because it is long, and that argument is meritless.  "[A] complaint—so long as it is minimally sufficient to put a defendant on notice of the claims against him—will not fail for mere surplusage."  *Bailey v. Janssen Pharmaceutica, Inc.*, 288 F. App'x 597, 603 (11th Cir. 2008). That is particularly true in a case, like this one, that involves complex underlying facts.  The very reason Plaintiffs' Complaint is long is because *Defendants* have created a complex "bureaucratic morass" (¶ 3) that can only be explained through a lengthy discussion of Defendants' web of legal obligations and their failures to comply with them.  *See Dang v. Honda Motor Co., Ltd*, No. 6:14-cv-2071, 2015 WL 12830489, at *4 (M.D. Fla. Mar. 25, 2015) (rejecting Rule 8 argument and noting that "the Amended Complaint is long and complex because the history of the [defendant's conduct] is long and complex."); *Gov't Emps. Ins. Co. v. AFO Imaging, Inc.*, No. 8:20-CV-2419-VMC-CPT, 2021 WL 734575, at *6 (M.D. Fla. Feb. 25, 2021) (rejecting Rule 8 argument made with respect to lengthy complaint because the case was "complex . . . , and the length [of the complaint] does not make it so that Defendants are unable to prepare a proper response").  "[I]t is not virtually impossible to know which allegations of fact support which

claims for relief," and there is therefore no ground on which to dismiss the Complaint under Rule 8(a)(2).  *United States v. Everglades Coll., Inc.*, No. 12-60185-CIV, 2013 WL 11976904, at *2 (S.D. Fla. May 10, 2013).

Here, in response to the Court's sua sponte order (CM/ECF Dkt. No. 8), Plaintiffs amended the Complaint so that "the allegations in each count refer to specific paragraphs in the general allegations that support" each claim.  *See JPMorgan Chase Bank, N.A. v. Hayhurst Mortg. Inc.*, 2010 WL 3952005 (S.D. Fla. Oct. 8, 2010) (explaining that such changes are sufficient to bring an amended pleading in compliance with Rule 8).  Any remaining "surplusage" in the Complaint "does not preclude [Defendants] from understanding the claims lodged against" them.  *Davis v. Bos. Sci. Corp.*, No. 2:17-CV-682-FTM-38CM, 2018 WL 2183885, at *3 (M.D. Fla. May 11, 2018).  Even if the Complaint "set[s] out more factual detail than necessary," those facts are "relevant to Plaintiff[s'] causes of action" and "[t]he complaint is logically organized, . . . intelligible and [it] clearly delineate[s] the claims and the Defendants against whom the claims are made."  *Hearns*, 530 F.3d at 1132.  As a result, Defendants have had "no difficulty in responding to the claims . . . with a Rule 12(b)(6) motion to dismiss."  *Id.*

## VI.    The Clerks' Remaining Arguments for Dismissal Lack Merit.

Each of the remaining arguments made by the Clerks in support of their request to dismiss the Complaint is without merit because they: (1) are predicated on factual assertions beyond the four corners of the Complaint (*e.g.*, the Clerks purportedly have "no role" in determining voter eligibility (Br. 23–29, 32–33)); (2) improperly assume facts in the Complaint that are not accurate (Br. 25–26, 28)); or (3) are based on incorrect or inapplicable assertions of law, including that Plaintiffs' claims are subject to an exhaustion requirement (Br. 33–35).  None of these arguments have merit.

### A.    The Clerks' Job Description Relies on Disputed Facts.

The Clerks improperly rely on facts outside of the Complaint to support their argument that they have "no role" in determining voter eligibility.  (Br. 24–29, 32–33).  As explained in the Complaint, the Clerks are responsible for accurately computing, accounting, and reporting LFOs, and their failure to do so contributes to other Defendants' failures to assess voter eligibility.  (¶¶ 102–13; Br. 25 (acknowledging that "records kept by the Clerks are pertinent to that [voter eligibility] determination by other Defendants")).  Defendants purport to contest this allegation (Br. 26, 28), but even if that were permissible at the pleading stage—and it is not—the

Clerks' dispute is little more than a quibble.  The Clerks concede that they are "responsible for maintenance and reporting of [LFO] account records as prescribed by law" (Br. 25) and they do not dispute that the Department of State expressly directs individuals previously convicted of felony offenses to County Clerks to obtain LFO data (¶ 102).  In any event, to the extent there is any distinction between the allegations in the Complaint and the Clerks' description of their role, that distinction merely highlights a disputed issue of material fact that cannot be resolved in a Rule 12(b)(6) motion.  *See, e.g.*, *G.F.B. Enters., LLC v. Toyota Motor Sales U.S.A, Inc.*, No. 23-CV-20392-RAR, 2023 WL 2631467, at *2 (S.D. Fla. Mar. 24, 2023) ("A court cannot resolve a factual dispute in adjudicating a Rule 12(b)(6) motion to dismiss.").

Moreover, setting aside the impropriety of the Clerks' factual assertions, the Clerks' lengthy job description is simply irrelevant to the claims brought in this case.  (Br. 24–32). Plaintiffs do not challenge the statutory and regulatory scheme that applies to Clerks (i.e., a facial challenge), but rather the Clerks' *actual failures* to fulfill their obligations in the years since Amendment 4 was ratified (i.e., an as-applied challenge).  (¶¶ 102–13, 192(f)).  In other words, the Clerks' portion of the motion to dismiss reflects an *aspirational* description of how the Clerks *should* operate that is irrelevant to this case, because the Complaint alleges that the Clerks are *not operating* in that manner, which has resulted in the alleged injuries to the Individual Plaintiffs and FRRC's members and constituents.  (¶¶ 103-13, 192(f)).  And the Clerks fail even to acknowledge the Complaint's allegations about their inconsistent, often incoherent, *implementation* of the existing statutory and regulatory scheme, including, for example, their failure to account for payments made towards LFOs (¶ 106); their failure to "apply th[e First Dollar Policy] when determining which financial obligations have been paid" (¶ 107); and their failure to "advise as to whether there is any balance owed after payments" (¶ 108; *see also* ¶¶ 102–06, 109–13).  As set forth at length above, *see supra* Part II, the existence of a statutory and regulatory scheme that *could* remedy the alleged violations of federal law if followed does nothing to undermine Plaintiffs' claims that the Clerks (and other Defendants) have failed to protect those rights *in practice*.[19]

---

[19] The Clerks' contention that Plaintiffs' claims should be dismissed because the Clerks lack the "authority" and "resources" to create a statewide database with LFO information also does not support their motion to dismiss.  (Br. 32–33).  Not only does this argument by the Clerks improperly rely on facts not pleaded in the Complaint, but it underscores why judicial intervention is necessary here.  According to the Clerks themselves, absent a court order, they

B.     Plaintiffs Are Not Required to "Exhaust" State Remedies Before Asserting
Federal Claims.

The Clerks' argument that the claims against them should be dismissed for failure to

exhaust is wrong as a matter of law.  (Br. 33–35).  The Clerks fail to cite even a single case to

support their assertion that Plaintiffs are required to exhaust *state* remedies before bringing the

*federal* constitutional and statutory claims asserted in this action (Br. 33–35), and that argument

is foreclosed by binding precedent.  In *Alacare, Inc.-N. v. Baggiano*, the Eleventh Circuit

explained that, in "*Patsy v. Board of Regents of the State of Florida*, 457 U.S. 496 [] (1982), the

Supreme Court strongly reaffirmed that there is no general requirement that a plaintiff exhaust

any remedy he might have at state law before proceeding into federal court, save where Congress

has crafted an exception to that general rule."  785 F.2d 963, 965 (11th Cir. 1986); *see also Wells

Fargo Armored Serv. Corp. v. Ga. Pub. Serv. Comm'n*, 547 F.2d 938, 939 n.1 (5th Cir. 1977)

("[E]xhaustion of available administrative remedies is not a prerequisite to suit under § 1983.");

*see also Smith v. State of Ind.*, 904 F. Supp. 877, 880 (N.D. Ind. 1995) (explaining that

exhaustion of state remedies is not required before a plaintiff may purse a federal claim in light

of Supremacy Clause).  Congress has not adopted an exhaustion requirement for any of

Plaintiffs' claims.[20]  *Johnson v. Meadows*—the only case cited by the Clerks in support of this

argument (Br. 35)—reaffirms the general rule announced in *Alacare*, because it concerns the

obviously inapposite *statutory* exhaustion requirement crafted by Congress in the Prison

_____

will continue to track court fines and fees in a way that makes it impossible to reliably determine
whether an individual with a felony conviction is eligible to vote.  (Br. 32).  The fact that
creating an LFO database will require additional resources and the involvement of government
officials other than the Clerks does not preclude Plaintiffs from asserting their claims against the
Clerks.  *See, e.g.*, *I.L. v. Alabama*, 739 F.3d 1273, 1282 (11th Cir. 2014) (explaining that a
plaintiff has standing to bring a claim against a defendant where court-ordered relief by that
defendant would "redress (at least in part) the plaintiff's injury").

[20] To the contrary, Congress has expressly provided that Plaintiffs *need not* exhaust state
remedies before pursing claims under the Voting Rights Act, including Section 11(b).  *See* 52
U.S.C. § 10308(f) (previously codified at 42 U.S.C. § 1973j(f)) ("The district courts of the
United States shall have jurisdiction of proceedings instituted pursuant to this section and shall
exercise the same without regard to whether a [plaintiff] shall have exhausted any administrative
or other remedies that may be provided by law"); *see also Fortune v. Kings Cnty. Democratic
Cnty. Comm.*, 598 F. Supp. 761, 764 (E.D.N.Y. 1984) (rejecting exhaustion argument in light of
§ 1973j(f), which "eliminates any requirement of exhausting administrative remedies" with
respect to VRA claims).

Litigation Reform Act.  *See* 418 F.3d 1152, 1155 (11th Cir. 2005) (citing mandatory exhaustion provision in 42 U.S.C. § 1997e(a), applicable to the PLRA and explaining that it "mandates strict exhaustion").  The Clerks' exhaustion requirement is contrary to law and provides no basis to dismiss any of Plaintiffs' claims.

**VII.    The Supervisors' Arguments for Dismissal Lack Merit.**

The Supervisor Defendants' requests for dismissal similarly lack merit.  (Br. 38–49). Their arguments are premised on an incorrect characterization of Plaintiffs' claims and a misapplication of legal principles concerning § 1983 and Equal Protection liability and joinder.

A.    <u>Plaintiffs Adequately Allege § 1983 Liability.</u>

The Supervisors' arguments concerning § 1983 liability are wrong for two reasons, and provide no grounds to dismiss them from this case.  (Br. 40–42).  First, the Supervisors' argument concerning § 1983 rests entirely on *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), which only applies in cases involving "local government units which are not considered part of the State."  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989); *Universal Life Church Monastery Storehouse v. McGeever*, No. 2:21-CV-618-NR, 2022 WL 214238, at *4 (W.D. Pa. Jan. 25, 2022) ("The holding in *Monell*, however, is restricted to municipalities and local government units and does not extend to states, entities considered arms of the state, nor state officials in their official capacity.").  But here, Plaintiffs are suing Supervisors because they are "acting under color of state law" (¶ 182), and the Supervisors themselves concede (in asserting they are entitled to immunity) that they are acting as state rather than municipal officials.  (Br. 13–16).  *See* Section II.C *supra*.

Where, as here, a plaintiff is pursuing a claim for prospective, injunctive relief against a county official concededly acting as an "arm of the state," the plaintiff may pursue that claim under the exception to sovereign immunity created by *Ex parte Young*, without implicating *Monell*.  *See, e.g.*, *Courthouse News Serv. v. Forman*, 601 F. Supp. 3d at 1244 (finding that County Clerk of Court was acting as "arm of the state" and the plaintiff plausibly alleged a § 1983 claim under *Ex parte Young*); *Dream Defs.*, 553 F. Supp. 3d at 1086 (same, as to county sheriff); *Ga. State Conf. of NAACP*, 484 F. Supp. 3d at 1320 (finding that, if local entity were entitled to immunity, it would not shield individual local officials from suit under *Ex parte Young*).  Because the Supervisors assert elsewhere in the brief that they are acting as an arm of the state, their argument concerning § 1983 liability is without merit.

41

Second, even if the Court rejects the Supervisor Defendants' concession that they are acting as an arm of the state and *Monell* therefore applies, Plaintiffs' allegations are sufficient to satisfy the *Monell* standard. Although Supervisor Defendants emphasize the need to allege a "policy or custom" (Br. 40–51), the Eleventh Circuit has emphasized that municipal liability under *Monell* can be established by alleging a "policy, custom, or practice that causes a constitutional injury." *Sosa v. Martin Cnty., Fla.*, No. 20-12781, 2023 WL 1776253, at *7 (11th Cir. Feb. 6, 2023); *see also Baxter v. Roberts*, 54 F.4th 1241, 1270 (11th Cir. 2022) ("A plaintiff can establish the existence of a municipal policy or custom in several ways including by . . . identifying 'a widespread practice that, although not authorized by written or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.'"); *Barnett v. MacArthur*, 956 F.3d 1291, 1296 (11th Cir. 2020) ("A municipality can be sued directly under § 1983 when one of its customs, practices, or policies causes an constitutional injury."). The Complaint alleges the Supervisors have engaged in customs and practices that are causing constitutional injuries in the form of a widespread practice of arbitrarily treating some individuals with prior felony convictions differently from other individuals with prior felony convictions (i.e., lack of consistency in the office) and from individuals with prior felony convictions in other jurisdictions (i.e., lack of consistency across jurisdictions). (¶ 179). This Court has recognized that the failure to adopt policies (which are at the heart of Plaintiffs' Equal Protection claims) can serve as the basis for § 1983 liability because it gives rise to a widespread practice of constitutional deprivation. In fact, this Court has sustained claims similar to those asserted against the Supervisor Defendants here. In *Ramos v. Miami-Dade County Board of County Commissioners*, the Court sustained a § 1983 claim against municipal officials who were alleged to have engaged in a "*de facto* policy or custom of medical indifference [in the Miami-Dade County jail system] which rose to the level of a constitutional violation." *See* No. 08-20065-CIV, 2008 WL 11410102, at *3–4 (S.D. Fla. July 10, 2008) (finding allegations of pattern of "problems encountered by inmates in receiving medical attention" sufficient at "this preliminary phase of the litigation, before any discovery has been taken"). Here too, the Supervisors of Elections are alleged to have engaged in a widespread practice of treating citizens differently, which has caused a constitutional injury. (¶¶ 114–16, 179, 192(g)). Accordingly, Plaintiffs' claim for § 1983 liability should not be dismissed.

B.     The Supervisors' Joinder Argument Fails.

The Supervisors' assertion that they should be dismissed as defendants because they are improperly joined under Federal Rule of Civil Procedure 20(a)(2) is without merit.  (Br. 42–45). The Complaint easily satisfies the requirements of Rule 20 and, in any event, the Supervisors' argument is foreclosed by the Eleventh Circuit's holding in *Jacobson*.

Rule 20 permits multiple defendants to be joined in one action where any right to relief against the defendants "aris[es] out of the same transaction, occurrence, or series of transactions or occurrences" and there is a "question of law or fact common to all defendants."  Fed. R. Civ. P. 20(a)(2).  "[T]he central purpose of Rule 20 is to promote trial convenience and expedite the resolution of disputes, thereby eliminating unnecessary lawsuits."  *MJM Elec., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 8:22-CV-2008-KKM-JSS, 2023 WL 2649059, at *1 (M.D. Fla. Mar. 27, 2023).  As such, "joinder of claims, parties, and remedies is strongly encouraged."  *Id.* (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 724 (1966)).  Because of the policy favoring joinder, "all logically related events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence."  *Garcia v. Chapman*, 911 F. Supp. 2d 1222, 1245 (S.D. Fla. 2012) (citation omitted).

Rule 20's flexible requirements are clearly satisfied here.  Plaintiffs' claims against each Supervisor are unquestionably "logically related" to each other because Plaintiffs' claims against each of them arise out of the same underlying conduct—the Supervisors' arbitrary and inconsistent assessment of voting eligibility and inconsistent notification procedures.  (¶¶ 4, 11, 15, 22–23, 28–30, 83, 114–16, 179, 192(g)).  Courts have recognized that claims, like these, that arise out of the same "pattern or practice" can be "logically related."  *See Alexander v. Fulton Cnty.*, 207 F.3d 1303, 1323 (11th Cir. 2000), *overruled on other grounds by Manders*, 338 F.3d 1304 (en banc).  FRRC has members in 63 of Florida's counties and is seeking statewide injunctive relief to require uniformity in practices across the state.  This is not a case, in other words, where the plaintiffs are advancing different legal theories in pursuit of differing damage amounts from different defendants—Plaintiffs are pursuing the same legal theory against very similarly situated defendants and are not seeking any damages from the defendants in question. Although there may be differences in how the Supervisors make determinations as to the voting eligibility of people with felony convictions in their respective counties, those differences do not change the fact that the claims against the Supervisors are clearly "logically related."

The efficiency considerations underlying Rule 20 also weigh overwhelmingly in favor of joinder here given that it would be functionally impossible to litigate this case in 67 different lawsuits. Not only would such an approach be prohibitively expensive and inefficient for the parties and the Court, but it would also make it impossible for Plaintiffs to obtain the systemic and statewide injunctive relief they request here. None of the cases cited by the Supervisors in support of their Rule 20 argument—most of which either involve complex commercial disputes or *pro se* plaintiffs filing suit against large numbers of clearly unrelated defendants—involve circumstances even remotely resembling those here. (Br. 42–43 (citing cases)).

Further, under *Jacobson*, the Supervisors are appropriate and necessary parties in this case. This is because, like the Clerks, the Supervisors play a distinct role in the causal chain of events that has harmed Plaintiffs—specifically, the Supervisors are responsible for making final determinations as to the voting eligibility of people with felony convictions and they have fallen short in their obligations to do so. (¶¶ 114–16); *see* Section I.C. For this reason, the Supervisors must also be a part of any ultimate injunctive relief ordered by the Court at the conclusion of this litigation in order for Plaintiffs' injuries to be redressed. *See Jacobson*, 974 F.3d at 1258. Plaintiffs' injuries are both traceable to and redressable by the Supervisors.

The Supervisors' invocation of Rule 20 does not alter this result. As an initial matter, the Eleventh Circuit was clear in *Jacobson* that it was untroubled by the prospect of future plaintiffs (like Plaintiffs in this action) joining all 67 Supervisors of Elections in their complaints. Specifically, after explaining that the plaintiffs in *Jacobson* should have sued the 67 Supervisor of Elections, the court acknowledged that "[t]hat approach would have made for more defendants," but it nevertheless went on to say that "nothing prevented the [plaintiffs] from taking that course of action" and then favorably cited another case in which the plaintiffs had sued all 67 of Florida's Supervisors of Elections. *Jacobson*, 974 F.3d at 1258. Since *Jacobson* was decided, plaintiffs in voting rights cases in the Eleventh Circuit have continued to file complaints naming all relevant local election officials without encountering any issues under Rule 20. *See, e.g.*, *Fla. State Conf. of NAACP v. Lee*, 566 F. Supp. 3d 1262, 1284 (N.D. Fla. 2021) (concluding at the pleading stage the plaintiffs had plausibly pleaded the challenged drop box restrictions were traceable to and redressable by the 67 Supervisors of Elections as well as the Secretary of State); *Nielsen v. DeSantis*, 469 F. Supp. 3d 1261, 1267 (N.D. Fla. 2020) (denying motion to dismiss the 67 Supervisors of Elections).

In sum, the Supervisors are appropriate defendants in this action because Plaintiffs' injuries are both traceable to and redressable by the Supervisors. Rule 20 provides no basis for dismissing the Supervisors.

C.     <u>Plaintiffs' Claim Against the Supervisors Is Neither Threadbare nor Conclusory.</u>

The Supervisor Defendants argue that Plaintiffs' Complaint includes only "threadbare and conclusory" allegations and thus fails to state a claim. (Br. 45). Yet mere pages earlier, the Supervisors (and other Defendants) argue that the Complaint should be dismissed because it goes into "excruciating particularity" and is not "short" or "concise." (Br. 18–19). Defendants cannot have it both ways—dismissal of the Complaint cannot be warranted because it is too long and detailed, and also because it is too "threadbare." Defendants' attempts to inconsistently mischaracterize the Complaint should be rejected.

In any event, the Supervisor Defendants' contention that Plaintiffs have failed to plead a plausible claim against them lacks merit. Plaintiffs' allegations related to the Supervisors of Elections are replete with factual allegations—not conclusory recitations of the law. (*See, e.g.,* ¶¶ 11, 15, 22–23, 28–30, 83, 114–16, 179, 192(g)). The Complaint also includes detailed allegations describing how the Supervisors' failures have harmed the Individual Plaintiffs. For example, after Mr. Sanchez and Ms. Jones registered to vote, neither were alerted by the relevant Supervisors—of Miami-Dade and St. Lucie Counties, respectively—of their purportedly outstanding LFOs. (¶¶ 22–23, 29–32, 116). In short, Plaintiffs' allegations concerning the Supervisors are both sufficiently clear to satisfy the requirements of Rule 8, and sufficiently detailed to infer a finding of plausibility under Rule 12(b)(6).

D.     <u>Plaintiffs Have Stated an Equal Protection Claim Against the Supervisors.</u>

Finally, the Supervisors argue that the Complaint fails to state an Equal Protection claim against them, but none of their arguments has merit.

First, the Supervisors contend that Plaintiffs' equal protection claim fails with respect to them because Plaintiffs have not pleaded unequal treatment by the Supervisors. (Br. 46–48). The Supervisors also advance the related argument that to the extent Plaintiffs have been the victims of unequal treatment, it is the result of the Clerks' inconsistent policies for calculating LFOs, not any inconsistent policies of the Supervisors. (Br. 49). But these arguments misunderstand Plaintiffs' Equal Protection claim. Plaintiffs' Equal Protection claim alleges that as a result of Defendants' conduct, the voting eligibility of an individual with a felony conviction

depends on the individual, disparate practices of different counties.  (¶ 179).  Although the Clerks contribute to this disparate treatment through their inconsistent and disparate practices for calculating and tracking LFOs (¶¶ 102–13), the Supervisors also contribute to this disparate treatment because it is the Supervisors that actually make final determinations as to individuals' eligibility to vote under Amendment 4 (¶¶ 114–16).  Even if the Supervisors rely on LFO information provided by the Clerks when the Supervisors make those eligibility determinations, the Supervisors are still part of the causal chain that is resulting in the arbitrary and disparate treatment of voters in different counties.  As explained *supra* in Section VII.B, this means that the Supervisors are necessary and appropriate defendants to Plaintiffs' Equal Protection claim.[21]

Second, the Supervisors contend that Plaintiffs' claims—including, but not limited to, the Equal Protection claim—must be dismissed to the extent the claims are premised on an allegedly "non-existent" legal requirement to notify individuals who have successfully had their voting rights restored.  (Br. 48–49).  But Plaintiffs' claims against the Supervisors are based on the Equal Protection and Due Process Clauses, not "non-existent legal requirements."  Put differently, the Supervisors' obligations to Plaintiffs are defined by the Constitution and are not limited to the Supervisors' explicit statutory obligations under Fla. Stat. 98.075(7) and 98.0751(3).  *See supra* Section II.B (explaining the significance of the distinction between obligations under the federal Constitution and state law).  In any event, the Supervisors have failed to meet even those state statutory obligations, as evident by the fact that individuals in Florida with felony convictions continue to be issued voter identification cards notwithstanding that they are not eligible to vote (*see, e.g.*, ¶¶ 11(c), 23, 136, 146), while others with felony convictions are erroneously informed by the Supervisors that they are not eligible to vote when in fact they are eligible (¶ 11(e)).

---

[21] In support of their argument that the Plaintiffs have not stated an Equal Protection claim against the Supervisors, the Supervisors also repeat other arguments that have already been dispensed with above.  For example, the Supervisors contend that pleading an Equal Protection claim requires pleading an "intent to discriminate" (Br. 47), but as discussed *supra* in Section IV.B.1, intentional discrimination is not a required element of an Equal Protection claim arising from arbitrary government action.  The Supervisors also contend that an Equal Protection claim can only arise from inconsistent treatment within "[a] jurisdiction" and that "differences in election administration between counties cannot support an equal protection claim."  (Br. 47). But as explained *supra* in Section IV.B.2, this argument fails to address (and ignores) *Bush v. Gore*, which holds precisely the opposite.

Accordingly, none of the Supervisors' arguments warrant dismissal of Plaintiffs' claims against them.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

Respectfully submitted,

/s/ Edward Soto
Edward Soto (Fla. Bar No. 265144)
Edward.soto@weil.com
Helena Masiello (FBN 1039514)
Helena.masiello@weil.com
**WEIL, GOTSHAL & MANGES LLP**
1395 Brickell Avenue
Suite 1200
Miami, Florida 33131
Telephone: (305) 577-3100

- and –

Carey Dunne (pro hac vice)
carey@freeandfairlitigation.org
Michele Roberts (pro hac vice)
michele@freeandfairlitigation.org
Kevin Trowel (pro hac vice)
kevin@freeandfairlitigation.org
Martha Reiser (pro hac vice)
martha@freeandfairlitigation.org
**FREE & FAIR LITIGATION GROUP**
266 W 37th Street
20th Floor
New York, NY 10018
Telephone: (646) 434-8604

- and –

John A. Freedman (pro hac vice)
John.freedman@arnoldporter.com
Jeremy Karpatkin (pro hac vice)
Jeremy.karpatkin@arnoldporter.com
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave NW
Washington, DC 20001-3743

Telephone: (202) 942-5000

*Attorneys for Plaintiffs*